Jay Patel

40

1    A.    Yes.  We asked them in a meeting, make sure you

2    are flexible, you don't have any restrictions on it.

3    However, you know, some people will tell you yes there

4    and then a week or two later they will try to switch it

5    again.  As we found out, we try to sort that out and,

6    obviously, replace them.

7    Q.    I'm sorry.  Sort what out?

8    A.    You know, to see that they are committing to

9    being flexible.  Because if they are not being flexible

10   and if they are causing more headache for us scheduling

11   wise and then we are not focusing on the operation of the

12   hotel, then it becomes very hard for us to run the hotel.

13   Q.    But you received applications from these

14   individuals at that time?  The individuals that you are

15   speaking about that you spoke to, did they give you new

16   applications?

17   A.    Yes.

18   Q.    Miss Payne, she was present at this meeting,

19   correct?

20   A.    Yes.

21   Q.    So she was aware that they applied?

22   A.    Yes.

23   Q.    Did you receive any more applications that week

24   to you personally and not in the presence of Miss Payne?

Jay Patel

41

1    A.    No, I did not receive much.  Because I was more

2    focused on getting the operation of the Sleep Inn

3    organized.

4    Q.    Okay.  You were still, that first week though, I

5    think you mentioned that you did not want Miss Payne to

6    be involved too much in the staffing because you would

7    take care of that?

8    A.    Right.  But that's why I was trying to meet as

9    many areas, as many people with her so she would kind of

10   see the operation and how you run it training wise.  It

11   was kind of like on-the-job training because there was no

12   other way for me to do it.

13   Q.    So the way that you spoke to those women as far

14   as letting them know, look, this is what we require,

15   please, let me know if you are flexible so we can either

16   work with you or we have to replace you; is that --

17   A.    Yes.  And most of them came out saying, please,

18   try to give us as many hours as possible because we want

19   to work full-time.  And that's what I always tell all my

20   general managers.  Whoever says they want to work

21   full-time, are flexible, less complaints from the guests

22   should be a priority because that way our customer

23   service level will go up.

24   Q.    Now, Mrs. Palmer applied directly to you on the

Jay Patel

42

1    9th of August?

2       A.    Actually, she did not apply.

3       Q.    Did you receive her application?

4       A.    I need to clarify first how she applied.

5       Q.    Sure.

6       A.    She, apparently, came into the hotel.  She

7    thought she had a job there.  And we were not aware of

8    who Islyn Palmer was.  So I guess there was a breakfast

9    person that was somehow put in the schedule that Joan

10   made out, the new one in the middle of the week.  When I

11   called the hotel to see how things were going, or I don't

12   know if the hotel called me, there was an assistant

13   manager working on the front desk because we were not

14   even fully staffed on the front desk yet, and said there

15   is a lady in the lobby screaming about her job.  And I

16   said, what job?  She said she's a breakfast attendant and

17   she's worked here for a while under the previous owners.

18            I said, okay, my policy has always been I

19   love people that want to work.  So I want to bring them

20   in.  I said, okay, then I'm going to be there in an hour

21   anyway so I will meet with her.  When I met with her, she

22   started saying that she worked here for a while and she

23   used to work on the weekends, like that.  I said, you

24   know what, before I can do anything for you, since I'm

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

43

1   not the manager, I want a manager to talk to you.  What

2   you do, you apply here with the application.  You do all

3   the paperwork.  And she's off today.  So you come in on

4   Monday or sometime in the middle of the week and that's

5   when you talk to her.  That's what I told Christine.

6   Chris gave her the application on the 9th.

7       Q.   Okay.  So you were made aware that, at that time,

8   someone called to say there is a woman who thinks she has

9   a job here and she's upset.  And you said I will be there

10  in an hour.  You informed her that you couldn't do

11  anything for her until she filled out this application?

12      A.   Right.  I said because I do not know about the

13  operation of the scheduling part and the general manager

14  would have a better idea on a daily day-to-day operation

15  side of it because they see the current business.  So she

16  can schedule you better.  And what you need to do is all

17  your requirements or whatever you have, you need to

18  explain that to the general manager.  However, on the 9th

19  she did not work that I'm aware because I could not let

20  her work on the 9th.

21      Q.   Did Mrs. Palmer apply, fill out an application on

22  August 9th, 2003, that you are aware of?

23      A.   I think so.  I don't know.  I have not seen the

24  application date when she applied.  But I told Christine



Jay Patel

44

1    to give her an application.  And when you give an

2    application, I told her to also give her the employee

3    handbooks and everything.

4         Q.   But you have never seen Mrs. Palmer's employee

5    file or never seen her application; is that correct?

6         A.   No.  I saw it when we were replying back to the

7    EEOC first question.

8         Q.   During the investigation?

9         A.   The first question, first letter we received from

10   the EEOC requesting what happened here.

