Jay Patel

76

1      A.    Well, she did work the weekend.  But the first

2    time she showed up was the 9th, not the 16th.  That's

3    what I'm trying to clarify.

4      Q.    So when Miss Payne testified that the only time

5    she met Mrs. Palmer was the day she fired her; is that

6    not accurate?

7      A.    It's a possibility.  Because what I'm not sure

8    about is if she just talked to her on the phone for

9    scheduling or because she assumed that I talked to her,

10   she already put her on the weekend schedule for the 16th

11   and 17th.  And I did not get into detail with her the

12   following week because there was so much other stuff

13   going on.  I never thought I was going to have EEOC on

14   this whole scenario.  I thought she was going to work out

15   great.

16     Q.    Was Mrs. Palmer ever interviewed by anyone?

17     A.    She met me.  That was a brief interview if you

18   even consider that an interview.  And Joan, I asked her

19   to meet with her.

20     Q.    You asked her to meet face to face with her?

21     A.    I asked her to see Joan about her scheduling and

22   see if she can make it work within our operation.

23     Q.    So at the time that Mrs. Palmer was hired under

24   Nabstar, the impression was that she could possibly work

77

1    out as an employee?

2        A.    I think that's the impression that I think all

3    three of us got I believe.  And the only way we would

4    know that is if we actually saw her work since she never

5    worked with us previously.'

6        Q.    Mrs. Palmer was permitted to work a full weekend

7    breakfast shift; is that correct?

8        A.    Yeah.

9        Q.    One time; is that correct?

10        A.    Yeah.  And then the two weeks happened so that

11    the new two-week schedule comes out on Monday.

12        Q.    I'm just asking how many weekends Mrs. Palmer

13    worked.  One, correct?

14        A.    That I remember was one.  I don't think she

15    worked after that.

16        Q.    Earlier you just testified that, despite her

17    weekend schedule, you thought it might be possible to

18    keep her employed with Nabstar; is that correct?

19        A.    Only if she could work the other three days.

20    That would make five full days.  It doesn't have to be

21    Monday, Tuesday, Wednesday.  It could be Wednesday

22    through Sunday or Monday, Tuesday, Thursday, Friday,

23    Saturday, anything.  She had to work full-time to make it

24    easy for us to schedule all employees.

Jay Patel

78

1    Q.    What are the reasons that you, all the reasons

2    that you are fully aware of, as you sit here today, that

3    Mrs. Palmer was terminated immediately thereafter her

4    first weekend of work?

5              MR. CONNORS:  Objection.  Asked and

6    answered.  But you may answer again.

7              THE WITNESS:  There were complaints already

8    that we knew about it.  But that's something you can sit

9    down and talk to the employees.  The biggest one was the

10   schedule conflict.  Because if the person can't work the

11   way we have the need, then what else can you do?  You

12   can't force them to come to work.

13   BY MS. SMITH:

14   Q.    Have you ever seen this document marked Payne 2?

15   A.    Yes.

16   Q.    And when did you first see this document?

17   A.    Probably about a week later.  Because at our

18   meeting, I said you need to put something in writing in

19   her file.  Because when she was telling me more about her

20   daughter calling and trying to sue, I said that was a

21   training thing for her too.  I said for every

22   conversation you have, you should write it down.

23              And, in fact, after this, I even told her

24   you should stop doing verbal warnings for major

1    incidents.  If somebody is late five minutes, that's a

2    different story.  You should do less verbal warnings and

3    more written warnings.

4        Q.    Now, when you said you heard more about what the

5    daughter was saying as far as suing the company, do you

6    remember what exactly made you prompt Mrs. Payne to then

7    commit something to writing?

8        A.    Regardless of the daughter calling or not, as a

9    procedure, I wanted her to put something in the file to

10   document it because it's always better that you have

11   employee files completed with full documentation.  So I

12   wanted her to put it down saying she had this

13   conversation with her about this.  Because whenever you

14   terminate somebody, you should write down what you

15   terminated for.

