Jay Patel

106

1    Q.    Payne 7 and Payne 8, have you had an opportunity

2  to review Payne 7 and Payne 8?

3    A.    Earlier today, yes.

4    Q.    You looked at the documents?

5    A.    Yes.

6    Q.    And that was during Ms. Payne's deposition?

7    A.    Yes.

8    Q.    Have you ever seen these documents before today?

9    A.    No.

10    Q.    Are you aware that they were supplied in response

11  to our request for documents?

12    A.    I guess I found that out earlier today.

13    Q.    So were you involved at all in the preparation of

14  supplying answers to defendant in our formal request for

15  documents?

16    A.    The question that he asked me, yes.  I guess you

17  had a list of questions.

18    Q.    So you were involved in --

19    A.    In part of it, yes.

20    Q.    Let me finish the question.  You were involved in

21  supplying some of the answers to our request for

22  documents to Mr. Connors?

23    A.    Yes.

24    Q.    But you were not aware of these customer

107

1  complaints?

2     A.   Well, I knew we had customer complaints.  That's

3  what she had told me before.  So I asked her to look up

4  in the file to see if she had stacked them away.

5     Q.   So to the extent that these customer complaints

6  still exist somewhere, the request for our request for

7  documents relating to the customer complaints about

8  Mrs. Palmer still stand and, at this time, are overdue.

9  So to the extent that they exist, the commission would

10 like --

11          MR. CONNORS:  We will make them available if

12 they exist.  I thought that these were the ones that were

13 being talked about.  But, obviously, they are not.  We

14 will look for ones that relate to the August, 2003, time

15 frame or whenever with respect to Ms. Palmer.  If they

16 exist, we will provide them to you.  We will provide them

17 to you quickly.

18          THE WITNESS:  Just for the record, even if

19 they had comment cards or not, she also received verbal

20 complaints.  That's what she tells me.

21          MR. CONNORS:  We understand that.  This is

22 just a specific request for us to go back and look for

23 ones that would apply, if we have any written ones that

24 relate to Mrs. Palmer for the right year.  These are not

1    the right ones.   I thought they were but they are not.

2    BY MS. SMITH:

3       Q.    In response to Defendant's Answers to Plaintiffs

4    Interrogatories, Number 1, which is basically stating all

5    the reasons that defendant wanted to terminate

6    Mrs. Palmer from employment, one of the requests --

7    excuse me.   I can read it to you on the record.   I have a

8    marked up version.

9             Interrogatory 1, did you have an opportunity

10   to read the question?

11      A.    Let me read it, make sure what you are talking

12   about.   Okay.

13      Q.    Now you can read the answer to that question.

14      A.    Okay.

15      Q.    Among the reasons that were listed is

16   insubordination, correct?

17      A.    Uh-huh.

18      Q.    Customer complaints, correct?

19      A.    Uh-huh.

20      Q.    Is that a yes or a no?

21      A.    Yeah.

22      Q.    And unwillingness to perform certain duties that

23   were part of breakfast duties; is that correct?

24      A.    Sort of I guess, not performing correctly is what



Jay Patel

109

1    I'm understanding.

2       Q.    I'm asking is that what it says in the answer.

3    Is that a yes?

4       A.    No, that's not accurate, no.

5       Q.    But am I reading this -- what's on the paper is

6    what I'm asking you.

7       A.    Oh, yeah.

8       Q.    And unwillingness to work a specific schedule?

9       A.    Yes.

10      Q.    So what I read you as far as the answers, I read

11   that accurately, but you are saying this information is

12   not correct?

13      A.    I think the wording is more confusing.  The

14   unwillingness to perform certain duties that were part of

15   breakfast duties, I think what is referencing is the

16   proper way of doing the duties.  Right.

17      Q.    Are you asking your attorney the answer or are

18   you answering the question?

19      A.    I'm answering the question.  The wording should

20   have been worded better.  The wording is getting twisted

21   around here is problem in this whole case.

22      Q.    Is this not Nabstar's answers to our

23   interrogatories that defendants supplied to us?

24      A.    Uh-huh.

Jay Patel

110

1    Q.   And you are stating now that this is inaccurate?

2             MR. CONNORS:  Object to the form.

3    Q.   Are you stating that this information I just read

4  on the record is inaccurate?

