Exhibit

"D"

Joan Payne

2

1                         JOAN PAYNE,

2            the witness herein, having first been

3            duly sworn on oath, was examined and

4            testified as follows:

5                         EXAMINATION

6     BY MS. SMITH:

7        Q.    Hello, Miss Payne.  My name is Rachel Smith.  I'm

8     a trial attorney with the US EEOC.  I'm here today to

9     take your deposition regarding claims that the EEOC has

10    brought on behalf of Mrs. Palmar against Nabstar, d/b/a

11    Sleep Inn.  I will, basically, be asking questions

12    relating to employment with Nabstar, LLC.

13               What is your full name, for the record, and

14    what is your current address?

15       A.    Joan Payne, 715 Cardinal Road, Bear, Delaware,

16    19701.

17       Q.    Are you represented by counsel today?

18       A.    Yes.

19       Q.    That would be Mr. Connors?

20       A.    I just know him by his first name.

21       Q.    Kevin Connors.  Have you ever been deposed

22    before?

23       A.    What does that mean?

24       Q.    Have you ever been in a situation where someone

Joan Payne

3

1    was taking your deposition under oath?

2        A.    No.

3        Q.    As you know, the court reporter has sworn you in.

4    So your testimony is being taken under oath as if you

5    were in a court of law.  So the same penalties of perjury

6    apply as if you were in a court of law.

7              As the court reporter can only record one

8    person at a time, even if you anticipate what I'm going

9    to ask, it's important to allow me to fully state the

10   question so that your answer, response to my question can

11   be reflected clearly in the record so the court reporter

12   can take it down.  So if we are both talking, she won't

13   be able to take it down accurately.  So I will give you

14   the same courtesy to let you talk and not talk over you.

15             If you don't understand any of my questions,

16   please ask me to repeat it.  If you need to take a break

17   at any time, let us know and we will determine an

18   appropriate time to break.  If a question is pending, we

19   will reserve the question and determine the break.

20             If Mr. Connors objects to any of my

21   questions, allow Mr. Connors to get out his objection and

22   we will attempt to resolved the objection and then you

23   will be able to answer.

24             Are you on any medications or under the

Joan Payne

4

1  influence of any drugs or alcohol that would impede your

2  ability to testify truthfully today?

3      A.    Only one medication, but that's cholesterol.

4      Q.    It won't affect your ability to tell the truth?

5      A.    I don't think so.

6      Q.    Have you reviewed any documents in advance of

7  your testimony today?

8      A.    Yes.

9      Q.    What documents did you review?

10     A.    Documents that the lawyer supplied to me.

11     Q.    Can you identify that document?

12     A.    I don't remember the name.  It's a long one.

13     Q.    Do you remember what the content of the document

14  was?

15     A.    It was questions and answers that he had replied

16  to the EEOC.

17     Q.    Were there any other documents that you reviewed?

18     A.    No.

19     Q.    Did you review any documents to refresh your

20  memory?

21     A.    Yes.

22     Q.    What document was that?

23     A.    Employee's file.

24     Q.    Which employee?



Joan Payne

5

1    A.    Ms. Palmer.

2    Q.    Do you know which specific documents that you

3    recall reviewing in the file?

4    A.    Our responses to Miss Hawthorne and just what I

5    had on file as far as applications and that's pretty much

6    it.

7    Q.    What year did you graduate high school,

8    Miss Payne?

9    A.    '69.

10    Q.    And what did you do after high school graduation?

11    A.    I worked for a bank.

12    Q.    What was your position?

13    A.    I was bank teller.

14    Q.    And what was the name of the bank?

15    A.    Wilmington Trust.

16    Q.    Was that in Wilmington, Delaware?

17    A.    Yes.

18    Q.    And after that, what was your next employment?

19    A.    Delaware Trust.

20    Q.    And what was your position?

21    A.    Bank teller.

22    Q.    And what year were you working at Delaware Trust,

23    if you can recall?

24    A.    I'd say late '70s.



Joan Payne

6

1    Q.    So were you at Wilmington Trust for about eight

2  to nine years?

