Joan Payne

31

1    A.    Yes.

2    Q.    So between August 4th and the time you first met

3    Mrs. Palmer, did you happen to see her punch card?

4    A.    No.

5    Q.    When did you first see Mrs. Palmer's punch card?

6    A.    When I had to do payroll.

7    Q.    And when was the first time you did payroll?

8    A.    Two weeks, it's a two-week payroll, biweekly.

9    Q.    Where are the punch cards normally kept?

10   A.    In the laundry room.

11   Q.    Are employees allowed to take their punch card

12   home with them?

13   A.    No.

14   Q.    Who informed you that the punch cards were in the

15   laundry room?

16   A.    I don't recall.

17   Q.    But you knew that they were there when you first

18   started working?

19   A.    After taking a tour and seeing what's in the

20   hotel, around the hotel, yes.

21   Q.    You had mentioned that you didn't know who the

22   employees were and had no way of finding out; is that

23   correct?

24   A.    Correct.

Joan Payne

32

1    Q.    Did you take a look at the punch cards to see who

2    the employees were?

3    A.    Eventually.

4    Q.    Is there a reason why you didn't look at the

5    punch cards to find out who was working when you first

6    started?

7    A.    Probably because I didn't think of it.

8    Q.    Now, you said that you had received some comment

9    cards, five by seven comment cards.  What is the, I

10   guess, normal process for receiving customer complaints?

11   Is it just by customer cards or these five by seven

12   cards?

13   A.    Yes.

14   Q.    Have you ever received any verbal complaints that

15   you later recorded on a comment card?

16   A.    No.

17   Q.    Have any guests ever given you any verbal

18   complaints that you maybe logged somewhere in a diary or

19   logbook?

20   A.    No.

21   Q.    So the only customer complaints that you usually

22   receive or that you have received as general manager are

23   written comment cards from customers themselves?

24   A.    If we get a room complaint, then we have a

Joan Payne

33

1  maintenance logbook that we write that there is a room

2  complaint, something is out of order or something needs

3  to be fixed.  We have that log.  But --

4     Q.   Now, as far as customers complaining about staff,

5  rudeness and friendliness, et cetera, the only method

6  that Nabstar or that you as general manager are aware of

7  are those customer cards; is that correct?

8     A.   Correct, and whether or not they go to Choice

9  Hotels.

10    Q.   I'm sorry?

11    A.   Choice Hotels, that's our umbrella.

12    Q.   And you said whether or not they go to Choice

13  Hotels.  Would you explain that?

14    A.   They can put compliments or complaints to Choice

15  about their hotel stays with any of the Choice Hotels.

16    Q.   Where are the comment cards kept?

17    A.   The front desk.

18    Q.   And who gets to see these comment cards?

19         MR. CONNORS:  Object to the form.  The

20  completed ones or the uncompleted ones?

21  BY MS. SMITH:

22    Q.   Comment cards that are turned in, either

23  compliments or complaints from customers, once they are

24  filled out by a guest either complimenting or complaining

1    about someone or something, who is entitled to view those

2    cards?

3        A.    Usually the guests turn them in at the front

4    desk.  And then they are put in my slot.  And it depends

5    on what they are pertaining to.  Then I discuss it with

6    that employee or now that we have our the front desk

7    manager.  It depends on what, whether it's a comment or a

8    compliment or a complaint.

9        Q.    Now, you mentioned the first time that you met

10   Mrs. Palmer she came to you to say that she worked the

11   breakfast shift, someone else was working there, and that

12   you discussed her schedule; is that correct?

13       A.    Correct.

14       Q.    And that you determined that her schedule would

15   not fit within the needs of Nabstar; is that correct?

16       A.    Correct.

17       Q.    And at that same time, you then realized that she

18   was the employee that was referred to in the comment card

19   that you had received over the weekend?

20       A.    Correct.

21       Q.    And did you take any steps, at that point, to

22   discipline her?

23       A.    No, not that I recall.

24       Q.    Do you recall ever having a meeting with her or



35

1  ever informing her that her services were no longer

2  needed with the company?

3      A.    Not that I recall.

4      Q.    Did you ever send any type of documentation

5  saying that your services are no longer needed with this

6  company?

7      A.    No, I don't think so.

8              (Thereupon, a short recess was had.)

9              (Thereupon, the reporter read back as

10  requested.)