11        Q.   Was that prior to the lawsuit being filed?

12        A.   That was way early I think.  Let me tell you, the

13   whole lawsuit is wrong because the dates that Joan

14   remembers are different.  That's the confusing part here.

15   But I'm the one that hired Palmer.

16        Q.   Okay.  Just answer the questions that I ask.  I

17   haven't asked you anything about what she remembers or

18   what she doesn't as far as Miss Payne is concerned.  But

19   it's your testimony that you hired Mrs. Palmer?

20        A.   Meaning I hired in the sense that I pretty much

21   did the quick interview with her and told her about it

22   and said put your application in.  We will try to get you

23   in.  But give all your, whatever your scenarios are to

24   Joan because she will be the more responsible and you

Jay Patel

45

1   will be reporting to Joan.

2       Q.   So on the 9th, is it fair to say that you allowed

3   Mrs. Palmer to maintain her employment at Sleep Inn?

4               MR. CONNORS:   Object to the form.

5       A.   Not quite.   Because the details we had not

6   figured out.   But we never refuse anybody's application.

7   I wanted to make sure we got an application.   Because

8   once we have an application, we can really sit down and

9   talk to the person.

10      Q.   When was she hired?

11      A.   I think in the middle of the week she came in and

12  she talked to Joan if I remember correctly.   And I did --

13      Q.   Let me finish the question.   So she came in in

14  the middle of that week to speak to Joan.   So the 9th was

15  a Saturday.   So sometime between the 9th and the 16th she

16  came in to speak with Miss Payne; is that correct?

17      A.   Yes.   Now hold on.   Let me finish my answer

18  though, the one before about the application.   After she

19  applied, I said talk to the general manager and I'm going

20  to try to have you put back on the weekend schedule

21  because I was under the impression that she would be

22  working the weekends.

23      Q.   Why were you under that impression?

24      A.   Because she told me something like, oh, I work on



1  the weekends.  And I said, what about the weekdays?  And

2  I didn't quite understand her.  But I was in a rush.  I

3  said, okay, you know what, the best thing for you to do

4  is talk to the general manager because that's how we do

5  business.  You need to talk to the general manager so she

6  understands your scenario.  She's able to schedule you

7  better.  But we look for full-time employees.  I did

8  mention that to her.

9       Q.    But then you said that she met with Miss Payne in

10  the middle of the week prior to the next weekend?

11      A.    Uh-huh.

12      Q.    And that, during that time, Miss Payne hired

13  Mrs. Palmer?

14      A.    Pretty much, yes.  She kind of took my word and

15  said, okay, yes, because she just assumed since I already

16  talked to her it's officially I'm just giving her, saying

17  go ahead and hire her.  But she just assumed that.

18  Because when I met with her, I really thought she was

19  great.  But scheduling was a problem for me in a sense

20  that I did not want to get involved in the scheduling

21  part of it because the day-to-day operation changes a

22  lot.  So I said I want you to talk to a general manager

23  in that sense.

24              However, after I left -- I should put this



Jay Patel

47

1  on the comment.  I mean, after she left on the 9th,

2  Christine told me she was very rude in the lobby,

3  extremely rude.

4      Q.   That's what Christine told you?

5      A.   Yes.

6      Q.   Was that when Ms. Palmer came in and found out

7  there was someone else working her shift?

8      A.   Yes.

9      Q.   So going back a little bit, you said that --

10  between the 4th and the 9th was about five days?

11      A.   Yes.

12      Q.   So Monday was the 4th and then the 9th and you

13  said you had been training Miss Payne that entire week as

14  far as how to handle the day-to-day operations of Sleep

15  Inn; is that correct?

16      A.   Yes.

17      Q.   And her duties and how to go about her duties as

18  general manager?

19      A.   Yes, but she had more than just the scheduling

20  parts of it.

21      Q.   Right.  She had many other different

22  responsibilities, correct?

23      A.   Because we didn't have the correct inventory of

24  supplies.  We had to figure that out.  We had to order

Jay Patel

48

1  new linens because we were changing the whole companies

2  around.

3     Q.    My question was:  Did Miss Payne have other

4  responsibilities besides scheduling that you assisted her

5  with in training?

6     A.    Yes.

7     Q.    And she was present at the meeting where

8  employees came to you expressing their desire for more

9  hours and you told them to apply, to turn in their

10 applications; is that correct?

11    A.    No, actually, that's not quite right.  Before

12 they started to work, they had already picked up the

13 application and already filled that out.  That's the only

14 way we told them to start the work in the morning.

15    Q.    I guess what I'm saying is -- I'm trying to make

16 sure I'm clear.  When the existing employees came in to

17 work, you said, wait, you can't work, you need to fill

18 out this application, right?

19    A.    Well, that's something that we already left at

20 the front desk.  When employees come in in the morning

21 tomorrow, before they come in, they need to do this

22 paperwork and have that, put it in her box and then

23 start.  But they knew the system of having their own

24 cards.  Because it was a new pay under a new company.