16       Q.    So as general manager, as any type of manager

17   beforehand, Miss Payne was not aware that she had to

18   write things down of that nature?

19       A.    Well, she was because she had worked at several

20   other jobs.  But I guess in her case she hadn't gotten to

21   it when she had talked to me on the phone.  So I said

22   it's very important that you put it down before you

23   forget.

24       Q.    What information, again, what information did the

Jay Patel

80

1    daughter tell you or tell Ms. Payne that she communicated

2    to you about a lawsuit?

3        A.    She didn't say anything or, at least, Joan didn't

4    tell me.  All she said, daughter is threatening and she's

5    very abusive on the phone.  And I had an earful of it.

6        Q.    Continue.

7        A.    But that's all she said.

8        Q.    She didn't say any specifics as to why you would

9    be sued?

10       A.    Some kind of a charge.  And I don't remember

11   exactly what kind of charge.  And my reaction to Joan

12   was, Delaware is at will employment.  So what is the

13   point of having at will employment if the employee and

14   the employer can't come to agreement on something.

15       Q.    Is there a reason why Payne 2 is recorded on a

16   Warning Notice?

17       A.    That's the only paper we have.  Everything is on

18   a Warning Notice.

19       Q.    And this is dated 8/20/03; is that correct?

20       A.    Yeah.

21            MR. CONNORS:  Object to the form.

22       Q.    Is this accurate?

23       A.    Based on the time line that she's told me, it

24   could be within the time frame that we discussed because



Jay Patel

81

1    I saw it a week later.

2       Q.   You saw this document a week later, 27th or --

3       A.   Right.  Because it was verbal, you know, it was

4    okay.

5       Q.   And it says the date of violation was the a.m. of

6    August 16th, 2003, correct?

7       A.   Yes.

8       Q.   And then the Warning Notice was not written until

9    the 20th according to this document?

10      A.   Right.

11      Q.   I'm sorry.  Do you recognize this as Ms. Payne's

12   signature under person manager's signature?

13      A.   Yes.

14      Q.   Do you know if this verbal Warning Notice was

15   given to Mrs. Palmer?

16      A.   Yes.  That's what Joan told me.

17      Q.   That she actually did give this to her?

18      A.   That before termination she had a conversation

19   with Ms. Palmer about the complaints over the weekend.

20   And then they started discussing the schedules and that's

21   when it didn't work out.

22      Q.   You said this notice was written after

23   Mrs. Palmer's termination.  And this was the only paper

24   that you all had to record why Mrs. Palmer was

Jay Patel

82

1   terminated?

2       A.    Well, the verbal warning was given to her.

3   That's why I said you put it down on a paper that you

4   gave a verbal warning so, for my record, I have that you

5   gave a verbal warning.

6       Q.    So this is after the fact?

7       A.    I don't know when she filled it out.  But I did

8   not have it when I was there on the next day, Thursday.

9       Q.    And if this was done after Mrs. Palmer's

10  termination, is there a reason why it's not indicated

11  here that Mrs. Palmer was in fact terminated? Excuse me.

12  That she was let go.  It does say that.  I'm sorry.  I'm

13  just confused as to whether she where this before

14  Mrs. Palmer's termination or this was written after per

15  your instruction to make sure there was something

16  documented to reflect why Mrs. Palmer was terminated.

17      A.    Well, to close her file, because once an employee

18  leaves, I said put down what the reason you terminated

19  her for in the file.  And, apparently, she put it on this

20  paper, which was fine with me because it's still a

21  warning anyway.  I said, okay, not a problem.

22      Q.    Is a warning notice the same as a termination

23  notice?

24      A.    No.  Typically, you would have termination, you



Jay Patel

83

1    write down the cause.

2      Q.    But has Joan Payne indicated to you that she

3    allowed Mrs. Palmer to review this?

4      A.    What is it?

5      Q.    Did Joan Payne indicate to you that she gave this

6    Warning Notice to Mrs. Palmer?

7      A.    No.

8      Q.    Just to clarify your earlier testimony, you said

9    that she did allow Mrs. Palmer to see the Warning Notice.