5    A.   No.  If you don't understand it right, then it

6  would be inaccurate.

7    Q.   I didn't interpret it.  I just read it.

8    A.   So then it is accurate, yes.

9    Q.   Could you explain to me why insubordination and

10  unwillingness to work a specific schedule are listed

11  separately?

12    A.   Well, how are you going to dissect it?  Because

13  on one end you are telling me because the one letter did

14  not have the schedule part and the other letter had the

15  complaint about customer complaints.  Now that we write

16  too much, you are complaining that we have two separate

17  words.  You are saying why is insubordination one and why

18  is unwillingness separate.  So we decide to write every

19  possible thing so you would have less questions.

20    Q.   See, that didn't work.

21    A.   We have been going around in circles for three

22  hours the same questions that we did this morning and

23  now.

24    Q.   Were you being deposed this morning?



111

1        MR. CONNORS:  Stop.  We are not arguing with

2   my witness.  Next question, please.

3   BY MS. SMITH:

4      Q.   My question is why -- your answer to my question

5   as to why these words are listed twice is because you

6   wanted to list every possible, or, excuse me, why

7   insubordination is listed separately from unwillingness

8   to work a specific schedule, and your answer to that

9   question, you have already answered that you are saying

10  you wanted to make sure there is every possible reason

11  why you could have fired her in this answer; is that

12  correct?

13        MR. CONNORS:  Object to the form.

14     A.   You are putting words in my mouth.

15     Q.   Can you clarify?

16     A.   Okay.  What I'm saying is the reasons -- there

17  are plenty of reasons that we terminated her.  However,

18  we decided to write down every word that we can think of

19  so now we don't come back a month from now and tell me

20  why did you not put this word on your original answer

21  like the way you did earlier.

22     Q.   Okay.  You said there were plenty of reasons why

23  Mrs. Palmer was terminated?

24     A.   Yes.



112

1              MR. CONNORS:  Object to the form of the

2     question.

3     BY MS. SMITH:

4        Q.    Were there more reasons why Mrs. Palmer was

5     terminated than what you listed or what was supplied in

6     her answers to interrogatories?

7        A.    I have already listed the reasons for you in the

8     beginning of it.  Insubordination could be disrespectful

9     to your supervisor, which is Joan Payne.  Unwillingness

10    to work the schedule and customer complaints.  We already

11    listed that.

12              There is plenty of reasons to terminate an

13    employee, especially when you are trying to help them

14    work out a schedule and they are being disrespectful to

15    you.  And on top of that, her daughter calls and screams

16    at your general manager.  You have a problem.

17       Q.    I just asked why you listed them separate, if

18    unwillingness to work a specific schedule and

19    insubordination are the same thing.

20       A.    Just in case maybe on that day the lawyers don't

21    understand right, we decide to put everything on it word

22    by word that we can think of.

23       Q.    Okay.  Take a look at Payne 3.

24       A.    I'm looking at it.



113

1    Q.    Have you read Payne 3?

2    A.    Yes.

3    Q.    Are you familiar with this?  Have you ever seen

4    the document marked as Payne 3?

5    A.    I saw it, yes.

6    Q.    What is this document?

7    A.    This Payne 3, is that what you are asking me?

8    Q.    What is this document?

9    A.    This is the part of the employee handbook, Code

10   of Conduct.

11   Q.    Are you familiar with the Code of Conduct?

12   A.    I am.

13   Q.    As general manager, you do you know that if, when

14   Miss Payne began work or at least her first week of work,

15   was she familiar with the Code of Conduct?

16   A.    She was given a handbook and she signed for it

17   that she received the handbook.

18   Q.    Do you know for sure if she read the handbook?

19   A.    It is their responsibility to read the handbook

20   and then sign for it.  So they say I have received the

21   handbook.  They sign for it.  So I'm assuming she read

22   it.

23   Q.    Okay.

24   A.    We can't force it.  We are not baby-sitting.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    Q.    Did she ever indicate to you that she read the

2  handbook?

3    A.    Usually in the beginning, they go through and

4  say, yeah, I looked at it.  It's pretty common sense

5  basically.

6    Q.    Well, looking at Page 14 there are a number of

7  bullet points in the middle of the page.  And above the

8  bullet points it reads, "The following are examples of

9  some but not all conduct which may result in immediate

10  termination of the employment relationship without

11  warning;" is that correct?