3    A.    No.  I was at Wilmington Trust for three years.

4    Q.    So mid to late '70s you worked at Delaware Trust?

5    A.    Yes.

6    Q.    And after Delaware Trust, where did you work?

7    A.    I worked for the Wilmington Stevedores at the

8  Port of Wilmington.  I was there six years.

9    Q.    And do you recall approximately what span of time

10  that was as far as years?

11    A.    That would be early '80s.

12    Q.    That you started?

13    A.    Yes.

14    Q.    And what was your position with Wilmington

15  Stevedores?

16    A.    I was bookkeeper.

17    Q.    And after that, where did you work?

18    A.    I worked for a real estate company.

19    Q.    Do you remember the name?

20    A.    A.C. Litzenberg.

21    Q.    And what was your position?

22    A.    I was a receptionist.

23    Q.    And from what year to what year did you work

24  there, if you can recall, general estimate?

7

1    A.    No, I don't recall.

2    Q.    Was it before the 1990s or after the 1990s?

3    A.    It was after the Stevedore's job, so I would say

4  mid '90s.

5    Q.    And then after you worked at A.C. Litzenberg,

6  where did you work after that?

7    A.    I worked for Associates Graphics.

8    Q.    What was your position there?

9    A.    Sales.

10   Q.    And how long did you work at Associates Graphics?

11   A.    Five years.

12   Q.    And approximately what year did you leave

13  Associates Graphics?

14   A.    Probably '95, '96.

15   Q.    And after Associates Graphics, where did you

16  work?

17   A.    I went to the Wilmington Hilton Hotel.

18   Q.    What was your job there?

19   A.    Sales.

20   Q.    And when did you leave the Hilton job?

21   A.    It would be late '90s.

22   Q.    And after the Wilmington Hilton, how did your

23  employment change?

24   A.    It I went to Embassy Suites Hotel.



Joan Payne

8

```
 1      Q.    Was this also a sales job?

 2      A.    I was senior sales manager.

 3      Q.    And how did your employment change after Embassy

 4   Suites?

 5      A.    I left there to Brandywine Suites as director of

 6   sales.

 7      Q.    And what year was that?  Do you recall?

 8      A.    That was 2003, I think.

 9      Q.    And after Brandywine suites, how did your

10   employment change?

11      A.    Then that became Nabstar, Sleep Inn.

12      Q.    What was your position when you first began with

13   Nabstar?

14      A.    General manager.

15      Q.    What year did you begin at Nabstar?

16      A.    2003.

17      Q.    You were with Brandywine Suites for one year?

18      A.    No, I was only with them for five months.

19      Q.    Why did you leave Brandywine Suites after five

20   months?

21      A.    Because Nabstar approached me for a GM position.

22      Q.    And the other positions that you had left or

23   changed jobs, were they for better employment

24   opportunities?
```





Joan Payne

9

1   A.   Both, better employment and money.

2            MS. SMITH:  Can we go off the record?

3            (Thereupon, a discussion was had off the

4   record.)

5            MS. SMITH:  I will reserve the right to

6   double-check on that.  For now, we will allow Mr. Patel

7   to sit in.

8            MR. CONNORS:  He's allowed to be here.

9   Absolutely.

10  BY MS. SMITH:

11   Q.   When you began at Nabstar in 2003 as general

12  manager, who was your supervisor?

13   A.   Well, Jay Patel.

14   Q.   Did you ever receive any training for your

15  position as general manager?

16   A.   No.

17   Q.   So you did not receive any training regarding the

18  laws of discrimination, either state or federal?

19   A.   No.

20   Q.   What were your duties as general manager?

21   A.   To oversee the property as far as employment,

22  payroll, sales, marketing.

23   Q.   Were you also directly in charge of employees

24  that worked for Nabstar properties?

Joan Payne

10

1    A.    Just for the Sleep Inn.

2    Q.    So you were in charge of all the employees, the

3    staff at the Sleep Inn Hotel?

4    A.    Yes.

5    Q.    And are you still presently the general manager?

6    A.    Yes.

7    Q.    In addition to overseeing the properties,

8    payroll, sales and marketing and overseeing the Sleep Inn

9    staff, did you have any other duties and responsibilities

10    as general manager?