11              (Payne Deposition Exhibit No. 1, Letter from

12  Joan Payne Dated August 20, 2003, was marked for

13  identification.)

14  BY MS. SMITH:

15      Q.    Take a minute or two to read it over.  Have you

16  had the opportunity to review this document marked Payne

17  1?

18      A.    Yes.

19      Q.    Do you recognize this document?

20      A.    Yes.

21      Q.    Can you tell me if that is your signature located

22  at the bottom or mid bottom left over Joan Payne?

23      A.    Yes.

24      Q.    And what is the date of the letter?



WILCOX & FETZER LTD.
Registered Professional Reporters

Joan Payne

36

1      A.    August 20th, 2003.

2      Q.    And as of this date, Mrs. Palmer was no longer

3    working at Sleep Inn?

4      A.    Yes.

5      Q.    Do you recall why you sent this letter?

6      A.    Yes.

7      Q.    Why?

8      A.    Her daughter called and asked, that she needed a

9    letter stating that Ms. Palmer was no longer employed at

10   the Sleep Inn for Workmen's Comp.

11     Q.    Workmen's Compensation?

12     A.    Yes.  Or what is it?

13     Q.    Unemployment?

14     A.    Yes.  I'm sorry.

15     Q.    Do you recall terminating Mrs. Palmer from

16   employment?

17     A.    Yes.

18     Q.    Do you recall why you terminated Mrs. Palmer's

19   employment?

20     A.    The main reason was the schedule.  And the second

21   was because of her work ethics.

22     Q.    Okay.  How long did Mrs. Palmer work under you

23   before you terminated her employment?

24     A.    I would say approximately two weeks or two

Joan Payne

37

1   weekends.

2       Q.   And in that span of time, you did not know

3   Mrs. Palmer was working for Sleep Inn, correct?

4       A.   Correct.

5       Q.   Could you explain what about Mrs. Palmer's work

6   ethics that you found to be cause for her termination?

7       A.   Slowness in the kitchen area.  There were guest

8   complaints that they had to keep coming to the front

9   desk, I was told, asking for supplies at the breakfast

10  that weren't being supplemented, cleanliness of the

11  breakfast area.

12      Q.   You received customer complaints about

13  Mrs. Palmer?

14      A.   About the breakfast area, yes, over the weekend.

15      Q.   Had she worked the one weekend or had she worked

16  two weekends?

17      A.   I know, in our discussion, she worked one

18  Saturday and one weekend and a Saturday, Sunday the next

19  weekend.  So I'm not sure, that two-week period, what she

20  worked.

21      Q.   And were these customer complaints in writing?

22      A.   No.

23      Q.   So she received customer complaints verbally?

24      A.   The front desk received verbally.  They relayed

Joan Payne

38

 1   them to me.

 2      Q.   Did you make a log of this, of these complaints?

 3      A.   We have a bible we call the front desk bible.  I

 4   don't think there is anything in there.  I don't recall

 5   making a log, no.

 6      Q.   So you had received a customer complaint

 7   regarding her or been made aware of customer complaints

 8   regarding her service either one Saturday or one full

 9   weekend that she worked the breakfast shift?

10      A.   Correct.

11      Q.   And is it your testimony that those complaints

12   led you to then terminate Mrs. Palmer's employment?

13           MR. CONNORS:  Object to the form.  You may

14   answer it.

15           THE WITNESS:  Not so much the performance;

16   it was more the work schedule.  We needed somebody

17   full-time for breakfast.

18   BY MS. SMITH:

19      Q.   Did you offer Mrs. Palmer any other options as

20   far as her schedule was concerned?

21      A.   The housekeeping.

22      Q.   And what was Mrs. Palmer's response?

23      A.   She was unable to do that.

24      Q.   Were there different responsibilities and hours



39

1  related to the housekeeping duties?

2      A.    Actually, they started a little later than the

3  breakfast person, but it was still a full-time job, not a

4  part-time job.  And that's what we hire there is

5  full-time people.

6      Q.    So it's your testimony that there were no

7  part-time workers currently at Sleep Inn?

8      A.    Correct.

9      Q.    Did you ever issue Mrs. Palmer a written warning

10  or written discipline?

11      A.    Just the one I wrote that day of her -- I wrote

12  it down.  I think it's insubordination because she wasn't

13  flexible with her schedule and her work performance was

14  not up to par.