49

1   They will make up their cards with their names on it.

2   Then I came in about an hour or two later.  So they did

3   not approach her.  They approached me.  Sir, we would

4   like to talk to you.

5       Q.   At that time you had the kind of courtesy

6   orientation for these women to explain to them what you

7   expected?

8       A.   Yes.

9       Q.   And in that explanation, you said, I believe you

10  testified that it was imperative to have the full-time or

11  that they were aware that full-time employment was needed

12  as far as their schedules and they needed to be flexible;

13  is that correct?

14      A.   Yes, yes.  But that was not a problem with them

15  because they were all full-time and they wanted more

16  work.

17      Q.   But at the time when you first met them, you

18  didn't know what their schedules were; that's why you met

19  with them?

20      A.   Right.  But in the orientation, they said they

21  all worked full-time and they said, oh, that's not a

22  problem.

23      Q.   My question is:  Did you explain to them it was

24  necessary for them to work full-time and that was very



Jay Patel

50

1    important to you?

2        A.    Yes.

3        Q.    And when you spoke with Mrs. Palmer maybe two or

4    three days later, did you get that information from

5    Mrs. Palmer about her schedule and when she could work?

6        A.    Well, she did start talking to me about her

7    weekends and weekdays.  And I asked her can you work

8    these days.  She said no.  I said, well, at this point,

9    it's best you apply with us and then you talk to the

10   general manager, Joan, and see if you can, you know, if

11   she's able to work it out with you.

12            Because we would have a better idea as we

13   went along about who was staying with us, and then if we

14   found out, hey, we could squeeze her in on weekends only.

15   But then she threw in another curve ball, which is she

16   works one weekend two days and the other weekend only one

17   day.

18       Q.    When did you find this out?

19       A.    I think in the middle of the week or something.

20       Q.    When she met with Mrs. Payne, is that when you

21   found that out?

22       A.    She had mentioned that to me already on the 9th.

23   But I thought why don't she talk to the general manager.

24   Sometimes, yeah, I may be able to do it or not.  I didn't

1    get into details with her on the schedule at that time.

2    I said why don't you talk to the general manager.  And as

3    I have a chance to talk with her, we'll figure out.

4              So I think in my powwow meeting -- we try to

5    do it Wednesday or Thursday.  She mentioned that to me.

6    What do we do?  I said, well, that is going to be a big

7    problem for us because you are not going to be able to

8    find one person to do one day a week, especially on a

9    weekend.  It's going to be very difficult for us to do

10   that.  See if she can work in other departments.  And I

11   guess, apparently, she said no.

12        Q.   Now, you said you spoke to Miss Payne about

13   Mrs. Palmer's employment that week, I guess, since you

14   have your weekly powwow meeting.  So if Mrs. Palmer

15   applied on the 9th, which is a Saturday, and the

16   following Thursday you had a powwow, sometime during that

17   week?

18        A.    In the first two weeks, it was more like almost

19   every day.  Because the first week I was there almost

20   every day.  The second week I cut it down.  Maybe I was

21   there an hour some days, some days half a day.  I know on

22   Wednesday and Thursday, usually one of those days I was

23   at the hotel.

24        Q.    And you spoke to Miss Payne about Mrs. Palmer?

Jay Patel

52

1    A.    Right.  And she did express her concern about

2  having special person only on the weekends, two days and

3  one day.  How will I do the scheduling like that?  I said

4  that will be very difficult for you.

5    Q.    And did she express, at that time, that she felt

6  Mrs. Palmer's inability to work different schedules was a

7  cause for concern as far as her work ethic?

8    A.    No, she had not.  Because then the following

9  week --

10    Q.    At that time, did she express it to you?

11    A.    No.  I mean, she expressed something about the

12  schedule conflict.

13    Q.    The schedule conflict at that time but not the

14  work ethic yet; is that correct?

15    A.    Because she hadn't worked yet.

16    Q.    Under your management?

17    A.    Yeah.

18    Q.    So was it then the following weekend -- she came

19  in on the 9th when she was originally scheduled to work

20  but found that another employee was working there, at

21  least that's what Mrs. Palmer has alleged; is that

22  correct?

23    A.    Yeah, that's correct.  When she came in,

24  obviously, we had a person there because we didn't know

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Jay Patel

53

1  she was working.  Even if she was working there,

2  technically, she was not our employee.

3      Q.   As far as you were concerned?

4      A.   Yes.

5      Q.   I just needed a yes or no to that.  And then the

6  following weekend was the 16th and 17th; is that correct?

7      A.   Correct, yeah.

8      Q.   And that was the weekend after Mrs. Palmer

9  applied and a few days after Mrs. Palmer met with

10 Miss Payne; is that correct?

11     A.   Yes.

12     Q.   And then she reported to work again on the 16th

13 and 17th; is that correct?