10   Is that not true?

11            MR. CONNORS:  Object to the form.

12     A.    No, I never said that.

13            MS. SMITH:  Are you saying no to answer his

14   question for him or are you just objecting?

15            MR. CONNORS:  I said objection to the form.

16            MS. SMITH:  Can you read back Mr. Patel's

17   testimony about whether the Warning Notice was given to

18   Mrs. Palmer to review?

19            (Thereupon, the reporter read back as

20   requested.)

21            THE WITNESS:  Maybe I'm misunderstanding the

22   question.  I'm assuming -- are you asking me did Joan

23   give her this paper?

24   BY MS. SMITH:

Jay Patel

84

1    Q.    Did Joan give Mrs. Palmer the Warning Notice,

2    Payne 2?

3              MR. CONNORS:    The paper?

4    Q.    The actual form.

5    A.    No, not that I'm aware of, no.

6    Q.    And that this document was more than likely

7    written after Mrs. Palmer was terminated?

8              MR. CONNORS:    Object to the form.

9    A.    Possibly.  I'm not sure about that.  Because I

10   just wanted documentation in the file what she was

11   terminated for.  Basically, I asked what she told me on

12   the phone.  I said put it down.

13   Q.    And when you indicated this was the only form

14   that you had, are you assuming that this is the form that

15   she wrote it on, what you requested, asked her to write

16   down?

17   A.    Well, I wasn't concerned whether she will write

18   on this form or she would type up a little paragraph

19   saying the reasons, whatever.  I just wanted something in

20   the file what she got terminated for.

21   Q.    And before that she indicated that she had

22   nothing in writing; is that correct?

23   A.    No, I did not ask her that.  When the

24   conversation was done, I said make sure you have



WILCOX & FETZER LTD.
Registered Professional Reporters

1   something in her file written down.  So did I not ask her

2   did you have it in writing, no.  I did not ask her that.

3      Q.   And, to your knowledge, is this the only thing,

4   only item in Ms. Palmer's file that has anything to do

5   with their conversation before her termination?

6      A.   I couldn't tell you.  I would have to see the

7   whole file.

8      Q.   Did you review the file before your deposition

9   testimony today?

10     A.   No.  Because I know the whole incident because I

11  was the one who started with her.

12     Q.   Was Miss Payne working on August 16th, 2003?

13     A.   I couldn't remember because that's the weekend.

14  So normally she could have came in or she may not have.

15  I don't know.  It depends.  A busy weekend she would come

16  in.  And she was still trying to learn the operation.  So

17  I couldn't remember.

18     Q.   I know you said that you remember most of the

19  incidents surrounding this case.  That's why I thought I

20  could ask you.

21           Now, this was the weekend that Mrs. Palmer

22  went to work her first full weekend.  But it's your

23  testimony that you don't recall if Miss Payne was at work

24  on the 16th?

Jay Patel

86

1    A.    Well, it's a possibility she could have came in

2    and gone.    It's also a possibility that she wasn't there

3    the entire time Palmer was there.    And being they had

4    conversation later in the week, it's a possibility that

5    she was not there.    Otherwise, she would have had a

6    conversation immediately right there on the spot.

7    Q.    And in regards to the guest cards, the comment

8    cards, what is the Nabstar policy on receiving customer

9    complaints on the comment cards as far as where they are

10   kept?

11   A.    Okay.    The comment cards are in every room.    And

12   they leave some at the front desk.    Not every guest fills

13   out a comment card.    Most of the guests there complain

14   verbally.    And the front desk will sometimes write it up

15   or sometimes will just tell the manager verbally.    If

16   it's maintenance related, they put it in the maintenance

17   log that's at the front desk.

18   Q.    So as general manager, Joan Payne, it is her

19   responsibility to know how the customer complaints are

20   received; is that correct?