12    A.    Uh-huh.

13    Q.    Let me just go back for one second.  Was this

14  employee handbook in place before you took over, before

15  you purchased Sleep Inn, before Nabstar purchased Sleep

16  Inn?

17    A.    No.  This is Nabstar's handbook.  No.  The

18  previous owners did not have any employee practices.

19  They are the ones you should have gone after.

20    Q.    So you are saying that Nabstar put in place a

21  Code of Conduct informing employees of their rights and

22  responsibilities and duties as employees of Nabstar,

23  correct?

24    A.    Yes.

W&F

WILCOX & FETZER LTD.
Registered Professional Reporters

Jay Patel

115

1    Q.    And how closely do you follow this Code of

2    Conduct when dealing with employees?

3                MR. CONNORS:    Object to the form.    You can

4    answer.

5                THE WITNESS:    We always try to follow as

6    much as possible on it.    We always try to help the

7    employees.    And that's a perfect example why we try to

8    offer her more work, different areas in housekeeping.

9    BY MS. SMITH:

10    Q.    So your testimony is that you do closely adhere

11    to this Code of Conduct when dealing with employees?

12    A.    Yes.    Otherwise, there is no sense having it.

13    Q.    Do you expect your general managers to also have

14    a firm grasp of the employee handbook and the Code of

15    Conduct for employees?

16    A.    Yes.    But we also tell them that you are not in a

17    job of firing people.    You want to double up the

18    employees and your firing should be a last option because

19    you can't get it to work somehow.

20    Q.    All I need to know if is you expect your general

21    managers to have a firm gasp of the employee handbook.

22    That's yes or no.

23    A.    Yes, that should be yes.

24    Q.    And taking a look at the bullet point in

Jay Patel

116

1    question, we'll go right to insubordination at the last

2    one.   And it reads, "Insubordination (The failure to

3    carry out position responsibilities, reasonable work

4    requests of management despite warnings.)"   Could you

5    explain to me what that means, the parentheses, what the

6    content between the parentheses, failure to carry out

7    ending in warning?   Could you explain that language?

8        A.    Basically ask that we ask you to work certain

9    schedules.   And if you can't work that, then it's

10   considered insubordination.

11       Q.    So that's what the failure to carry out position

12   responsibilities and reasonable work requests, your

13   testimony is it regards scheduling?

14       A.    No, I'm not finished with the answer.

15       Q.    Continue.

16       A.    The scheduling, now if you're put in a

17   responsible position, whatever your job duties are, and

18   you can't carry that out properly, it's also

19   insubordination.   These are just the examples.   That's

20   why we have them in parentheses.   Insubordination is a

21   little bit more common sense.   Disrespectful to your

22   general manager is also insubordination.   Disrespectful

23   to your fellow workers is also insubordination.

24       Q.    Well, whoever drafted this document tried to



Jay Patel

117

1    place an explanation next to insubordination to further

2    clarify; is that correct?

3        A.    Yeah, I guess some big shot lawyer in this town.

4    That's all I can tell you, a big shot lawyer in this

5    town.

6        Q.    So you didn't necessarily take part in drafting

7    this?

8        A.    No.  This has been going on.  A lot of hotel

9    companies or a lot of companies use the same thing and

10   they just drafted one from them.

11       Q.    When it says despite warnings, how do you

12   interpret that as far as dealing with your employees'

13   customer relations or conduct?

14       A.    Well, a warning could be a simple thing as a

15   request.  Hey, can you work this way?  And the employee

16   says, no, I cannot work this way.  I can only work

17   certain days of the week.  Then I say, well, then I don't

18   need you.

19       Q.    So that's your warning, asking them?

20       A.    Right.  We are asking them.  We are not saying

21   come in here and see ya.  No, we are asking if you can

22   work for us, we'd love to have you.

23       Q.    So if an employee comes in and you ask them to

24   work a certain schedule, you consider that a warning?



Jay Patel

118

1   A.   If we ask them to work a schedule and they can't

2   work it, that would be a warning pretty much, understood

3   that we can't work with this employee.  Now it's a

4   different scenario when they say I can't this week only

5   this date.  But it says, no, these are the only days I

6   will work forever, then it doesn't work with us.