11    A.    I can't think of anything offhand.

12    Q.    That's the general, your general position?

13    A.    Right.

14    Q.    Now, as a supervisor of the staff of Sleep Inn,

15    were you in charge of the hiring and termination of

16    employees?

17    A.    Yes.

18    Q.    Did you interview individuals for jobs, so forth

19    and so on?

20    A.    Not at the beginning.

21    Q.    When did you begin the duties of interviewing?

22    A.    Probably two to three months after I started

23    there.

24    Q.    Were you employed by Nabstar before or after the



WILCOX & FETZER LTD.
Registered Professional Reporters

11

1    purchase of Sleep Inn Hotel in Newark, Delaware?

2       A.    A few days before.

3       Q.    Were there any other managers or decision-makers

4    that were above you as far as rank or your superiors

5    other than Mr. Patel?

6       A.    His father.

7       Q.    What is his name?

8       A.    Bob Patel.

9       Q.    Do you know exactly when Nabstar purchased the

10   Sleep Inn Hotel in Newark, Delaware?

11      A.    August 4th, 2003.

12      Q.    And at any time prior to that, did you have any

13   interaction with any of the staff that was employed at

14   Sleep Inn?

15      A.    No.

16      Q.    When did you first have any interaction with any

17   of the existing staff at the Sleep Inn Hotel?

18      A.    The day I started.

19      Q.    August 4th?

20      A.    Yes.

21      Q.    And what was your interaction with the staff?

22      A.    Can you explain my interaction?

23      Q.    Did you have a meeting?  Did you introduce

24   yourself?  How did you come to --



Joan Payne

12

1    A.    We did not have a meeting.  It was the first day

2  of the takeover.  Just went around briefly and introduced

3  myself.

4    Q.    Do you have an office separate from the Sleep Inn

5  facility or do you work at the hotel?

6    A.    I work at the hotel.

7    Q.    And what time of day did you make your rounds to

8  introduce yourself to the staff?

9    A.    Later in the day.  Settlement -- Jay called me

10  around 2:30.  The settlement was completed, to meet him

11  at the hotel around 3.  So I probably got there around 3

12  and left at 5, so within that time period.

13    Q.    So you met the staff that was on the schedule

14  between 2:30 and 5:00 that day on August 4th?

15    A.    Correct.

16    Q.    Did you ever introduce yourself to any other of

17  the staff who worked different shifts?

18    A.    No.

19    Q.    Did you have a list of employees who were

20  currently working at the Sleep Inn Hotel?

21    A.    No.

22    Q.    Could you tell me how then you came to find out

23  who was working at the Sleep Inn Hotel, who your staff

24  was?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Joan Payne

13

1    A.    Just by asking the staff that was there who was

2   working and finding out who I can -- I had to do a

3   schedule.   Finding out who I have to work the different,

4   front desk, laundry, breakfast area.

5    Q.    Did you have any interaction with the previous

6   owners?

7    A.    No.

8    Q.    Did you ask Mr. Patel if he had any interaction

9   or had asked any questions of the previous owners about

10  the staff?

11   A.    No.

12   Q.    Did you question how it was you were to manage a

13  staff of employees that you knew nothing about?

14   A.    No.

15   Q.    How did you anticipate, other than just asking

16  around to individuals who were there, how did you

17  anticipate getting the information about the staff that

18  you were supposed to manage other than just asking

19  around?

20   A.    Can you repeat the question?

21   Q.    Sure.   Other than just asking the existing

22  employees that you met between 2:30 and 5:00 p.m. on

23  August 4th, 2003, how else did you anticipate finding out

24  who the staff was that you were supposed to supervise?

Joan Payne

14

1    A.    Well, that's a good question.  I figured in the

2  changeover I would know, if the staff wasn't there to

3  report for work, then we needed help.

4    Q.    Were you able to consult a preexisting schedule

5  to find out --

6    A.    No.

7    Q.    Were you able to consult a preexisting schedule

8  to find out who might have been working prior to your

9  arrival on August 4th to supervise the staff of

10  employees?