15              (Palmer Deposition Exhibit No. 2, Warning

16  Notice, was marked for identification.)

17  BY MS. SMITH:

18      Q.    Have you had an opportunity to review Payne 2?

19      A.    Yes.

20      Q.    Do you recognize this document?

21      A.    Yes.

22      Q.    Is this your signature, your personal manager's

23  signature on the middle right?

24      A.    Yes.

Joan Payne

40

    Q.    And is this a warning notice for Islyn Palmer for

the breakfast shift?

    A.    Yes.

    Q.    And the date of the warning states August 20th,

2003?

    A.    Yes.

    Q.    And the date of violation states August 16, 2003;

is that correct?

    A.    Yes.

    Q.    So you issued this warning on the 20th?

    A.    That's what it says.

    Q.    Did you issue this warning personally to

Mrs. Palmer?  Did you give this directly to Mrs. Palmer

in person?

    A.    I don't recall doing it.  I don't remember.  I

know it was written here that I did a verbal warning with

her.

    Q.    The 16th, August 16th was a Saturday morning in

2003.  And were you working Saturday morning?

    A.    Not that I recall.

    Q.    August 20th was a Wednesday in 2003.  And I

presume you were working at that time?

    A.    Correct.

    Q.    However, if you look at Payne Number 1, that

Joan Payne

41

```
1   letter indicates that she was already not working at

2   Sleep Inn.  She had already been terminated.  My question

3   is:  If Mrs. Palmer had already been terminated, why then

4   would you issue a warning notice to Mrs. Palmer if she

5   had already been terminated?

6              MR. CONNORS:  Object to the form.

7              THE WITNESS:  Okay.  This is not a written

8   notice.  This is what -- this is a verbal warning that I

9   wrote a notation that I have a warning, that I made her

10  aware of her performance from the weekend and it was not

11  up to par.  And because of her poor performance and we

12  discussed her scheduling, then I let her go.

13  BY MS. SMITH:

14     Q.   But could you explain why you wrote the date of

15  warning as being August 20th, 2003?

16     A.   Repeat the question.

17     Q.   I will back up.  Why did you write out a warning

18  notice?

19     A.   It's a notice -- it's for me to know what I did.

20  Because it's a verbal warning.  That's why there is no

21  signature.  There is a verbal warning.

22     Q.   So for a verbal warning, the employee does not

23  have to be aware that there was a notice written and she

24  doesn't have to sign to verify what the warning was
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Joan Payne

42

1  about; is that correct?

2      A.    Correct.

3      Q.    What was the purpose of writing the verbal

4  warning on 8/20/03 if, in fact, Mrs. Palmer had already

5  been terminated?

6              MR. CONNORS:  Object to the form.

7              THE WITNESS:  Okay.  She was terminated.

8  This was done in the morning.  And she was let go.  So I

9  made a notation to myself what happened in the morning.

10  BY MS. SMITH:

11     Q.    So she was terminated on the 20th?

12     A.    Best recollection.

13     Q.    So let me make sure I'm clear on this.  You

14  issued a warning notice in the morning?

15             MR. CONNORS:  Object to the form.

16     Q.    Is it correct that you issued a warning notice in

17  the morning or you drafted a warning notice in the

18  morning, terminated Mrs. Palmer in the morning and then

19  later sent a letter to Mrs. Palmer in response to a call

20  you got from her daughter that same day?

21     A.    Correct.

22     Q.    Is there a progressive discipline policy at Sleep

23  Inn?

24             MR. CONNORS:  Object to the form.  You may

43

1    answer.

2              THE WITNESS:   Usually it's two written

3    warnings.

4    BY MS. SMITH:

5        Q.    Did Mrs. Palmer ever receive a written warning?

6        A.    No, that I recall.

7        Q.    And why did she not receive a written warning?

8        A.    I don't know.

9        Q.    Okay.  You mentioned earlier that Mrs. Palmer was

10   terminated partially because of insubordination.  Is it

11   correct that her unwillingness to change her schedule in

12   your testimony was insubordination?

13       A.    Yes.

14       Q.    Do I have that correct?

15       A.    Yes.

16       Q.    Are you familiar with the Code of Conduct at

17   Sleep Inn?

18       A.    I read it.  But I haven't read it recently.

19              MS. SMITH:   You can mark this as Payne 3.

20              (Payne Deposition Exhibit No. 3, Employee

21   Handbook, was marked for identification.)

22   BY MS. SMITH:

23       Q.    Have you had the opportunity to review Payne 3?

24   Have you had an opportunity to read Payne 3?



Joan Payne

44

1    A.    Yes.

2    Q.    Do you recognize this document?