14     A.   Okay.  Now, I think you've got two meetings.  I'm

15 confused.

16     Q.   The 9th she came in to work, found somebody was

17 working there.

18     A.   Right.

19     Q.   You informed her, talk to Christine and she will

20 give you an application to fill out, correct?

21     A.   Yes.

22     Q.   And you couldn't give her a hire right at that

23 second but you informed her that you didn't want to turn

24 down her application and that she should speak to the



Jay Patel

54

1  manager on Wednesday or in the middle of the week,

2  correct?

3      A.    Well, I wanted to hire her.  And that's why I

4  told her you need to talk to the general manager.

5  Otherwise, I would have said based on application, I'm

6  not interested.  I wanted to hire her but what I did not

7  want to do is set a precedent because the new general

8  manager is coming in.  I don't want to go around hiring

9  people and she's not aware of it.  I wanted to make sure

10  that she met with Joan.

11      Q.    As well as yourself?

12      A.    Because she already met me and she worked out the

13  scheduling part of it because Joan has to oversee her.

14            (Thereupon, a discussion was had off the

15  record.)

16  BY MS. SMITH:

17      Q.    My question is just a yes or no.  She met with

18  you first on the 9th and then following that she met with

19  Miss Payne; is that correct?

20      A.    Okay.  The meeting part I'm not sure.  She met or

21  came in or did it on the phone, I'm not sure.

22      Q.    But she did interact or have some sort of

23  conversation with Miss Payne prior to her coming in to

24  work again on the 16th and 17th of August?

Jay Patel

55

1    A.    Yes.    She would have to.

2    Q.    I will finish the question.

3    A.    I thought you were done.

4    Q.    No.    I wanted to get the full date out.    Never

5    mind.    It's pretty clear.

6              And so when Mrs. Palmer came in to work on

7    the 16th, 2003, was there already someone scheduled to

8    work on that shift?

9    A.    I don't know.    I did not see the schedule.    But I

10   think she had somebody and she probably moved her back

11   into the housekeeping.    Mostly likely might have been

12   Marisol.    And I think she put her back as like a

13   supervisor for the day.

14   Q.    And then was she also working again on the 17th

15   of August, 2003?

16   A.    As far as I remember.    I thought she worked the

17   weekend.

18   Q.    The both days?

19   A.    I thought she was going to work that weekend.    I

20   don't remember exactly.

21   Q.    Okay.    Do you ever recall seeing the new schedule

22   that Joan made up for the staff?

23   A.    I saw that, I think, the day she made it up,

24   which was the 6th or 7th maybe.

Jay Patel

56

1    Q.    So she made up the new schedule around the 6th or

2    7th of August; is that correct?

3    A.    I think so.  Because we didn't have any of the

4    information the first two days.  I think we were shooting

5    around Wednesday or Thursday to kind of nail it down.  It

6    was going to be a rough schedule anyway for the first two

7    weeks for us because we -- even we also factor, because

8    of my previous experience, is even if people come on

9    board with you, they may quit on you in a day.  That has

10   happened several times.

11   Q.    But you still think it's necessary to make up a

12   schedule?

13   A.    Oh, yes.  Without that, how do you hold them

14   accountable?

15   Q.    Now, after Mrs. Palmer worked the 16th and the

16   17th of August, was that the very first time that

17   Mrs. Palmer had worked under the new owners, Nabstar,

18   LLC?

19   A.    I would have to check the record, but I think

20   that was, if I remember correctly, I think that's what it

21   was.  But I can't remember if she worked one or two

22   weekends.  She worked like two days one weekend, which

23   is the 16th and 17th.  No, she would not have worked the

24   day before because we already made the schedules the

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

1    first week.  So I doubt it.  And she didn't want to work

2    the weekdays so she didn't work the weekdays.

3       Q.    So the first time that Mrs. Palmer worked as an

4    employee for Nabstar was the 16th and 17th of August,

5    2003?

6       A.    I'm not a hundred percent sure.  I don't want to

7    give the wrong answer.

8       Q.    Okay.  It's just what you remember.  Do you know

9    if Mrs. Palmer worked again after August 16th and 17th of

10   2003?

11      A.    I don't remember.  I don't think so.

12      Q.    Do you know why Mrs. Palmer did not work after

13   the 16th and 17th of 2003?

14      A.    It was over the phone that Joan actually called

15   me on this one and said I had to let her go.  And I said,

16   why?  Well, I received several complaints over the

17   weekend about the breakfast bar.  And when I was talking

18   to her, she was very rude and had an attitude problem.

19   And being talking to her for the first day, I kind of had

20   to give her the benefit of the doubt, meaning Joan,

21   because I also had heard the same thing the first day she

22   came in.  She was extremely rude.  And I saw that too a

23   little bit in our conversation.