21   A.    Yes.

22   Q.    Would she be more aware of the day-to-day

23   operations as far as how customer complaints are handled

24   via comment card, verbal or in writing, would she be more

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Jay Patel

87

1  knowledgable of that than yourself?

2      A.    She would have first the attention to the

3  complaints than I would because she's at the property.

4  But if it's verbal complaints, then she, obviously, she

5  would have first knowledge than I would.

6      Q.    I think my question is more procedure wise.  As

7  general manager with the day-to-day operation of how

8  things are actually handled at this property, would she

9  have more knowledge of how that is done more so than

10  yourself?

11      A.    Well, procedure wise it would be equal knowledge

12  both because, obviously, we have to agree on the

13  procedures.

14      Q.    So your just as aware of how customer complaints

15  are received and documented as Miss Payne?

16      A.    Right.  However, there are several ways

17  complaints could be made.

18      Q.    Okay.  So it's your testimony that guests can and

19  have come in to verbally complain and then later on it is

20  written down?

21      A.    Okay.  No.  Guests can fill out a comment card.

22  We can ask guests if they are doing verbal complaint to

23  fill it out on a comment card because it's better for us

24  tracking wise.  But some guests will over the phone.

Jay Patel

88

1  Some will send you a letter or will complain to the front

2  desk agent.   Sometimes if it's people like me, I always

3  call and ask for the general manager.

4     Q.    How involved were you during the investigation of

5  this charge of discrimination filed by Mrs. Palmer?

6     A.    I think I've seen almost every letter that

7  they've sent.   Then I have asked Joan to respond with the

8  information they requested.

9     Q.    How did you react when you learned that there was

10  a charge of discrimination filed against your company?

11    A.    Honestly, I thought it was pretty bad that I was

12  taking in an employee that we were trying to do good for

13  and it kind of backfired on it.   That was my first

14  reaction.   I couldn't believe it.

15    Q.    Did you want this matter to resolve itself

16  quickly?

17    A.    Yes.   I really thought the first letter would

18  resolve it because we listed down, honestly, exact thing

19  except the dates of -- the first dates are off.   But, I

20  mean, it's pretty much written down exactly what

21  happened.   And that's why I really thought it was

22  resolved.   Then I couldn't -- I was just scratching my

23  head.   I told Joan I couldn't believe it.   I'm trying to

24  help somebody here.   I didn't have to take the employee.

Jay Patel

89

1  If age was an issue, I never had to hire her to begin

2  with.  We were just looking for a good person to work

3  with.

4      Q.  So I'm just clarifying.  Did you hire her or did

5  Miss Payne hire her?

6      A.  It looks to me like I hired her because I had

7  first conversation and Joan just went along because she

8  was, Joan was first or second week on the job and she was

9  like whatever you say, boss.

10     Q.  Now, back to my question about the investigation.

11  Did you, in your initial responses to the EEOC in the

12  investigation, did you review what Miss Payne sent to the

13  commission as far as responses to make sure that they

14  were accurate?

15     A.  No, I did not actually.  Because I read the

16  letter like a week or two later and she said I think this

17  is a pretty good understanding.  And then it really hit

18  me when I was sitting that the first date was wrong.

19  Because when I read the first letter of the paragraph, it

20  made sense to me, exactly what happened.

21     Q.  Did you allow Miss Payne to respond to mostly all

22  the letters?

23     A.  She responded to all of them, right.

24     Q.  Did you have any partake in any of the responses

Jay Patel

90

1  to the commission?

2    A.   Only with the incident that started with the

3  meeting with her.  The discussion that we had when she

4  came in and screamed in the lobby and then I had to come

5  in, those incidents I had to explain it to her.  Because

6  she wasn't present.

7    Q.   Was this after Miss Payne wrote this letter?

8    A.   No.  I talked to her during this time, explaining

9  it to her that you need to explain to EEOC that she came

10 in on this date.  However, the date, she got it wrong.

11 That's what I told you.  Joan, I have to tell her to

12 write down everything or she'll forget.

13   Q.   I think my question was:  Was it before or after

14 the  date and you said you spoke to her regarding that

15 letter?  Was that your answer?