7   Q.   And are you --

8   A.   And that was a problem.  If an employee says this

9   week I have a problem and I have to go to a hospital for

10  my kid or something, that's a different scenario.

11  Q.   Now, when you came into this situation, there are

12  existing employees, and because of that, did you

13  consider, allowing Mrs. Palmer to work the weekend

14  schedule, did you consider that a warning?

15  A.   When I allowed her to work the weekends, I really

16  thought that if she talks to Joan and she's able to

17  figure out a schedule and she works out great for us, it

18  would be a great employee for us.  What made it worse for

19  us was her unwillingness to work the schedule and the

20  complaints that we started receiving.  Then what do you

21  do with the employee if the employee can't even come to

22  work?  What is the sense of having the coaching session?

23  Q.   Are you aware of how long Mrs. Palmer worked

24  prior to her employment with Nabstar?  Let me clarify

Jay Patel

119

1    that question.   Are you aware of how long Mrs. Palmer

2    worked at the Sleep Inn Hotel that Nabstar purchased

3    before Nabstar purchased the hotel?

4        A.   No.  They didn't give us any employee information

5    or records because it's their records.

6        Q.   And you are testifying that you never received

7    anything from them from prior, like either how the place

8    sold rooms, you didn't get any information; is that

9    correct?

10       A.   They faxed me the availability about two days

11   before, like late Friday evening, what the forecast is.

12   And I almost had a heart attack because it was like 10,

13   12 rooms sold.  And I called my father and I said, what

14   do we do?  He's like, don't panic.

15       Q.   So your answer to that is they didn't give you

16   much information?

17       A.   No.  They specifically restricted us from talking

18   to any of the employees.

19       Q.   Did you ask why?

20       A.   They were very paranoid in case of the sale

21   didn't go through and they would lose employees.  And on

22   top of that, they were not hotel people.  They never sold

23   a hotel before.  So they did not understand how to do the

24   proper sale.

Jay Patel

120

1    Q.    When you spoke to Mrs. Palmer for that 5 to 10

2   period of time or your brief interview with Mrs. Palmer,

3   did she indicate to you how long she had worked at Sleep

4   Inn Hotel before she filled out an application?

5    A.    I think the only thing I remember her saying, I

6   worked here for a long time.  And, honestly, the long

7   time was the question that I said, you know what, I would

8   rather have you talk to Joan.

9    Q.    And I presume that you did not see any employee

10   file for Mrs. Palmer at the time you started creating her

11   file after she sent her application in?

12    A.    Right.  We had zero files for any of the previous

13   employees.  It was, basically, starting from scratch.

14    Q.    Okay.  Who is Aaron Smith?

15    A.    From what I know, he used to be a general manager

16   a few years ago at Sleep Inn.

17    Q.    Prior to Nabstar's purchase or before Nabstar's

18   purchase of Sleep Inn?

19    A.    No, way before like under the previous owners two

20   years ago.

21    Q.    So if Mrs. Palmer was working for Sleep Inn,

22   Mr. Smith would have been her direct manager?

23    A.    I don't know anything about that.  I don't know

24   her dates or anything.

Jay Patel

121

1    Q.    That's fine.

2    A.    It actually would have made it easy for us if we

3    had some employee information.  We would have been able

4    to interview right, schedule better.

5    Q.    There is no question pending.

6    A.    We would not even be having any of this

7    conversation.

8    Q.    There is no question pending.  I didn't ask you

9    anything unless you want to continue to talk.  But I

10   think I may be done.

11              MR. CONNORS:  We're done.  You are finished?

12              MS. SMITH:  I think I'm done.

13   BY MS. SMITH:

14   Q.    Do you know who replaced Mrs. Palmer?

15   A.    Do I know?

16   Q.    Yes.

17              MR. CONNORS:  Object to the form.  You can

18   answer.

19   BY MS. SMITH:

20   Q.    Do you know who was assigned to work the

21   breakfast shift that Mrs. Palmer had begun to work the

22   16th and 17th of August, 2003?

23              MR. CONNORS:  Objection to the form.  You

24   can answer.

Jay Patel

122

1          THE WITNESS:  As far as I'm concerned, she

2    was not replaced because we were not even aware of her

3    employment because she had not come to us when we first

4    took over.