11    A.    No.

12              (Thereupon, a discussion was had off the

13  record.)

14  BY MS. SMITH:

15    Q.    So just to recap, your job as general manager was

16  to oversee the property, manage a staff, but you did not

17  know who the staff was when you got there, correct?

18    A.    Correct.

19    Q.    And you did not speak to Mr. Patel or Mr. Patel

20  did not speak to you regarding the existing staff or who

21  your direct reports would be; is that correct?

22    A.    Correct.

23    Q.    Was there an orientation held for the existing

24  employees?



Joan Payne

15

1    A.    I was not there.  But I was told there was, yes.

2    Q.    Was there a reason why you weren't there?

3    A.    I was not invited.

4    Q.    So as the general manager in charge of the staff,

5    you were not invited to the orientation?

6    A.    Correct.  Because I think it's because I wasn't

7    hired yet.

8    Q.    Do you recall when the orientation was?

9    A.    I think it was like two weeks prior to the sale.

10    Q.    Was there ever a period of time where existing

11    employees were interviewed for new positions?

12    A.    I did not do any interviews.

13    Q.    Do you know who was in charge of that, of doing

14    the interviews?

15    A.    No, I do not.

16    Q.    So as general manager, no one made you aware of

17    the interview process or who was being interviewed?

18    A.    Correct.

19    Q.    Did you ever have any meetings between yourself

20    and Mr. Patel about the transition of ownership of

21    Nabstar acquiring Sleep Inn and how maybe Nabstar wanted

22    things to run, just in general?

23    A.    Yes.

24    Q.    First of all, when were these meetings held?



Joan Payne

16

1    A.    They are actually ongoing meetings.  We had a

2    brief meeting the day I was hired, two days prior to

3    starting, not knowing, you know, taking the changeover

4    and not knowing who was going to be there and who's not

5    going to be there for employees.  But it's ongoing

6    progress of meetings how to run the hotel.

7    Q.    Were any employees given applications to fill

8    out?

9    A.    The ones that stayed, yes.

10    Q.    Do you know if there was any employees who left

11    Sleep Inn after your first day on August 4th, 2003?

12    A.    Yes, there were several employees that left.

13    Q.    So when you began, there was no preexisting

14    personnel files for any of the employees that worked for

15    Sleep Inn?

16    A.    Correct.

17    Q.    So the previous owners, to the best of your

18    knowledge, kept no files on their employees, correct?

19            MR. CONNORS:  Object to the form.

20    Q.    To the best of your knowledge.

21            MR. CONNORS:  Object to the form.

22    Q.    You can answer.

23            MR. CONNORS:  You can answer.

24    A.    Best of my knowledge, I guess.

1    Q.    Back to the orientation.  You said you weren't

2    invited to that.  But do you know when that was held?

3    A.    Did I know when it was held?  No, I did not.

4    Q.    Do you know where it might have been held?

5    A.    No.

6    Q.    Do you know what might have been discussed at the

7    orientation?

8    A.    No.

9    Q.    How did you know that there was an orientation?

10    A.    Mr. Patel told me afterwards, the day we started.

11    Q.    And you didn't ask any questions about who the

12    staff might be or who attended?

13    A.    No.

14    Q.    Did you think that you may have needed to know

15    that information as the general manager to manage the

16    staff that was present at the orientation?

17    A.    Repeat the question.

18    Q.    Sure.  Did you think that might have been useful

19    information to have to manage the staff to know who was

20    at the orientation?

21              MR. CONNORS:  Object to the form.  You may

22    answer.

23              THE WITNESS:  Repeat the question.

24    BY MS. SMITH:



Joan Payne

18

1    Q.    Sure.    I can rephrase the question.    Why did you

2    not ask any questions about who was present at the

3    orientation since your job description includes managing

4    the staff of employees?

5    A.    I think, at the time, it didn't come up because

6    we were in such chaos when we took over, employees

7    leaving and just generally getting to know the property

8    and what was going on.    There was too much chaos at the

9    beginning to know what happened at the orientation

10   meeting.