3    A.    Yes.

4    Q.    Is this part of the Employee Handbook of Sleep

5    Inn?

6    A.    Correct.

7    Q.    Is this the handbook that you follow to maintain

8    decorum or conduct among your staff?

9    A.    Try to, yes.

10    Q.    Do you refer to this document at all as a

11    guideline as to how to discipline your staff?

12    A.    Sometimes.

13    Q.    Was this document used as a guideline in your

14    decision to terminate Mrs. Palmer?

15    A.    No.

16    Q.    I want to call your attention to -- I don't

17    believe I have any extra copies -- the Defendant's

18    Answers to the Plaintiff's Interrogatories that we

19    served.  It's a series of questions and answers that I

20    served to counsel that a representative of Sleep Inn was

21    supposed to certify as true when answering my questions

22    about this case.

23            And to call your attention to question

24    Number 2, Mr. Connors, I can read it aloud or you can

Joan Payne

45

1   show Miss Payne the question.  In general, I'm asking

2   what policy Defendant, Sleep Inn, alleges that

3   Mrs. Palmer violated.  And the certified answer reflects

4   that it was a violation of defendant's Code of Conduct

5   and defendant supplied me with this document.  So you

6   just testified that you did not, in fact, use this Code

7   of Conduct to terminate Mrs. Palmer; is that correct?

8              MR. CONNORS:  Object to the form of the

9   question.  You can answer it.  That's fine.

10  BY MS. SMITH:

11     Q.   So is it your testimony that the information

12  supplied in defendant's answers to interrogatories is

13  false?

14     A.   Can repeat that question?

15     Q.   Sure.  You just said that you did not use this

16  Code of Conduct in terminating Mrs. Palmer.  Did you not

17  refer to this Code of Conduct, correct?

18     A.   Correct.

19              MR. CONNORS:  I object.  What do you mean by

20  refer to it?  Did she read it before?  Did she read it

21  before she did it?  Did she know about it?  I think

22  that's an unfair open-ended question.

23              MS. SMITH:  That's a speaking objection.

24  I'll object to your objection.  Coaching from your



Joan Payne

46

1  defense counsel is not permitted.

2           MR. CONNORS:  Which it was not done either.

3  BY MS. SMITH:

4     Q.  When you terminated Mrs. Palmer, did you use this

5  Code of Conduct as a guideline as to what actions to take

6  regarding her termination?

7     A.  No.

8     Q.  Did Mrs. Palmer violate any of the policies in

9  this Code of Conduct?

10          MR. CONNORS:  I'm going to object on the

11  basis that this question has been asked and answered

12  before in the form of a written response to a written

13  question.

14          MS. SMITH:  And this is a deposition of

15  Miss Payne.  And, therefore -- I mean, your objection is

16  noted.  But, obviously, you can answer the question.

17          THE WITNESS:  Repeat the question.

18  BY MS. SMITH:

19    Q.  The question is:  Did Mrs. Payne violate --

20    A.  Mrs. Payne?

21    Q.  I'm sorry.  Did Mrs. Palmer violate any of the

22  policies in this Code of Conduct?

23    A.  I would say, after reading the Code of Conduct,

24  it would be the insubordination, failure to carry out



Joan Payne

47

1    positions, responsibilities and reasonable work request

2    of management.

3        Q.    Does it say despite warnings?

4        A.    Yes, it does.

5        Q.    How many warnings did you give Mrs. Palmer before

6    you terminated her?

7        A.    I don't think I did any.

8        Q.    Is there a reason why you did not do that?

9        A.    I would say because of the attitude I got when we

10   had our discussion.

11       Q.    And how did Mrs. Palmer react to you?

12       A.    She was very hyper.  Because of knowing, thinking

13   that her job had been replaced and already having guest

14   comments and trying to work out a schedule, she wasn't

15   cooperative.

16       Q.    So you don't think, if in fact Mrs. Palmer was

17   hyper as you say, you don't think she was justified in

18   that being as though someone had taken her job?

19             MR. CONNORS:   Object to that question.

20   That's argumentative.

21   BY MS. SMITH:

22       Q.    You can answer.

23       A.    Not when it was the first time that she met me,

24   and I didn't know who she was and she really didn't know

Joan Payne

48

```
 1   who I was and the conflict of the changeover.  I thought

 2   she was somewhat disrespectful to me when I was trying to

 3   explain things to her.  So --

 4      Q.   So did you, in fact, attempt to give her any more

 5   opportunities to improve her work ethic and give her, I

 6   guess, an opportunity according to the Code of Conduct?