24                So I kind of gave her that benefit of the



Jay Patel

58

1    doubt.  Okay.  Well, her daughter called -- and she had

2    already called me after the whole thing was terminated.

3    She said she was extremely rude too on the phone and she

4    kind of gave me an earful.  So I said that would be bad

5    for our company.  And she's like, yeah, that would be bad

6    because you can't just have staff member disrespect a

7    general manager.  And as I'm trying to give Joan more

8    morale, I said you are right.  If the employee can't

9    respect the supervisor, because that would be setting bad

10   precedent.  So that's what I heard was the complaint.

11        And then she's like, well, you also had a

12   problem because her scheduling was so messed up, two days

13   here, one day the following week.  And I say you couldn't

14   work that in?  She said no.  Did you offer her maybe a

15   combination, like work the weekend breakfast and the

16   weekdays housekeeping?  She said, no, she can't work that

17   because she had another job or something like that.  I

18   said okay.

19   Q.   How long after Ms. Palmer's termination did you

20   speak with Miss Payne over the phone about Ms. Palmer's

21   termination?

22   A.   I talked to her, which is our usually Wednesdays

23   or Thursdays, I think it was like either late Wednesday

24   or Thursday morning I talked to her, the week following

59

1    the 16th and 17th.

2      Q.    The 20th maybe?

3      A.    Yeah.   20, 21st.

4      Q.    In that conversation, did Ms. Payne tell you that

5    she had to let Mrs. Palmer go?

6      A.    She, actually, called me because she said her

7    daughter called and said she's going to sue you.  She

8    said I'm just letting you know what happened.  So I said,

9    why did you let her go?  And that's when she -- I just

10   gave you all the details what she told me.

11     Q.    And then so Ms. Payne told you, called to inform

12   you that she had already terminated Mrs. Palmer?

13     A.    Yes.

14     Q.    Does she normally call you when she terminates

15   employees?

16     A.    Well, this was her pretty much like the third

17   week on the job.  Yeah, after that she became more

18   careful because I told her you have to inform me first

19   before you terminate.  However, we listed a few things,

20   stealing on the job or big incident where she can

21   terminate immediately and still let me know afterwards.

22             MS. SMITH:  Could you read back the last

23   three questions?

24             (Thereupon, the reporter read back as



Jay Patel

60

1    requested.)

2    BY MS. SMITH:

3        Q.    What else did Miss Payne say to you in regards to

4    why she terminated Mrs. Palmer?

5        A.    Well, her number one concern was the scheduling.

6    I said, we couldn't work around it?  She said, no, she

7    was not very flexible.  She said she also got a lot of

8    bad comments from the guests during the weekend, over the

9    weekend.  At that point I said, well, then even working

10    around it would be tough because she already gave you

11    attitude in your conversation here and you are getting

12    bad complaints.  That would be a bad problem.  On top of

13    that you add the scheduling problem.  I said you've got a

14    tough one on your hands.

15            But she had already terminated her.  So it's

16    not like I had to come in an intervention here.  She had

17    already terminated her at that point.  Because in our

18    conversation -- she didn't give me exact detail of the

19    conversation.  But she said she's got attitude problems.

20    She did emphasize a lot about the cleanliness of the

21    breakfast area and the complaints from the guests.

22        Q.    Did she mention anything about the

23    insubordination in regards to flexibility and schedule?

24        A.    Yes.

61

1    Q.    Did she specifically use the term

2    "insubordination?"

3    A.    I can't recall exact word for it.  But she said

4    it would be hard for me to create a schedule the way she

5    wants it because then you will have five other employees

6    coming back saying I want this, this, this day they work.

7    And we would have chaos.  As it is, we already have chaos

8    on hand.

9    Q.    And did you consider any employees' conflict of

10   schedule to be insubordination?

11   A.    Yes.  We normally do not tolerate that.

12   Q.    You don't tolerate a conflict of schedule?

13   A.    Yeah, we do not tolerate when they start becoming

14   picky and say now I'm only going to work this, this, this

15   day on.

16   Q.    If an employee already worked a certain schedule

17   and they were unable to change that schedule, since you

18   came into a situation where there are existing employees

19   and they came to you to say, listen, I would like to

20   continue working my old schedule and I am not able to

21   work the schedule that you asking me, that's what you

22   consider the insubordination?

23   A.    Well, see, that's a pretty open question.  We did

24   not have a full handle of the property at that point, the



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Jay Patel

62

1  scheduling.  But if they came in and said I only work 9

2  to 5, Monday through Friday, then that would not work

3  with us and we would just let them go.

4      Q.    My question is:  Mrs. Palmer is alleging that she

5  had previously been working an existing schedule and

6  Nabstar is alleging that she refused to change the

7  schedule that she had been working prior to the company

8  takeover.  Is that type of scheduling conflict what you

9  consider to be insubordination?