16   A.   No, no, no.  When the first letter came in, she

17 gave it to me, the letter.  Because, obviously, she said

18 you started with Palmer.  So tell me what exactly

19 happened with the hiring process.  So I gave her my

20 notes.  And then I said you need to write down any

21 complaints or whatever you receive because you were in

22 operation.  So you need to write that down, the

23 termination part, because you apparently terminated her.

24         So I don't have the exact wording and

91

1   details that you had conversation with her so you need to

2   put that down.  So I guess since I was involved in the

3   beginning part of it, I had to give her the beginning

4   part of it.  And the operation and complaint part, she

5   had to fill that in.

6       Q.   So the letters that she drafted, you were not

7   involved in every single letter that she drafted to the

8   commission in regards to this investigation?

9       A.   No.  In some ways I would be involved a little

10  bit to it depending on what information they asked for.

11      Q.   And the person who would have the most access to

12  any customer comment card would be Miss Payne?

13      A.   Joan, yes.

14      Q.   The person who would have the most access to any

15  customer cards or customer complaints in writing would be

16  Miss Payne; is that correct?

17      A.   Yes.

18      Q.   Was any other employee discharged due to customer

19  complaints at all since Nabstar began?

20      A.   Yes.  Last year we terminated two employees

21  because somebody dropped off a gift check for a

22  restaurant and used it for personal and were terminated

23  right there on the spot.

24      Q.   Was that a customer complaint or theft?



Jay Patel

92

1    A.    That was actually both because we found out when

2    the customer came back and said did you receive my gift

3    checks.   So it was a complaint and theft at the same

4    time.

5    Q.    So it was response to an inquiry from a customer

6    asking --

7    A.    That's how we found out.

8    Q.    So it was a customer who inquired about gift

9    checks.   And after some investigation, you realized that

10   it was one of your employees that actually stole the gift

11   checks and then you terminated that person for stealing.

12   A.    Stealing, not reporting, customer complaint.

13   Q.    Not reporting?

14   A.    Not reporting that they received the gift checks

15   for the hotel use.   Terminated the person and his

16   girlfriend both because they were both involved, which we

17   found out that they were dating after the incident.   And,

18   on the record, that was Joan and she did that before

19   similar way.

20   Q.    Did you receive a request to supply the

21   commission with customer complaints?

22   A.    I'm not sure I understand the question.

23   Q.    Did you ever receive a request during the

24   investigation about customer complaint cards, about

1    supplying the commission with those customer complaints?

2    A.    I don't remember that in the letter.  But I think

3    when one of the letters, I said you should put down any

4    comment cards or complaints that you have written, to

5    copy it.  And then she said let me look in the complaint,

6    comment card files.

7    Q.    Did you know if, during the investigation,

8    Miss Payne was able to locate any guest comment cards

9    related to Mrs. Palmer?

10    A.    She told me she thought she found two cards.

11    Q.    I'm sorry.  Let me clarify.  This is during the

12    investigation, not the litigation.

13    A.    You know, honestly, I thought we were still in

14    the investigation part here.

15    Q.    Let me clarify the question.  I don't think you

16    understand.  Are you aware that we are in a lawsuit right

17    now against your company in court and that's why you have

18    an attorney?

19    A.    I thought we were going to the lawsuit part of

20    it.  I wasn't sure if we were in the lawsuit part of it.

21    The whole time I kept telling, being the right guy, this

22    is a problem.

23    Q.    So you don't know right now that there is a

24    lawsuit going on?



Jay Patel

94

1      A.    No.   Actually, I'm not quite sure.

2      Q.    Did you know that the EEOC filed a complaint in

3    federal court against your company?

4      A.    I know they have filed a complaint, yes.

5      Q.    That's what I mean.   So there is a point in time,

6    prior to the EEOC filing a complaint in court, there was

7    a period of time when Investigator Evangeline Hawthorne

8    communicated with Miss Payne about gathering information

9    prior to the lawsuit being filed.