5    BY MS. SMITH:

6       Q.    I think actually --

7       A.    I already answered that question.

8       Q.    -- you said Marisol Gomez; is that correct?

9       A.    No.  We had hired Marisol.  She would be

10   housekeeping or breakfast person.  I don't know who was

11   going to work the weekend because we were total chaos at

12   that point.

13      Q.    But Marisol Gomez was working at the same time

14   when Mrs. Palmer came in on the weekend of the 9th?

15      A.    It's a possibility, yes, because obviously we

16   have seven days and we need people not work all seven

17   days.

18      Q.    Was Marisol Gomez also working on the 16th and

19   17th?

20      A.    I don't know.  I would have to see the schedule.

21   It's a possibility that maybe she moved back to the

22   supervising for that day because we try to accommodate

23   her.

24      Q.    But she could have been scheduled to work that



Jay Patel

123

1    day?  I draw your attention to Payne 6.

2       A.   So this is the new schedule that was made before

3    she even came in the picture.

4       Q.   I'm just asking if you see Ms. Marisol Gomez on

5    the schedule for the 16th and 17th.

6       A.   Yes, I do.  Because we did not know who was

7    working for us at that point.  So we put our breakfast

8    person in.

9       Q.   Okay.  Payne 4, do you recognize the items that

10   are photocopied on this document, Payne 4?

11      A.   Yeah.

12      Q.   What do you see on this document?

13      A.   Social Security card and Resident Alien card.

14      Q.   Can you make out the numbers on the Social

15   Security card?

16      A.   No.  Wait.  Social Security card, yes.  The top

17   one.

18      Q.   It says Marisol Gomez, correct?

19      A.   Marisol Gomez, correct.

20      Q.   Is that, fuzzy though it may be, but is that a

21   photocopied picture of a Resident Alien card with Marisol

22   Gomez's picture on it?

23      A.   It looks like it.

24      Q.   Does that appear to look like Marisol Gomez?



WILCOX & FETZER LTD.
Registered Professional Reporters

Jay Patel

124

1    A.    The picture is kind of really bad right now.  But

2    at that point, we made a copy of Miss Gomez's picture.

3    Q.    Can you make out any of the numbers as far as

4    card expiration date?

5    A.    No.

6    Q.    Card expires and above it 12/12/06?

7           MR. CONNORS:  You just told him what the

8    answer was.  I object to the form of the question.

9           MS. SMITH:  Actually, right.

10   BY MS. SMITH:

11   Q.    Do you recognize any of the numbers or letters

12   above?  I won't give away the answer this time.  I think

13   it says alien number and above that --

14   A.    There is three numbers on top.  And then there is

15   some kind of number in the middle because I used to be a

16   green card holder at one point.

17   Q.    This Resident Alien card is a green card?

18   A.    Back in the '80s it was green card.  Now

19   everybody calls it Resident Alien.  It was 20 years ago.

20   But I think it's the same thing.  But that's about it.  I

21   don't pay attention much except we look for two ID's that

22   we are supposed to get and make a copy of it.

23   Q.    You said you used to hold a Resident Alien card;

24   is that correct?



Jay Patel

125

1    A.    Right.  But I was 12.

2    Q.    How long did you hold that card?

3    A.    '91.  So I would be about 18.  So maybe six,

4    seven years.

5    Q.    Did you ever look at it or see what it said?

6    A.    No.  Really only when I go to Canada, just gave

7    it to them to come back.

8    Q.    So you never really knew what was on your

9    Resident Alien card, the information?

10    A.    I knew it was the only way I could go back in and

11    out of the country.  When I went to Canada, they said you

12    look a little too much older.  So you have to go for

13    renewal.  I know people wait a lot and it's worth it.

14    Although, right now I don't feel like it.

15    Q.    Someone said you look too old for this card; you

16    should go renew it?

17    A.    Right.

18    Q.    Is that because there is a date of birth on the

19    card?

20    A.    No.  Well, I guess, apparently, probably there is

21    because when I went to Canada they stopped me.  I had my

22    passport too so.  They said after 14 years of age you

23    have to renew it.

24    Q.    So is it true that there is a date of birth

Jay Patel

126

1    indicated on a Resident Alien card?