11            MR. CONNORS:    Just note my objection to the

12   form of that previous question.

13            MS. SMITH:    Objection noted.

14   BY MS. SMITH:

15   Q.    You mentioned that there was some chaos.    In

16   regards to employees leaving, can you describe to me

17   exactly what you would describe as being the chaos

18   specifically?

19   A.    Well, we had front desk people that quit.    All

20   the sudden, we had a couple hours to find out who was

21   going to cover the front desk.    So that was the main

22   thing when I got there, that front desk staff was

23   covered.

24   Q.    How did you go about soliciting new employees or

Joan Payne

19

1    how did you go about soliciting individuals to cover the

2    front desk?

3        A.    I don't recall to be honest.

4        Q.    What is the normal process for solicitation of

5    persons to cover whatever areas of employment or staffing

6    issues?

7        A.    Well, a lot of times people come in and put

8    applications in or we put an ad in the paper if we need

9    help.

10       Q.    At the time, do you recall putting an ad in the

11   paper or accepting applications for a front desk person?

12       A.    No.

13              MR. CONNORS:    Back at the time of the

14   transition?

15              MS. SMITH:    We are still in 2003, yes.

16              THE WITNESS:    No.

17   BY MS. SMITH:

18       Q.    As general manager now, do you have a thorough

19   knowledge of who is employed by Nabstar working at Sleep

20   Inn?

21       A.    Yes.

22       Q.    How did you come to thoroughly know who works for

23   you at this time?

24       A.    Well, I have been there almost three years.    So

Joan Payne

20

```
1   we have housekeeping meetings once a month.  We have

2   staff meetings every week.  We have a front desk meeting

3   every month.  So you get to know your staff.

4       Q.   When you first began in August of 2003, did you

5   call any meetings with the staff that you were going to

6   be supervising?

7       A.   I don't recall.

8       Q.   Is there a breakfast shift every day at Sleep

9   Inn?

10      A.   Yes.

11      Q.   And the day you began on August 4th, 2003, you

12  said you weren't aware of who your staff was or who was

13  going to be covering what shift; is that correct?

14      A.   Correct.

15      Q.   Do you remember, after you met with the staff

16  between 2:30 and 5:00 p.m., did you then leave work for

17  the day?

18      A.   Yes.

19      Q.   Were you aware, at that time, who was going to be

20  working the breakfast shift the next morning?

21      A.   I would assume I was aware.

22      Q.   You had stated before that you had only met the

23  staff who was on the shift between 2:30 and 5:00 p.m.

24  Did you, at that time, believe that those were the same
```



1    individuals to work the breakfast shift?

2       A.    No.

3       Q.    Did you know who was going to be working the

4    breakfast shift the next morning?

5       A.    At the time, no.

6       Q.    Okay.  So is it your testimony that you left that

7    day on the 4th, you left work at 5 p.m. not knowing if

8    and who was going to be working the breakfast shift the

9    next morning as a general manager?

10      A.    As a general manager, I would assume I knew that

11   the breakfast shift was covered but not knowing who was

12   covering it.

13      Q.    And did you find that out from the persons who

14   worked the 2:30 to 5:00 p.m. shift?

15      A.    Yes.

16      Q.    Have you ever seen Mrs. Islyn Palmer before

17   today?

18      A.    Yes.

19      Q.    How do you know Mrs. Palmer?

20      A.    Through the Sleep Inn.

21      Q.    What was your relationship to Mrs. Palmer through

22   Sleep Inn?

23      A.    I assume -- I guess I was her boss.

24      Q.    Did you ever see Mrs. Palmer working at Sleep



Joan Payne

22

1    Inn?

2       A.    No.

3       Q.    What were your hours that you kept as general

4    manager?

5       A.    8 to 5, Monday through Friday.

6       Q.    So you never worked on the weekends?

7       A.    No.  Well, I do, but only when it's necessary.

8    When we have a full house, I work weekends.

9       Q.    When was the first time that you ever met

10   Mrs. Palmer?

11      A.    I think the following couple weeks or following

12   week when I found out that she was working the breakfast

13   and we already had somebody for the breakfast.