 7      A.   I tried.

 8             MR. CONNORS:  Object to the form of that

 9   question.

10   BY MS. SMITH:

11      Q.   And you can answer if you understand the

12   question.

13      A.   I think it was discussed that we would give her

14   an opportunity if she could work the hours, as we were

15   not looking for a part-time employee.

16      Q.   We are going to put that aside for now.  Just for

17   clarification purposes, when you began as general manager

18   in August, 2003, were all employees then given a new

19   application?

20      A.   I think so.

21      Q.   How was this done?  How did you go about issuing

22   new applications to the employees?

23      A.   By the employees that were there, finding out

24   from them who they thought was staying and who was not
```



Joan Payne

49

1    going to be staying and leave applications at the front

2    desk for them to fill out.

3         Q.    Do you know if Mrs. Palmer ever filled out an

4    application?

5         A.    I think later she did.

6         Q.    At the front desk?

7         A.    I don't recall.

8         Q.    Did you ever give Mrs. Palmer an application to

9    fill out?

10        A.    No.

11        Q.    Did you ever see Mrs. Palmer's application?

12        A.    Later in her file.

13        Q.    When you say later, when is that?  When did you

14    see her application?

15        A.    I guess a couple weeks later.

16        Q.    When you say a couple of weeks, was it before the

17    first time you met her or after?

18        A.    After.

19        Q.    And the first time you met her was the day you

20    gave her the warning and the termination letter; is that

21    correct?

22        A.    Correct.

23        Q.    And then that's the first time you saw her

24    application?



Joan Payne

50

1    A.    Not that day.

2    Q.    So it was after you terminated her that you found

3    her application?

4    A.    Correct.

5    Q.    Where was the application?

6    A.    It was in her file I presume.

7    Q.    Where was this file kept?

8    A.    In the office.

9    Q.    Was this apart from any of the other employees?

10   A.    No.

11   Q.    Is there a reason why you never saw this file

12   until after she was terminated?

13   A.    Repeat the question.

14   Q.    Is there a reason why you did not see this file

15   before Mrs. Palmer was terminated?

16   A.    Not that I recall.

17   Q.    When Mrs. Palmer came in to see you, was that her

18   scheduled workday?

19   A.    No.

20   Q.    Why then did she come in to see you?

21   A.    I presume because she was upset that someone was

22   there over the weekend to work the breakfast.

23   Q.    Do you know if she inquired as to why that was?

24   A.    I don't recall.



Joan Payne

51

1    Q.    Did she inquire as to whether she would be able

2    to continue to work the breakfast shift?

3    A.    I don't recall.

4    Q.    Do you recall anything, any other discussions

5    that you had about the breakfast shift regarding

6    Mrs. Palmer?

7    A.    I know we went back and forth talking about

8    trying to get a full-time and her being upset that she

9    thought she was replaced.

10   Q.    Just to clarify also your previous testimony,

11   just make sure I have that, it's clear on the record,

12   Mrs. Palmer had been working breakfast shift for a number

13   of years before the takeover, and did you consider her

14   willingness to change her shift to a full-time position

15   to be insubordination?

16         MR. CONNORS:   Object to the form of the

17   question.   You may answer.

18         THE WITNESS:   Well, part of insubordination,

19   but also not the needs for what we wanted for the hotel.

20   BY MS. SMITH:

21   Q.    Do you know the age of Mrs. Palmer?

22   A.    No, I do not.

23   Q.    Do you know if she's older than any of the other

24   employees that you have currently on staff?



Joan Payne

52

1    A.    I guess she is.

2              MR. CONNORS:  Don't guess.  Do you know?

3              THE WITNESS:  I'm sorry.  What?

4              MR. CONNORS:  Do you know?

5              THE WITNESS:  If she's older?

6              MR. CONNORS:  Yeah.

7              THE WITNESS:  No, I do not.