10     A.    Well, her case is little different in the sense

11 that she was not our employee to begin with.  She may

12 have worked for years under a previous owner a certain

13 schedule.  But that had no effect on us because for us it

14 was like opening a new hotel.  So we looked at it that

15 way.

16         However, when she came in and said I worked

17 here in the past, and I always like to keep employees

18 from the past, so we try to do it.  But I did not have a

19 full handle of her scheduling.  We didn't quite

20 understand it.  That's when I asked her to talk to the

21 general manager.

22     Q.    And because you were, at some point, made aware

23 she was working previously, even though that did not bind

24 you to keep her to that schedule, is it your testimony

Jay Patel

63

1   that, is it your allegation that the fact that she, you

2   are saying that she refused to change her schedule to the

3   schedule you wanted, that was insubordination?

4       A.    That would be, yes, in a sense that she was not

5   flexible.  And our business requires complete flexibility

6   because of customer service.  You could have a call-out.

7   If you had a call-out, we need a breakfast person.  If we

8   had another breakfast person that could work, even during

9   the weekdays, it would make it easy for us.  We would

10  call them.  Can you, please, come in because so and so is

11  sick?

12      Q.    When you met with Joan Payne with the individuals

13  who offered to work however many hours they were willing

14  to work according to whatever schedule you gave them,

15  would you have terminated any of them for insubordination

16  if they had told you that they could not, that they

17  needed to work their old schedule?

18      A.    Yes, after the first week, after the first

19  week-and-a-half or whatever we had left -- we had almost

20  two weeks left.  Yeah, after that we would have made it

21  to our policy.  The first two weeks were really tough for

22  us to get anybody to work for us that were there.  And

23  then once we get our new schedule out, we wanted them to

24  stick to it.

Jay Patel

64

1    Q.    So you would not have given them any opportunity

2    to work; you would have just terminated them on the spot?

3    A.    After, yeah.  Well, we'd first try to talk to

4    them.  Because we always tell our GM's, you are not in

5    the firing business.  That's your last option.  You try

6    to figure out ways how you can make it work.  If you can

7    give them another job duties or within the same field or

8    maybe they can't work certain days but they can work

9    certain hours, try to get it done like that.  But if they

10   can't work full-time and they are getting very strict

11   about certain days that they want to work, then we would

12   have to let them go.

13   Q.    For insubordination?

14   A.    Yes.

15   Q.    Or conflict of schedule?

16   A.    Either, anyway you take it.  Because once they

17   start telling management I can only work this day or that

18   day, for us it would be a nightmare because everybody

19   wants to work 9 to 5.

20   Q.    I'm confused.  Because if that is the case, then

21   why was Ms. Palmer given the opportunity to work the 16th

22   and 17th?

23   A.    Because I decided to be a Mr. Nice Guy.  And I

24   thought if I gave her a chance to work with us and then

1  she talks to the general manager and clarified the

2  schedule, maybe we could keep her.  Because I am very big

3  on loyalty.  And when she said she worked under the

4  previous owner and she wanted to work, I thought I was

5  being a nice guy.  And it's really hurting us right now.

6      Q.   Now, you are saying that you did allow

7  Mrs. Palmer to continue her employment when you spoke to

8  her on the 9th?

9      A.   Well, I talked to her about the brief schedule

10 and we talked about that she would work the weekend.  I

11 said, okay, I might be okay with it, but I want you to

12 talk to Joan first.

13     Q.   And because she did work on the weekend, is it

14 safe to say that Ms. Payne also was okay with her working

15 the weekend schedule?

16     A.   No.  Actually, it looks like after the first

17 weekend, she received the complaints.  And she asked me

18 is that okay.  I said, yes, Delaware is considered at

19 will employment state.  If you are not happy with the

20 employee, then you can get rid of them because that is

21 what the Department of Labor told us.

22     Q.   Let me back up one second.  So after she met with

23 Miss Payne after the 9th, my question was to you, is it

24 safe to say that Miss Payne also thought it was okay for



Jay Patel

66

1   her to work that following weekend, the 16th and 17th?

2   That's a yes or no.

3            MR. CONNORS:  Object to the form.  You can

4   answer it.

5            THE WITNESS:  No, I'm not quite sure.

6   BY MS. SMITH:

7   Q.   Why did Mrs. Palmer report to work on the 16th?

8   A.   Because Joan assumed, since I was the boss,

9   whatever I said, assume that you want her so I put her

10  on.

11  Q.   So you were okay with Mrs. Palmer working the

12  weekend?

13  A.   I wanted her to work that weekend schedule and

14  then we would have better handle so we could start doing

15  regular schedules.  Remember, as I mentioned before a few

16  times, we were under total chaos.  We wanted as many

17  employees to stay with us as possible.

18  Q.   So you allowed her to work the weekend regardless

19  of any possible scheduling conflicts at that time?