10     A.    Right.  See, I think the confusion happened was,

11   after our first response, we didn't hear back for a few

12   months.  And we really thought the file was closed.

13     Q.    I didn't ask a question.  I haven't asked a

14   question.

15            MS. SMITH: Could you read back the last

16   question?

17            (Thereupon, the reporter read back the

18   pending question.)

19   BY MS. SMITH:

20     Q.    Were you involved in the investigation stage of

21   the charge of discrimination, which was prior to the

22   lawsuit being filed, prior to the complaint being filed

23   in federal court?

24            MR. CONNORS:  Object to the form.  You can

**W&F**

**WILCOX & FETZER LTD.**

Registered Professional Reporters

Jay Patel

95

1  answer.

2          THE WITNESS:  I'm not sure I understand the

3  question.  In the sense the investigation meaning

4  replies?

5  BY MS. SMITH:

6    Q.   Your correspondence -- I'm referring to the

7  correspondence between Nabstar officials and Evangeline

8  Hawthorne, who is an investigator with the EEOC.  Were

9  you involved in any of those correspondence letters in

10  formulating Nabstar's responses?

11    A.   Yes, I was involved with the letters in the part

12  where she needed information about how we met Palmer or

13  found out about Palmer.  Because there was the first one

14  from my company to find out about Palmer on the 9th.

15    Q.   And I believe that I was asking about, do you

16  recall during the investigation that the EEOC requested

17  guest comment cards referring to Mrs. Palmer?

18    A.   No, I'm not aware of that.

19          MR. CONNORS:  Off the record.

20          (Thereupon, a discussion was had off the

21  record.)

22          (Patel Deposition Exhibit No. 1, Letter From

23  the EEOC Dated February 24, 2005, was marked for

24  identification.)

Jay Patel

96

1   BY MS. SMITH:

2       Q.   Have you ever seen this document before,

3   Mr. Patel?

4       A.   Possibly.  I can't recall a hundred percent, but

5   it looks familiar.  Anything regards to this, she would

6   show it to me.

7       Q.   Anything in regards to what issue?  I'm sorry.

8       A.   For this charge number, she would show me at

9   least.

10      Q.   Miss Payne would show you?

11      A.   Yeah.  But --

12      Q.   I'm not done my other question.

13      A.   I want to finish my other answer.

14      Q.   I just asked if you had ever seen the document

15  before.  You said it looks familiar.

16      A.   Maybe.  I'm not sure.  But possibility, yes, I

17  said.

18      Q.   Okay.  What date does it state at the top?

19      A.   February 24.

20      Q.   What year?

21      A.   2005.

22      Q.   And could you read me after "Dear Miss Payne,"

23  first paragraph, and then language after number one?

24      A.   "As you know, I had been assigned to investigate

W&F

WILCOX & FETZER LTD.

Registered Professional Reporters

97

the above referenced matter.  I have reviewed the

information forwarded in response to the charge of

discrimination and determined that following additional

date is needed.  Provide copies of guest comment cards

that you received which were critical of CP's

performance."

Q.    Did you, in fact, supply Miss Hawthorne with

those comment cards?

A.    I don't know if she did.  I did not.  Because if

it's something like this, it's a possibility she might

have just told me on the phone and I said go ahead with

it.

Q.    Go ahead with what?

A.    If you have anything, give it to her.

Q.    Did Miss Payne indicate to you that there were,

in fact, comment cards that customers did fill out to

complain about Mrs. Palmer?

A.    I think she did because she thought she found

some for August.

Q.    And you told her to, please, supply that to the

commission; is that correct?

A.    I said, if you have anything, yes, go ahead, send

it to them.

Q.    Are you aware that, in fact, Miss Payne did not

Jay Patel

98

1  supply the commission with any comment cards?

2      A.    No, I'm not.

3              (Patel Deposition Exhibit No. 2, Letter of

4  Determination, was marked for identification.)

5  BY MS. SMITH:

6      Q.    Take a second to read that.  I really want to

7  focus on the first page.  Have you ever seen this Letter

8  of Determination before from the EEOC?