2        A.    I don't know.  Because I never really paid

3    attention to it.  Earlier I saw you mentioned this to

4    her.  Honestly, it's the first time I'm looking at it.  I

5    didn't think they put a date on.

6        Q.    So when you said you heard me earlier mention to

7    Miss Payne in her testimony asking her about Payne 4, and

8    can you make out the numbers on the top underneath

9    Marisol's name?

10       A.    Yeah, I could see 4.  I'm not clear if the middle

11   one is 26 or what.  And the other one says 76.  But

12   actually --

13       Q.    Do you make that out to be a date of birth?

14       A.    I never even paid attention to it.  Because, to

15   me, it just has to be a picture ID.  We don't ask for

16   birthday.  So we never look for it.

17       Q.    But is a birth date indicated on the Resident

18   Alien card?

19       A.    It is apparently.

20       Q.    And what does the year read?

21       A.    76.

22       Q.    Does that indicate to you 1976?

23       A.    I hope so.

24       Q.    So that would mean in 2003, Miss Gomez would be



127

1    about 27 years of age if you do the math?

2        A.    But I don't look at the birth dates.

3        Q.    I understand.  But according to this card --

4        A.    Whatever the age would be at that point.

5        Q.    So doing the math, she would be about 27 years of

6    age?

7        A.    I know where you are going with this thing.

8        Q.    I haven't asked you any questions.

9        A.    For the record, if you are asking me that did I

10   look at the birth date before, no.

11       Q.    I didn't ask you that and that's not what I'm

12   going to ask you.  So it would be helpful for you if you

13   allowed me to ask the questions and not anticipate.

14             But, clearly, Miss Gomez is significantly

15   younger than Mrs. Palmer who, at the time, was 74 years

16   of age.  Is it fair to say that an individual could tell

17   the difference between a 74-year-old woman and a

18   27-year-old woman?

19             MR. CONNORS:  Object to the form of the

20   question.

21             THE WITNESS:  How does that relate to any of

22   it?

23   BY MS. SMITH:

24       Q.    It's an age discrimination complaint.



Jay Patel

128

1    A.    I understand that.   But Marisol was not hired for

2  breakfast.   She was hired for the housekeeping department

3  person.

4    Q.    Was she scheduled for breakfast duties on August

5  9th?

6    A.    Yes.

7    Q.    Was she scheduled for breakfast duties on August

8  16 and 17th?

9    A.    Yes.   Before we found --

10    Q.    That's all I have.

11    A.    Before we even found out we had Islyn Palmer on

12  it, we had to schedule a breakfast attendant.

13          MS. SMITH:   Thank you.   That's all I have.

14                  EXAMINATION

15  BY MR. CONNORS:

16    Q.    Sir, did age have anything to do with the

17  termination of Islyn Palmer?

18    A.    No.

19          MR. CONNORS:   Those are all the questions I

20  have.   Thank you.   He's going to read and sign.

21          (Thereupon, the deposition concluded at 4:40

22  p.m.)

23

24



129

INDEX TO TESTIMONY

JAY PATEL                                          PAGE

    Examination by Ms. Smith                         2

    Examination by Mr. Connors                      128


                    - - - - -


                 INDEX TO EXHIBITS


PATEL DEPOSITION EXHIBIT NO.                       PAGE


1, Letter From the EEOC Dated February
    24, 2005...................................... 95:22
2, Letter of Determination....................... 98:3

Jay Patel

130

1

2

3

4               REPLACE THIS PAGE

5

6           WITH THE ERRATA SHEET

7

8           AFTER IT HAS BEEN

9

10          COMPLETED AND SIGNED

11

12          BY THE DEPONENT.

13

14

15

16

17

18

19

20

21

22

23

24

State of Delaware )
                  )
New Castle County )

### CERTIFICATE OF REPORTER

I, Anne L. Adams, Registered Professional Reporter and Notary Public, do hereby certify that there came before me on the 9th day of March, 2006, the deponent herein, JAY PATEL, who was duly sworn by me and thereafter examined by counsel for the respective parties; that the questions asked of said deponent and the answers given were taken down by me in Stenotype notes and thereafter transcribed into typewriting under my direction.

I further certify that the foregoing is a true and correct transcript of the testimony given at said examination of said witness.

I further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.


Anne L. Adams
Certification No. 105-RPR
(Expires January 31, 2008)