14      Q.    Did you have to hire someone to put in the

15   breakfast position?

16      A.    Yes.

17      Q.    You hired someone from the outside?

18      A.    Yes.

19      Q.    And how did you come to or why did you need to

20   hire someone from the outside to cover the breakfast

21   shift?

22      A.    Because we needed somebody full-time for

23   breakfast because we serve it seven days a week.

24      Q.    Was there a time when the breakfast shift was not

Joan Payne

23

1  covered?

2      A.    Not that I recall.

3      Q.    But you still thought the need to hire another

4  individual for the breakfast shift?

5      A.    We felt we needed a breakfast person, yes.

6      Q.    You just testified that the breakfast shift, as

7  far as your knowledge, was never not covered?

8      A.    Right.

9      Q.    So I guess what I'm trying to find out is:  Why

10 did you then feel the need to hire someone from the

11 outside to cover the breakfast shift if it was already

12 covered?

13          MR. CONNORS:  Object to the form of the

14 question.

15 BY MS. SMITH:

16     Q.    But you can answer.

17     A.    Well, I don't know how to reply to that because

18 I'm trying to remember.  It's almost three years ago.

19 I'm brand new in a brand new position, never been a GM

20 before.  And I know there is a shift that has to be

21 covered.  I felt that we needed a breakfast person.  I

22 didn't know that we had not had one or if there was one.

23 I don't recall.

24     Q.    So you just hired someone not knowing if there

Joan Payne

24

1    was already someone working; is that correct?

2        A.    Correct.

3        Q.    Did you interview this person for her job as a

4    breakfast person, the person that you hired for the

5    breakfast shift?

6        A.    Yes.

7        Q.    When did you interview this person?

8        A.    I don't recall.

9        Q.    Do you remember how long after you started that

10   you had to hire a breakfast person?

11       A.    I don't recall.

12       Q.    Do you recall if it was one week after you

13   started?

14       A.    Probably within the week we hired a breakfast

15   person.

16       Q.    Now, did you earlier testify that you did not

17   interview anyone for any positions?

18            MR. CONNORS:  Object to the form.

19       Q.    And that Mr. Patel did the interviewing for new

20   positions?

21            MR. CONNORS:  Object to the form of the

22   question.

23            THE WITNESS:  I didn't do any interviews

24   before the date they took over.

Joan Payne

25

1   BY MS. SMITH:

2       Q.    After they took over, you handled the interviews

3   for new positions?

4       A.    Yes.

5       Q.    Do you remember who you hired to work the

6   breakfast shift at that time?

7       A.    Yes.

8       Q.    Who was that person?

9       A.    That was Marisol.  M-A-R-I-Z, I think, O-L.

10      Q.    Do you recall her last name?

11      A.    I think it's Gomez.

12      Q.    Did you ever interact with Mrs. Gomez or Miss

13  Gomez when she came in to work?

14      A.    Yes.

15      Q.    And did she work the weekend breakfast as well?

16      A.    Yes.

17      Q.    Did she work the weekend breakfast shift?

18      A.    Yes.

19      Q.    And did she also work during the week?

20      A.    Yes.

21      Q.    Did you see her at the weekends as well?

22      A.    No.

23      Q.    Did anyone ever state to you that Mrs. Islyn

24  Palmer was an employee of Sleep Inn?

Joan Payne

26

1      A.    No.

2      Q.    And when was the first time that you met

3  Mrs. Palmer?

4      A.    I think two weeks later.

5      Q.    And where was this?

6      A.    When she came in on Monday to let me know that

7  she was working the breakfast that weekend.  And I had

8  already, I had hired somebody.  So there was already two

9  people on breakfast.

10     Q.    When you say that Monday, if you started on the

11 4th of August, did she come in the following Monday like

12 a week later?

13     A.    No, I think it was two weeks later.

14     Q.    So we are looking at some time towards the middle

15 of August?