8  BY MS. SMITH:

9    Q.    Do you know the ages of any of your staff?

10   A.    Several.

11   Q.    Do you know the age of miss Marisol Gomez?

12   A.    No, I do not.

13   Q.    Do you know if Miss Gomez replaced charging party

14  in her breakfast shift?

15   A.    Yes.

16             MR. CONNORS:  Object to the form of that

17  question.

18  BY MS. SMITH:

19   Q.    Well, I will rephrase.  Did Marisol Gomez take

20  over the breakfast shift that Mrs. Palmer had previously

21  worked?

22   A.    Yes, I think so.

23             MR. CONNORS:  Same objection.

24   Q.    And to further clarify, in 2003 is the time

Joan Payne

53

1    frame, is that still a yes?

2        A.    Yes.

3        Q.    August?

4                MR. CONNORS:   Same objection.

5                (Payne Deposition Exhibit No. 4, Social

6    Security and Resident Alien Card of Marisol Gomez, was

7    marked for identification.)

8    BY MS. SMITH:

9        Q.    Have you had an opportunity to review Payne 4?

10       A.    Yes.

11       Q.    Do you recognize the two items on Payne 4 that

12   are photocopied here?

13       A.    Yes.

14       Q.    What do you recognize this as?

15       A.    We ask for two formal ID's for employees.

16       Q.    And who is the employee represented in these two

17   items?

18       A.    Marisol Gomez.

19       Q.    And the top one, it appears to be a Social

20   Security card or a copy of a Social Security card,

21   correct?

22       A.    Correct.

23       Q.    And the other one is a Resident Alien card?

24       A.    Correct.



Joan Payne

54

1    Q.   On the bottom also with her name, Marisol Gomez,

2    correct?

3    A.   Correct.

4    Q.   And underneath of her first name, Marisol, and a

5    Resident Alien card, there is a date, 04/24/76.  Do you

6    see that date?

7    A.   Yes.

8    Q.   Do you recognize that as a birth date?

9    A.   No.

10   Q.   A date of birth.  I'm sorry.

11   A.   No.

12   Q.   Do you have any idea what the number represents,

13   April 24th, 1976?

14   A.   No, I do not.

15           MR. CONNORS:  Object to the form of that

16   question.

17   BY MS. SMITH:

18   Q.   How are you aware of any of the other

19   individuals' ages at Sleep Inn?

20           MR. CONNORS:  You mean now?

21   Q.   Any of your employees' ages that you are aware of

22   at any time.

23   A.   We try to do a monthly birthday thing for the

24   employees.



Joan Payne

55

1               (Payne Deposition Exhibit No. 5,

2      Housekeeping Schedule, was marked for identification.)

3      BY MS. SMITH:

4          Q.    Have you had an opportunity to review Payne 5?

5          A.    Yes.

6          Q.    Have you ever seen this document before?

7          A.    Yes.

8          Q.    What is this document?

9          A.    It's a housekeeping schedule.

10         Q.    When was the first time that you saw this

11     schedule?

12         A.    I would say probably the week of my employment.

13         Q.    The week that you first started?

14         A.    Uh-huh.

15         Q.    It's marked at the top "old" at the top left.  Is

16     that your handwriting?

17         A.    Yes.

18         Q.    So you wrote "old" on this document?

19         A.    Yes.

20         Q.    Why did you wrote "old" on this document?

21         A.    Because this was the previous owner's

22     housekeeping schedule.

23         Q.    Okay.  And where did you come across this

24     schedule?



Joan Payne

56

1    A.   Housekeeping office.

2    Q.   Was there some sort of manager of housekeeping or

3  you just found it in the office?

4    A.   Found it in the office.

5    Q.   The individuals -- there seems to be names listed

6  on the left-hand side.  All the way to the left under

7  where it says dates, there are some names.  Are you

8  seeing that?

9    A.   Yes.

10    Q.   Do any of these individuals still work for Sleep

11  Inn in the housekeeping department?

12    A.   Currently?

13    Q.   Yes.

14    A.   No.

15    Q.   None of them are working any longer?

16    A.   Correct.

17    Q.   You will see over Isabel -- the last name in

18  housekeeping says Isabel?

19    A.   Yes.