20  A.   Yes, without understanding in detail what her

21  scheduling was going to be.

22  Q.   And then you testified a few minutes ago that

23  Miss Payne asked you about at will employment?

24  A.   No.  She asked me -- she said I terminated her.



Jay Patel

67

1    What can happen because her daughter is threatening to

2    sue us?  I said, well, according the Department of Labor,

3    they told me that I was considered at will employment.

4    So you can terminate them without any reason.

5              I have to get my general manager's feedback

6    because the general manager says she's not quite happy

7    with the employee, performance, scheduling, all the

8    other, that I have to take their word for it because they

9    work with them.

10   Q.   Was Mrs. Palmer the oldest employee that you had

11   at the time?

12   A.   I wouldn't know that because we don't ask the

13   age.

14   Q.   Do you know if there were employees there younger

15   than Mrs. Palmer?

16   A.   I wouldn't know that because I don't know the

17   ages.

18   Q.   Do you know any of the employees that work for

19   Nabstar?

20   A.   Personally?

21   Q.   Have you ever met them?

22   A.   I meet mostly the front desk.  Because when I

23   walk into Joan's office, the front desk is always there.

24   Q.   The women that came in for housekeeping, the ones

Jay Patel

68

1   that you met that applied, that offered to work all the

2   hours that you requested, you obviously met them; is that

3   correct?

4       A.   Yes.

5       Q.   By appearances only, I'm gathering, could you

6   tell if they were older or younger than Mrs. Palmer?

7       A.   Actually, few of them looking the same and a

8   few --

9       Q.   The same age?

10      A.   Well, I wouldn't say the same age, but look wise

11  the same.  I'm pretty horrible in guessing.

12      Q.   So you don't know if there were any employees

13  older or younger than Mrs. Palmer?

14      A.   No, I couldn't tell you with confidence.  But

15  based on common sense, yeah, a few did look younger, a

16  few did look about the same age.

17      Q.   Do you know the ages of any of your employees at

18  Sleep Inn now?

19      A.   No.  And, for the record, I don't know Joan

20  Payne's age either.  She's my general manager, so --

21      Q.   You mentioned that when you first met Mrs. Palmer

22  that you thought she was great, if I can use your

23  testimony, and that you wanted to hire her.

24      A.   Right.  Because the weekend, she mentioned



1   weekend a lot.  And as I said previously, the weekend

2   people are hard to find.  Part-time becomes even tougher

3   when you work one day.

4       Q.   So the answer is yes?

5       A.   Yes.

6       Q.   But then later on you testified that you thought

7   she had an attitude problem as well?

8       A.   Yes.

9       Q.   So she was great and had an attitude problem?

10      A.   She was great because she wanted to work the

11  weekend hours.  In that sense, she was great.  The

12  attitude was there.  But, you know, I'm always a believer

13  in giving them a chance.  I thought if we could train her

14  our way in trying to work her into our schedules and our

15  system, it would be great to have somebody who wants to

16  work the weekends.

17      Q.   And in your business of customer service, if a

18  breakfast attendant had an attitude problem, would you

19  find that to be a not so great quality?

20      A.   Not at all because, in our business, breakfast is

21  the most important part of the guest's stay.

22      Q.   But you still thought she was a great person to

23  hire for the weekends none the less?  Despite what you

24  considered to be her having an attitude problem, you



Jay Patel

70

1  still thought that she was a great person to hire for the

2  weekend morning breakfast shift?

3      A.    No.    That's because when she said she worked the

4  weekend, that part triggered in my head saying great.

5  But as I do the full analysis, the attitude, I kind of

6  put it on the back burner thinking we'll train her in

7  that sense and if she can change.    But I did not know the

8  extent of the problem until she left and then Chris, the

9  front office manager, told me that she was very rude and

10  screaming in the lobby.

11      Q.    And you are saying that this woman, was she an

12  existing employee?

13      A.    No.    She was hired by me as an assistant manager,

14  front office manager.

15      Q.    So she had never met Mrs. Palmer until that

16  morning --

17      A.    Yes.

18      Q.    -- when she found someone else working her job;

19  is that correct?

20      A.    Yes.

21      Q.    And how much interaction did you actually have

22  with Mrs. Palmer when you first met?

23      A.    That's the first time we met.    That's the only

24  time I had.

Jay Patel

71

1    Q.    Was it a brief interaction or was it a long

2    period of time?

3    A.    5, 10 minutes max.

4    Q.    From that 5, 10 minutes, you garnered that she

5    had an attitude problem?

6    A.    Yes.  Because the way she was answering my

7    questions.  And when I walked in, she was a little

8    steamy.

9    Q.    Do you think it was maybe understandable she

10   would be a little steamy finding somebody working a job

11   that she had been performing before?