9      A.    Yes.

10     Q.    And on the first page, the last paragraph on the

11 page, the first two sentences ending in complaints, so

12 the last paragraph --

13     A.    What about it?

14     Q.    Can you read it for the record, please?

15     A.    "Respondent claims that charging party was

16 discharged for schedule conflicts or for performance

17 insubordination.  Respondent claims that charging party

18 received several guest complaints after her first weekend

19 of work, however, failed to provide any evidence of such

20 complaints."

21     Q.    So according to this Letter of Determination, the

22 commission never received any guest complaints despite

23 our requests for such complaints during the

24 investigation; does that appear accurate to you?

99

1          MR. CONNORS:  Object to the form.

2     A.    The letter says so.  I guess that always seems

3  like set in stone, so --

4          MR. CONNORS:  Don't guess.

5     Q.    Don't guess.  This information contained in the

6  Letter of Determination sent to Nabstar, and you see this

7  date here, can you read that?

8     A.    3/31/05.

9     Q.    And that signature, what is the name under the

10 signature?

11    A.    Marie Tomasso.

12    Q.    This letter, the information that's indicated in

13 that paragraph in those two lines that you read, is that

14 accurate?

15    A.    Well, the verbal complaints is a verbal

16 complaint.  So you are not going to get that.  The

17 comment cards, if we have them on file, then we will be

18 happy to give it to you.

19    Q.    My question is:  Is this accurate that no guest

20 comment cards were given to the commission prior to the

21 filing of the complaint after you received this Letter of

22 Determination?

23    A.    Yeah, actually, after this letter was given, I

24 think we turned it over to our attorney for insurance

Jay Patel

100

1   company.  And I thought they would guide me through the

2   whole process and see what they need.  Because I never

3   had a case like this.  I was not sure what I had to do.

4       Q.   When you were notified about the Patel 1, you

5   testified earlier that you didn't know if you turned

6   anything into the commission during the investigation; is

7   that correct?

8       A.   It's a possibility that -- if I saw the letter,

9   then they definitely would have the information.  If she

10  asked me on the phone what to do, I probably would say,

11  yes, go ahead and send it to them.

12      Q.   And if the Letter of Determination from the

13  commission indicates that we did not receive such comment

14  cards, would that be something that you disagree with?

15      A.   I would have to ask Joan, because she was the

16  responding party, to see what she did with it or she

17  responded.

18      Q.   Were comment cards provided to the EEOC during

19  our formal discovery after we filed a lawsuit?

20      A.   I don't think so.  Not in initial inquiry, no.

21      Q.   I'm talking about after we filed the lawsuit in

22  response to the requests for documents.

23      A.   I thought she said she found some.  But we found

24  out earlier it was incorrect.

101

1    Q.    Earlier meaning --

2    A.    In Ms. Payne's deposition.

3    Q.    Now, it appears that the EEOC has requested these

4    comment cards on February 24, 2005, again requested them

5    in our interrogatories and requests for documents on

6    November 22nd, 2005, November 22nd and November 23rd of

7    2005, and we have yet to receive the comment cards that

8    defendant has claimed exist in regards to Mrs. Palmer.

9    Is it your testimony that these comment cards exist?

10                MR. CONNORS:   Object to the form.

11    A.    November 23rd I was not in the country.  So if

12    you ask for it or requested it, I would have not have

13    gotten one.

14    Q.    Your attorney was supposed to indicate to you and

15    Miss Payne that we did request the documents in our

16    request, in our formal request in this litigation.  Did

17    your attorney speak to you regarding our formal request

18    for documents at any time between then and now?

19    A.    Yeah.  First inquiries, yes.

20    Q.    And this is after we filed a lawsuit in this

21    case.

22    A.    Okay.

23    Q.    Not with Miss Hawthorne.  I'm talking about with

24    the actual lawsuit.