16     A.    Sounds correct.

17     Q.    And that's the first time you had met

18 Mrs. Palmer?

19     A.    Yes.

20     Q.    And, at that time, you stated that Mrs. Palmer

21 informed you that she would be working the breakfast

22 shift the following Saturday or Sunday?

23     A.    State that again.

24     Q.    Sure.  You stated that the first time you met

1   Mrs. Palmer was on a Monday, two weeks later, that's the

2   first time you had any interaction with her wherein she

3   informed you that she was to work the breakfast shift?

4       A.   Correct.

5       Q.   The following weekend?

6       A.   That she had already worked the breakfast shift

7   and she was upset because there was someone else on the

8   breakfast shift.

9       Q.   And do you recall any other conversation that you

10  had with Mrs. Palmer on that Monday?

11      A.   No.

12      Q.   Did you have any other meetings with Mrs. Palmer

13  that you can recall?

14      A.   No.

15      Q.   Did you have any other conversation with

16  Mrs. Palmer that you can recall?

17      A.   No, I think that was the only one.  I'm not sure.

18      Q.   Did you ever speak to Mrs. Palmer about any

19  performance issues?

20      A.   Yes.

21      Q.   When was that?

22      A.   That same day.

23      Q.   What performance issues did you discuss with Mrs.

24  Palmer?



Joan Payne

28

1    A.    The breakfast, mainly it was the breakfast.  She

2    stated her days that she could work.  And I said, well,

3    we needed someone full-time.  So and we had hired one not

4    knowing she was already, you know, there for the

5    breakfast.  So I asked her if she would be willing to

6    help in other areas.  So that was the discussion.

7    Q.    Was there anything else that you discussed with

8    her about any disciplinary problems or performance issues

9    on that Monday?

10    A.    Just -- I don't recall.  I know I got comment

11    cards and I don't recall if I mentioned them to her or

12    not to be honest.

13    Q.    When you say comment cards, were they small cards

14    or were they long forms like eight by --

15    A.    They are five by seven.

16    Q.    And what dates, do you remember what dates were

17    on the comment cards that you got?

18    A.    No, I don't.

19    Q.    Were they for the time when you were general

20    manager and her supervisor?

21    A.    Yes.

22    Q.    So they had to have been August 4th and the two

23    weeks after, correct?

24    A.    Correct.



Joan Payne

29

1    Q.   When did you receive a comment card regarding

2  Mrs. Palmer?

3    A.   It was within those two weeks.  I don't know the

4  date.  I just received comment cards about the breakfast

5  attendant.

6    Q.   Well, there was two weekends in between the time

7  that you started and the time when you first met

8  Mrs. Palmer, correct?

9    A.   Correct.  I assume.

10    Q.   But you are stating that you had no idea that

11  Mrs. Palmer worked there before that Monday, correct?

12    A.   Correct.

13    Q.   When you received the comment cards about

14  Mrs. Palmer, how did you know that they were about

15  Mrs. Palmer if you didn't know that she was working

16  there?

17    A.   Because --

18         MR. CONNORS:  Object to the form of that

19  question.  You may answer.

20         THE WITNESS:  I still didn't know who

21  Ms. Palmer was.

22  BY MS. SMITH:

23    Q.   Did the comment cards specifically state her

24  name?



Joan Payne

30

1      A.    No.

2      Q.    And when you met Mrs. Palmer, how did you know

3    that the cards did apply to her?

4      A.    Because that's when I found that she worked that

5    breakfast that weekend, by her punch card.

6      Q.    So the comment cards, the dates on the comment

7    cards matched up with her punch card?

8      A.    Correct.

9      Q.    Do all employees have punch cards?

10     A.    We did in the beginning.

11     Q.    Back in 2003 when you first started, there were

12   punch cards?

13     A.    Correct.

14     Q.    You were in charge of payroll, correct?

15     A.    Correct.

16     Q.    And did you use punch cards to, I guess,

17   determine what the paychecks would be for each individual

18   worker by their hours on the punch card?

19     A.    Correct.

20     Q.    And how long after you started did you start, I

21   guess, utilizing the punch cards for the purposes of

22   payroll?

23     A.    That week.

24     Q.    When you started on August 4th?