20    Q.   And the name above it says "Merizol" with a "Z?"

21    A.   Yes.

22    Q.   Is she no longer working with Sleep Inn?

23    A.   Correct.

24    Q.   Is this the same Marisol that began working the

57

1  same shift as Mrs. Palmer?

2     A.   I think so.

3     Q.   You said you think so?

4     A.   Yes.

5     Q.   But are you sure?

6     A.   Pretty sure.  Because we only had one Marisol.

7  So I'm pretty sure it was her.

8     Q.   Did you assign Miss Gomez to work the shift that

9  Mrs. Palmer had originally worked, the breakfast shift?

10    A.   Yes, I think so.

11    Q.   Was she an existing employee of Sleep Inn?

12    A.   Who?

13    Q.   Marisol Gomez.

14    A.   No, I don't think so.

15    Q.   As of August 1st, 2001, she appeared to be on the

16  housekeeping schedule; is that correct?

17          MR. CONNORS:  Object.

18    Q.   Miss Marisol Gomez.

19          MR. CONNORS:  Object to the form of the

20  question.

21          THE WITNESS:  She's not on the housekeeping

22  schedule.  She doesn't start until 8/6.

23  BY MS. SMITH:

24    Q.   She's on the schedule.  I guess my question is:



Joan Payne

58

1    Does the schedule start date say 8/1?

2    A.    Correct.

3    Q.    And this is a schedule that the previous owners

4    had that you found in the housekeeping office, correct?

5    A.    Correct.

6    Q.    And she was already on it, correct?

7    A.    No.  Because that's my handwriting.

8    Q.    Okay.  So you wrote in Marisol's name on the old

9    schedule?

10   A.    Marisol, Isabel.

11   Q.    So these two are new employees that you hired?

12   A.    Yes.

13   Q.    You personally hired?

14   A.    I think so.

15   Q.    Did you personally hire Miss Gomez?

16   A.    I don't recall.

17   Q.    But she's on the old schedule but you believe

18   that she's a new hire?

19   A.    This is the schedule that I found in

20   housekeeping.  These are two employees.  They needed to

21   know when they were going to work.  And I put them on

22   here until I could have done the new schedule.  Because

23   we were reformatting everything because we didn't know

24   who was staying and who was leaving.

Joan Payne

59

1    Q.    Was she hired as a full-time employee?

2    A.    Yes.

3    Q.    Is there a reason why she's only on the schedule

4    here one time?

5    A.    I don't recall.  Because I, probably because I

6    was doing a new schedule.

7    Q.    Let's go down a little bit under "breakfast."

8    And you see Islyn and Lorenza; do you see those names,

9    I-S-L-Y-N towards the bottom left?

10   A.    Yes.

11   Q.    Do you know if that refers to Islyn Palmer?

12   A.    No, I don't.  I'm assuming.

13   Q.    At the time when you saw the schedule, you didn't

14   know who Islyn Palmer was; is that correct?

15   A.    Correct.

16   Q.    But you saw a name and dates and times on the old

17   schedule, correct?

18   A.    Correct.

19   Q.    And does this schedule go up until August 15th at

20   the end?

21   A.    Correct.

22   Q.    So the individuals on this schedule were

23   scheduled to work, according to this document, August 2nd

24   and August 3rd of 2003, and also on August 9th; is that

Joan Payne

60

1    correct?

2        A.    Correct.

3        Q.    So at the time you saw this schedule, did you, at

4    that time, believe these names to be the existing

5    employees at Sleep Inn?

6        A.    No.

7        Q.    Then who did you think the individuals were that

8    were listed on this schedule?

9        A.    I knew they were employees of the Sleep Inn, but

10   I did not know if they were going to be still employees

11   of the Sleep Inn.

12       Q.    Do you recall a Petronila Corral?

13       A.    Yes.

14       Q.    Was she an employee at Sleep Inn?

15       A.    Yes.

16       Q.    How did you come to know that she was an employee

17   of Sleep Inn?

18       A.    Because she was still there when we got there.

19       Q.    Did you see her during the week?

20       A.    Yes.  She was in the housekeeping.

21       Q.    Did you ever speak to Miss Corral about other

22   individuals who worked at Sleep Inn?

23       A.    No.

24       Q.    Did you ever speak to Laura or Edith about anyone