12   A.    Not quite because I'm assuming the previous

13   owners announced the sale of the property.  So you are

14   supposed to come in and talk to the new owners if you

15   want the job.

16   Q.    Isn't that what she did?

17   A.    She came in on the 9th and we took it over on the

18   4th.

19   Q.    If Mrs. Palmer wasn't made aware of the

20   announcement, do you think that that was a possibility?

21          MR. CONNORS:   Objection.

22   Q.    Let me rephrase.  Do you think it's a possibility

23   that Mrs. Palmer was not made aware of the sale?

24          MR. CONNORS:   Object to the form.

Jay Patel

72

1    A.    I don't know about that one.  I don't know what

2    the previous owners did.  I can't comment on that.

3    Q.    You did earlier testify that they, basically,

4    gave you no information and made it very difficult for

5    you when you took over the sale; is that correct?

6    A.    Yes.  We requested a meeting to talk to the

7    employees and they would not give us anything until

8    closing date.

9    Q.    My question just was:  Were they difficult to

10   deal with?

11   A.    Yes, very difficult.

12   Q.    And you had been told by existing employees that

13   they were poor bookkeepers and that they had poor record

14   keeping, et cetera; is that correct?

15   A.    Yes.

16   Q.    And regarding the customer complaints that

17   Ms. Payne had received regarding Mrs. Palmer's

18   performance over the weekend of the 16th and the 17th,

19   did you ever see anything in writing regarding

20   Mrs. Palmer?

21   A.    No, I did not.

22   Q.    Were you ever told that there was anything in

23   writing, any written customer comment cards?

24   A.    No.  Actually, I asked her in one of the last

73

1    year's response, I said, if you have any written

2    complaints, you should send it to them as a copy.  But it

3    looks like I looked at what she sent in today for the

4    first time and it looks like she sent the wrong ones.

5        Q.    So is it the case that any comment cards do, in

6    fact, exist that relate to any customer complaints

7    against Mrs. Palmer?

8        A.    Right.  If there are, they would be in the file

9    somewhere.  Because we stock all the comments in one

10   file.

11       Q.    Do you destroy any of these documents?

12       A.    Usually comment cards, we don't keep them for a

13   long time.  But we are only two years or two-and-a-half

14   years.  So I would think that she would still have them

15   somewhere.  However, she had left for six months.

16       Q.    Who had left for six months?

17       A.    Joan Payne.

18       Q.    Is there a reason why?

19       A.    Personal.  Her father was I think -- what you

20   call?  She was taking care of her father at home.  So we

21   had a different manager in the middle six months.

22       Q.    What span of time was that?

23       A.    I think it was right before when you came in,

24   which was, I think, in June or July she left.

Jay Patel

74

1    Q.    June or July of 2004 or 2005?

2    A.    '5.  And from that point until January 2nd or

3    January 1st, we had a manager who apparently did not work

4    out.  So I called Joan to see if she was coming back to

5    the job market.  And she said, yeah, she would take the

6    job back.  Although, that was two months of harassment to

7    her saying can you, please, come back.

8    Q.    So between August of 2003 and June of 2005,

9    Miss Payne was serving as general manager, correct?

10   A.    Correct.

11   Q.    When did you receive notice that there was a

12   charge of discrimination filed again Nabstar, LLC, by

13   Islyn Palmer with the EEOC?

14   A.    The first one was in December of 2003 I think.

15   Q.    Okay.

16   A.    And she asked me and I said, well, write up the

17   letter.  Apparently, I made a mistake of not reading the

18   letter before she mailed it out because the dates were

19   all incorrect.

20   Q.    What dates were incorrect?

21   A.    She put August 16th and 17th of orientation or

22   something, meeting with her.  And, actually, I talked to

23   her on August 9th.

24   Q.    Let's take a look at the letter that you are

Jay Patel

75

1  referring to.

2              (Thereupon, a discussion was had off the

3  record.)

4              (Thereupon, a short recess was had.)

5  BY MS. SMITH:

6     Q.   I know I had asked you earlier when the first

7  time you received notice of a charge of discrimination by

8  Mrs. Palmer.  And you said that was around December of

9  2003, correct, when you received notice of the charge of

10 discrimination that is?

11    A.   I remember 2003.

12    Q.   That's fine.  And you had mentioned -- actually,

13 there was no question pending.

14    A.   You gave me this for clarification.  I said my

15 dates on this letter were mixed up.

16    Q.   What dates --

17    A.   What I'm trying to clarify is Ms. Palmer showed

18 up for breakfast duties the weekend of August 16th and

19 17th.  I think that's the misleading statement that is

20 causing more confusion here.  She actually showed up on

21 the 9th and then she worked this weekend.  I think the

22 wording is not quite accurate or not the right chosen

23 words as to when she wrote the letter.

24    Q.   You mean the dates are wrong?



W&F

WILCOX & FETZER LTD.
Registered Professional Reporters