Jay Patel

102

1    A.    Okay.  Based on the date you requested --

2    Q.    I'm not asking you about the date you requested.

3  I'm asking if these comment cards exist.

4    A.    I would have to ask Joan because she has the

5  files in her office.  If she tells me she has them, then

6  she would have them.

7    Q.    My question to you is:  We have asked for them

8  before at least twice in writing as you see here, 24th,

9  and again through your attorney we asked for these

10  documents.  And I'm asking if Mr. Connors ever spoke to

11  you and asked to, please, produce or check your files for

12  these particular comment cards.

13          MR. CONNORS:  Don't answer that question.

14  That's attorney/client privilege.

15  BY MS. SMITH:

16    Q.    It relates to your due diligence in regards to

17  this matter, if you were contacted by anyone to find out

18  if you had any information regarding this lawsuit.

19          MR. CONNORS:  Object to the form.

20    A.    I received this letter.  I gave it to them.

21    Q.    Who?

22    A.    The attorney's office.  And whatever they asked

23  me I tried to give to them.

24    Q.    Did anyone ever ask you for any customer

Jay Patel

103

1  complaint cards after the filing of this lawsuit?

2      A.    None that I can recall.  If it's something that

3  Joan might have got, I don't know, and if she didn't pass

4  that on to me.

5      Q.    Are you involved in this litigation?

6      A.    I'm involved since I knew about her from the

7  beginning, yes.

8      Q.    Are you someone that may have information or

9  documents relating to the charge of discrimination or

10 this lawsuit?

11     A.    Repeat the question.

12     Q.    Are you someone that would possibly have

13 information regarding Mrs. Palmer's charge of

14 discrimination against your company?

15     A.    No, I would not have the full information.  I

16 would have to see the employee file.

17     Q.    So you are not a principal person in charge of

18 this organization for purposes of this lawsuit?

19             MR. CONNORS:   Object to the form of the

20 question.

21             THE WITNESS:   It depends.

22 BY MS. SMITH:

23     Q.    Do you have any information at all regarding this

24 lawsuit?



WILCOX & FETZER LTD.
Registered Professional Reporters

Jay Patel

104

1            MR. CONNORS:  Other than what he's already

2      testified for three hours today?

3            MS. SMITH:  Are you objecting?

4            MR. CONNORS:  I object.  Yeah.  That's a bad

5      question.

6            MS. SMITH:  That's not a real objection.  Or

7      are you going to make a speaking objection?

8            MR. CONNORS:  We have been here for three

9      hours now.  He's given you all the information he knows

10     about the case.

11           MS. SMITH:  Your conduct, Mr. Connors, is

12     not proper.

13           MR. CONNORS:  Your questions are not proper.

14     I objected to the form of them.  If you want to continue,

15     you may continue.

16           MS. SMITH:  I would like to without you

17     making continuing speaking objections.  If you want to

18     further interrupt and impede the process in this matter,

19     we can take it up for the judge.  In the interest of

20     time, I would like to continue.  Your speaking objections

21     are completely out of line.

22           MR. CONNORS:  No, they are not.  They are

23     not speaking objections either.

24           MS. SMITH:  If you object to the form, you

1  object to the form.

2       MR. CONNORS:  I've objected to the form of

3  the question.

4  BY MS. SMITH:

5    Q.   Now, do you know any information at all regarding

6  any of the customer comment cards in this matter?

7    A.   Only what the managers or Joan at the hotel had

8  summarized for me, which is the breakfast complaint and

9  the cleanliness.

10   Q.   And your testimony is no one, your attorney has

11 not contacted you to inquire as to whether you in fact

12 had any comment cards or if these comment cards actually

13 existed?

14   A.   I don't recall any conversation on it.

15   Q.   Okay.

16   A.   However --

17   Q.   I just asked you yes or no.  Either he did or he

18 didn't.

19   A.   We could have talked about a few things and I

20 can't remember every little word of it.

21   Q.   But you don't remember him asking him for that?

22       MR. CONNORS:  Object to the form.

23 Objection.  Asked and answered.

24 BY MS. SMITH:

