Joan Payne

61

1    who was still employed at Sleep Inn?

2       A.    No.

3       Q.    Socorro Torres, did you ever speak to her about

4    anyone who worked at Sleep Inn?

5       A.    No.

6       Q.    Do you recall speaking to anyone in particular

7    about who worked at Sleep Inn?

8       A.    I recall talking to people who worked, yes.

9       Q.    Do you remember who they were?

10      A.    No, I do not.

11      Q.    And when I say people who worked there, I meant

12   existing employees who were employed under the previous

13   owner.  Let me clarify.  Earlier you testified the only

14   way you found out about who was working at Sleep Inn was

15   by talking with preexisting employees who were employed

16   under the previous owner; is that correct?

17      A.    The way I found about the employees are the

18   employees that were working for the previous owners and

19   they stayed and not the ones that left.

20      Q.    Okay.  So when you saw this schedule, is there a

21   reason why you placed these two names on here, Marisol

22   and Isabel -- we're back to Payne 5 -- on this schedule

23   and not just starting a whole new one?

24      A.    I don't recall.

Joan Payne

62

1    Q.    In this old schedule when you saw the other

2    names, you did not inquire as to who these people were on

3    the schedule; is that correct?

4    A.    Correct.

5    Q.    How did you come to make a new schedule not

6    knowing who the individuals were on the old schedule?

7    A.    By talking with the employees and finding out who

8    was staying and finding out if we had to hire.

9    Q.    So by speaking with existing housekeeping

10   workers, you found out by word of mouth who was staying

11   and who was leaving?

12   A.    Correct.

13   Q.    You didn't speak to the individuals themselves?

14   A.    No.  They speak Spanish.  So I don't understand

15   Spanish.

16   Q.    And that's the reason you didn't speak to

17   individuals directly?

18   A.    Correct.

19   Q.    So when you saw these names on the schedule, you

20   did not believe that they were still going to be working?

21   A.    It was a 50/50 chance that they were going to be

22   still working.

23   Q.    Did you assume Islyn Palmer was also Hispanic?

24   A.    No, I did not.



Joan Payne

63

1    Q.   Did you inquire as to who any of these people

2  were on the schedule to the people that were already

3  working?

4    A.   Not -- no, I did not.

5    Q.   Is there a reason why you did not ask about the

6  people that were already on the old schedule?

7    A.   I don't recall.

8    Q.   So as general manager, it's your testimony that

9  you chose not to inquire about the individuals listed on

10  the schedule that you marked "old" that you found in the

11  housekeeping department/office and instead just accepted

12  the word of other employees as to who was going to leave

13  and who was going to stay; is that correct?

14    A.   Correct.

15    Q.   According to this schedule, it appears that

16  Mrs. Palmer worked the 2nd and the 3rd of August of 2003;

17  is that correct?

18    A.   Correct.

19    Q.   And that was before you started, correct?

20    A.   Correct.

21    Q.   And you started on a Monday, August 4th?

22    A.   Correct.

23    Q.   Then the schedule indicates that Mrs. Palmer did

24  not work again until Saturday, August 9th; is that

64

1  correct?

2      A.    Correct.

3      Q.    And it doesn't indicate that she worked past that

4  time on this schedule; is that correct?

5      A.    Correct.

6              (Payne Deposition Exhibit No. 6,

7  Housekeeping Schedule, was marked for identification.)

8  BY MS. SMITH:

9      Q.    Have you had an opportunity to review Payne 6?

10     A.    Yes.

11     Q.    Do you recognize this document?

12     A.    Yes.

13     Q.    Is that your handwriting in the upper left-hand

14  corner, "new" underlined?

15     A.    Yes.

16     Q.    Did you create this schedule?

17     A.    Yes.

18     Q.    Excuse me.  Is this a housekeeping schedule?

19     A.    Yes.

20     Q.    Did you create this housekeeping schedule?

21     A.    Yes.

22     Q.    Do you know what year this reflects?

23     A.    I'm assuming it reflects 2003 when we took over.

24     Q.    Do you recognize any of the names on this



Joan Payne

65

1    schedule?

2       A.    No, because they are half cut off.

3       Q.    Right.  That's what we actually got from, in our

4    investigative files, that the names are cut off.  So can

5    you make out any of the letters towards the end that

6    could somewhat identify any of the names that you can

7    remember from looking at Payne 6?

8       A.    I guess the bottom two looks like Lorenza and

9    Marisol.

10      Q.    And in the right, smack dab in the middle, it

11   looks like "enza G."  Is that also Lorenza?

12      A.    Lorenza, correct.

13      Q.    And then above, I guess about five lines down

14   from the top you see E-R-R-O?

15      A.    Okay.

16            MR. CONNORS:  Object to the form.

17      Q.    Do you see that?

18            MR. CONNORS:  You keep telling her what

19   she's seeing.

20            MS. SMITH:  No, I'm asking.  Do you see

21   that?

22            THE WITNESS:  Correct.

23   BY MS. SMITH:

24      Q.    Do you see E-R-R-O?



1    A.   It's either an "E" or a "C."

2    Q.   Could that possibly be Socorro Torres?

3    A.   I don't know.

4    Q.   Do you recall a Socorro Torres working?

5    A.   How do you spell it?

6    Q.   Well, S-O-C-O-R-R-O, Socorro Torres.

7    A.   No, I don't recall.

8    Q.   Did she work for you at all in your capacity as

9  general manager?

10    A.   Can you rephrase that?

11    Q.   Did Mrs. Socorro Torres ever work for you at all

12  in your capacity as general manager?  Did she ever work

13  under you?

14    A.   I think so.  I don't recall.

15    Q.   But you do recognize the name Lorenza or can you

16  identify anything that could be Lorenza or Marisol?

17    A.   At the bottom.

18    Q.   And if you take a look at Payne 5, do you also

19  see Lorenza and Marisol on the old schedule?

20    A.   Correct.

21    Q.   And is Lorenza's schedule and the old schedule

22  similar to her schedule in the new schedule?  Is she

23  working the same days?

24    A.   No.



Joan Payne

67

1    Q.   Did you speak to Lorenza at that time before you

2    changed her schedule?

3    A.   I don't recall.

4          MR. CONNORS:   Object to the form.   There

5    could be two Lorenza's on this new schedule, correct,

6    Lorenza G or --

7          MS. SMITH:   Are you asking the questions?

8    Are you going on your cross?   Because I'm not done my

9    direct.

10          MR. CONNORS:   No.   I'm just trying to point

11    out some of this.

12          MS. SMITH:   Because if you are going to make

13    an objection, please do.   If not, I will have to

14    continue.

15    BY MS. SMITH:

16    Q.   Is there a possibility there could be two

17    Lorenzas?

18    A.   There is a possibility.

19    Q.   Do you remember employing two Lorenzas?

20    A.   I don't recall.

21    Q.   But there is a Lorenza on the old schedule and a

22    Lorenza on the new schedule, correct?

23    A.   Correct.

24    Q.   And there is a Marisol on the old schedule and a



Joan Payne

68

1    Marisol on the new schedule, correct?

2        A.    Correct.

3        Q.    Now, going back to Payne 5, the schedule ends at

4    August 15th.   There are no dates scheduled past that on

5    the old schedule, correct?

6        A.    Correct.

7        Q.    On the new schedule, the dates go to August 17,

8    2003; is that correct?

9        A.    Correct.

10       Q.    And Marisol appears to be on the schedule for

11   Saturday and Sunday on August 16th and August 17th.    Are

12   you seeing that?

13       A.    Correct.

14       Q.    Is this an accurate portrayal of what the

15   schedule would have been in August, 2003?

16       A.    I would say so.

17       Q.    Noting that Islyn Palmer is no longer on the new

18   schedule or Islyn, the name Islyn is no longer on the new

19   schedule?

20       A.    It doesn't look like it.

21       Q.    What does the letter "F" indicate?

22       A.    Finish.

23       Q.    What is finish?  Can you explain that?

24       A.    It's 8:30 until they finish their assigned



1    duties.   Depends how many rooms they have to clean.

2        Q.    Is that an eight-hour day or could it be a three

3    or four-hour day?

4        A.    It varies.   I would say the least hours is four.

5    The most it would be is eight.

6        Q.    Okay.   But no more than eight hours a day?

7        A.    Correct.

8        Q.    Before you met Mrs. Palmer, did you have any idea

9    how old Mrs. Palmer was at the time?

10       A.    No.

11       Q.    And none of the other employees that you spoke to

12   mentioned Mrs. Palmer was employed?

13       A.    Correct.

14       Q.    Do you know, at the time, what Mrs. Palmer's

15   hourly wage was as a housekeeper or breakfast attendant?

16       A.    No.

17       Q.    So approximately how long of a time did

18   Mrs. Palmer work for you under your knowledge before she

19   was terminated?

20       A.    Two weekends.

21       Q.    I meant with your knowledge, knowing that she

22   worked there.

23       A.    I'm sorry?

24       Q.    How long after you realized that Mrs. Palmer was



Joan Payne

70

1    an employee, how long was it after you realized that she

2    was an employee did you then terminate Mrs. Palmer?

3        A.    I would say a week, two weeks, guessing.  I don't

4    recall.

5        Q.    So you said that, you earlier you testified --

6    and we can read back the testimony if need be -- that the

7    first time you met Mrs. Palmer was about two weeks after

8    your start date.  That was on a Monday, correct?

9        A.    I believe it was a Monday, correct.

10       Q.    So that was a couple of weeks after you had

11   started.  And that day that you had met Mrs. Palmer you

12   had a meeting to discuss performance deficiencies,

13   substandard work and that she was not able to work a

14   schedule that you thought fit within Nabstar's need or

15   Sleep Inn's need, correct?

16       A.    Correct.

17       Q.    And that was the first time that you thought she

18   was employed was the day you met her?

19       A.    Correct.

20       Q.    How long after that did you then terminate

21   Mrs. Palmer?

22       A.    I don't recall.  It was either that day -- I

23   thought I did it the same day we met.

24       Q.    So you terminated Mrs. Palmer the same day you



Joan Payne

71

```
1   met her; is that correct?

2       A.    That's what I'm thinking.

3       Q.    Did she have an opportunity to work another

4   breakfast shift before you terminated her?

5                   MR. CONNORS:   Object to form.   You may

6   answer.

7                   THE WITNESS:   No.

8   BY MS. SMITH:

9       Q.    Was it your decision alone to terminate

10  Mrs. Palmer as general manager?

11      A.    Yes.

12      Q.    Did you discuss her termination with any other

13  staff member, employee or your supervisor?

14      A.    No.

15      Q.    Was your supervisor ever made aware that

16  Mrs. Palmer was terminated?

17      A.    After the fact.

18      Q.    How long after the fact?

19      A.    A couple days.

20      Q.    And why did you notify your supervisor?

21      A.    Because we have our Powwows.   We keep Powwows.

22      Q.    What are they?

23      A.    They are to discuss the hotels, how it's going,

24  the needs, improvements, you know, how's the business,
```



Joan Payne

72

1    how's it going, employees.

2       Q.    How often was this done?

3       A.    Once a week.

4       Q.    Any particular day?

5       A.    We try to have it on Thursdays.  It didn't always

6    happen.

7       Q.    So maybe sometimes you missed a week or you go

8    like Wednesday, Thursday, Friday, sometimes among

9    different days?

10               MR. CONNORS:  Object to the form.  You may

11   answer.

12   BY MS. SMITH:

13      Q.    The question is:  Normally, you met once a week?

14      A.    Correct.

15      Q.    And what was the response that you got when you

16   said that you terminated Mrs. Palmer when you notified

17   your supervisor that you terminated Mrs. Palmer?

18      A.    He was just more concerned that there was someone

19   else to take the place.  And I him that it was a

20   part-time employee.  I don't believe he was aware there

21   was a part-time employee.  I can't say.  You would have

22   to ask him.  Just general, how the hotel was running

23   being it was a brand new takeover.

24      Q.    Okay.  Do you still have those weekly meetings

Joan Payne

73

```
1   with your supervisor?

2       A.    Yes.

3       Q.    Is anyone else present?

4       A.    No.

5       Q.    Were you asked any questions as to why you

6   terminated Mrs. Palmer?

7       A.    Yes.

8       Q.    Do you remember what the questions were?

9       A.    No.

10      Q.    Do you remember how you responded to any

11  questions that were asked to you?

12      A.    I would say probably the same way I have done

13  today, based on the scheduling and what the Nabstar Sleep

14  Inn needed as a breakfast person and work performance.

15      Q.    How big of a part did the customer complaint play

16  in your decision to terminate Mrs. Palmer that day, the

17  same day you met her?

18      A.    I would say -- you are looking at a percentage?

19      Q.    Did it play a big part or did it play a part at

20  all in your decision?

21      A.    Yes, it did play a part.  It's a mixture between

22  the guest complaints and the schedule.

23      Q.    And you said that the front desk relayed to you

24  that there were customer complaints about an employee?
```

Joan Payne

74

1    A.    Yes.

2    Q.    When did you get these messages about customer

3    complaints?

4    A.    Usually on Mondays when I come in.

5    Q.    So that Monday, did you get a call from the front

6    desk about customer complaints?

7    A.    No, they come in and see me.

8    Q.    Do you know who came in to see you?

9    A.    No, I don't.

10    Q.    Was it a front desk manager?

11    A.    I don't recall.

12    Q.    Is it normally a front desk manager who comes to

13    speak to you about customer complaints?

14    A.    Yes.

15    Q.    And these customer complaints were not in

16    writing?

17    A.    Correct.

18              MS. SMITH:   Off the record.

19              (Thereupon, a discussion was had off the

20    record.)

21              (Thereupon, the reporter read back as

22    requested.)

23    BY MS. SMITH:

24    Q.    Now, did you understand that testimony that was



Joan Payne

75

1    just read back?

2        A.    Uh-huh.

3        Q.    And earlier you testified that the only way that

4    you knew of as far as receiving customer complaints were

5    the comment cards?

6                     MR. CONNORS:    Object to the form.

7        A.    Right, and Choice Hotels.

8        Q.    When you say and Choice Hotels -- I'm sorry.    I

9    don't know what you mean when you say that.

10       A.    When guests are, guest privileges, which is a

11   sign-up agreement with Choice umbrella hotels -- we have

12   eight brands of hotels.    They can either write a

13   compliment or a guest complaint to Choice Hotels.    And I

14   get it via E-mail.

15       Q.    But it's still some sort of written form?

16       A.    It's a questionnaire that they fill out for

17   Choice.

18       Q.    Is that something that you receive verbally or

19   just via E-mail?

20       A.    E-mail.

21       Q.    So is it your testimony now that there is

22   additional ways that you receive customer complaints?

23       A.    I said that before, through Choice and through

24   comment cards.

Joan Payne

76

1    Q.   I guess my question is -- you stated a few

2  minutes ago that the front desk relays to you customer

3  complaints verbally.

4    A.   Yes.

5    Q.   Are you the only person that receives these

6  E-mails that come, I guess, subsequently after a guest

7  leaves?

8    A.   From Choice Hotels?

9    Q.   Yes.

10    A.   Yes.

11    Q.   If a customer complains about Sleep Inn, would it

12  be on a Sleep Inn guest comment card?  If the customer

13  fills out a guest card at the end of their stay, a

14  comment card, the five by seven, was that say Sleep Inn

15  on it or Choice Hotels?

16    A.   It would say Sleep Inn.

17    Q.   And customer complaints that you receive, you get

18  them through the comment cards, correct?

19    A.   Correct.

20    Q.   So you're testifying now that you also get them

21  verbally from the front desk; is that correct?

22    A.   Correct.

23    Q.   Is there a reason that you didn't say that when I

24  asked the question the first time?

**W&F**

WILCOX & FETZER LTD.

Registered Professional Reporters

Joan Payne

77

```
 1      A.   No, I don't know a reason.

 2             MS. SMITH:  Would you like to take a break,

 3   Mr. Connors?

 4             MR. CONNORS:  I'm fine.

 5             (Thereupon, a discussion was had off the

 6   record.)

 7   BY MS. SMITH:

 8      Q.   So the comment cards are normally kept at the

 9   front desk?

10             MR. CONNORS:  Objection.  Asked and

11   answered.

12   BY MS. SMITH:

13      Q.   Is that a yes, just for clarification?

14      A.   Correct.

15      Q.   And you have access to those comment cards,

16   correct?

17      A.   Yes.

18      Q.   Did you ever see any comment cards regarding

19   Mrs. Palmer?

20      A.   Yes.

21      Q.   And I will be more specific, regarding complaints

22   against Mrs. Palmer.

23      A.   I think they were complaints, yes.

24      Q.   In regards to this lawsuit, did you supply us
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Joan Payne

78

1   with customer complaints that relate to Mrs. Palmer's

2   performance?

3       A.   Yes, I think so.

4       Q.   How do you know that those complaints refer to

5   Mrs. Palmer's performance?

6               MR. CONNORS:  Objection.  Asked and

7   answered.

8               MS. SMITH:  I did not specifically ask about

9   the complaint forms that were supplied to defendant for

10  our case in this lawsuit.

11              MR. CONNORS:  Same objection.

12              MS. SMITH:  You can answer.

13              MR. CONNORS:  You may answer.

14              THE WITNESS:  Because the complaint logs

15  came in the weekend that she worked breakfast, the

16  comment cards.

17  BY MS. SMITH:

18      Q.   So you received those comment cards at that time

19  contemporaneously with the time that Mrs. Palmer worked;

20  am I clear on that?

21      A.   Correct.

22              (Payne Deposition Exhibit Nos.  7 and 8,

23  Comment Cards, were marked for identification.)

24  BY MS. SMITH:



Joan Payne

79

1    Q.    Have you had an opportunity to review Payne 7 and

2    Payne 8?

3    A.    Yes.

4    Q.    Do you recognize these documents?

5    A.    Yes.

6    Q.    Are these the customer complaints that you

7    supplied to the EEOC related to our request for the

8    customer complaints that were included in your decision

9    to terminate Mrs. Palmer's employment?

10    A.    Yes.

11    Q.    And under comments and suggestions -- I guess

12    we'll start with Payne 7 -- guests who stayed in room

13    322, can you make out what it says under comments and

14    suggestions?

15    A.    Yes.  I think so.

16    Q.    Well, first let's start at the very top.  It says

17    "Sleep Inn?"

18    A.    Yes.

19    Q.    Is this a blown-up version of the five by seven

20    cards that the customers would fill out or is this a

21    different form?

22    A.    No, I think this is the actual size of the card.

23    Q.    So it's a card that's on a regular 8 by 11?

24    A.    It's a fold-over card and you open it up.

Joan Payne

80

1    Q.    I understand.  Okay.  So this is what a customer

2    would have in his or her room, and if they had a bad

3    experience or a good experience, they just write it on

4    this particular form?

5    A.    Correct.

6    Q.    And you received this, Payne 7 and Payne 8, on

7    the weekend that Mrs. Palmer was schedule to work,

8    correct?

9    A.    Yes.

10   Q.    So under comments and suggestions it says, "My

11   husband and I always stayed at Sleep Inn."  Am I reading

12   that correctly?

13   A.    Yes.

14   Q.    "I was surprised but -- I can't read that --

15   unorganized."  Am I reading that correctly?

16   A.    Uh-huh.

17   Q.    "The breakfast area was the next morning"  Are

18   you following?

19   A.    Yes.

20   Q.    "Along with not being able to find things like

21   cereal bowls and utensils, coffee -- I can't make that

22   word out.

23   A.    Coffee cups.

24   Q.    And does that say "sugar?"



Joan Payne

81

1    A.    It looks likes it.

2    Q.    "The tables were a mess as were not clean.  An

3    older woman who looked like she was in her sixties did

4    not look clean or know what she was doing."

5    A.    I don't know what that word is.

6    Q.    Or did not look -- we can't make that out.  Or

7    know what she was doing.  Is that an appropriate read?

8    A.    (Witness indicating.)

9    Q.    This guest checked up at the top -- can you make

10   out the name Beverly -- actually, I can't make that out.

11            Is there any way that you have another

12   record of this guest's name and address for the purposes

13   of Sleep Inn's registration in a computer?

14   A.    The registrations are only kept for a year.

15   Q.    So there is no other way to find out what this

16   guest's name is?

17   A.    Correct.

18   Q.    Nor address?

19   A.    Correct.

20   Q.    Basically, they checked off that they found the

21   quality of service to be poor and the continental

22   breakfast itself to be poor, correct?

23   A.    Yes.

24   Q.    Sorry, under "please check the appropriate box?"

Joan Payne

82

1    A.    Yes.

2    Q.    And at the very top it says that the hotel that

3    they stayed in was Sleep Inn in Newark, Delaware.  Can

4    you make out the dates for me?

5    A.    It looks likes 8/7.

6    Q.    8/7 to 8/8?

7    A.    Uh-huh.

8    Q.    Can we just take a peek at the old schedule?  8/7

9    and 8/8, that's a Thursday and a Friday under this

10   schedule.  And it looks as though under Islyn, which

11   would have, at that time, referred to Mrs. Palmer because

12   that's her first name, it's says that she's not scheduled

13   to work?

14   A.    Correct.

15   Q.    Let's take a look back at 7, I guess, Payne 7.

16   Can you make out the year?

17   A.    '04.

18   Q.    Was Mrs. Palmer working in 2004?

19   A.    No.  I don't think so.

20   Q.    Are you positively sure that this customer

21   complaint refers to Mrs. Palmer?

22   A.    Now that you mention it, no, I'm not positive.

23   Q.    Had you seen this before?

24   A.    The comment?



Joan Payne

83

1    Q.    Yes.

2    A.    Yes.

3    Q.    And you presumed that it referred to Mrs. Palmer?

4    A.    Correct.

5    Q.    But is it your testimony now that you don't

6    believe that it does apply to Mrs. Palmer?

7    A.    Correct.

8    Q.    Let's take a look at Payne 8.  We can skip the

9    comments and suggestions and go to the date.  Can you

10   make out the dates?

11   A.    8/7?

12   Q.    As the check-in date?

13   A.    Yes.

14   Q.    And the check-out date?

15   A.    I don't have my glasses on.

16   Q.    If you need to put them on --

17   A.    I don't have them with me.  It's either 8 or 9.

18   Q.    Of what year?

19   A.    '04.

20   Q.    Again, Mrs. Palmer wasn't working in 2004; is

21   that correct?

22   A.    Correct.

23   Q.    So this customer complaint could not have applied

24   to Mrs. Palmer; is that correct?



Joan Payne

84

```
1      A.    Correct.

2      Q.    Did you certify to counsel that these were the

3   customer complaints that you referred to or used in your

4   decision to terminate Mrs. Palmer?

5      A.    Yes.

6      Q.    Is there a reason --

7            MR. CONNORS:  Objection to the form.  I

8   don't know what certified means.

9   BY MS. SMITH:

10     Q.    Did you represent to defense counsel that these

11  documents were the customer complaints that added to your

12  decision or was part of your decision to terminate

13  Mrs. Palmer?

14     A.    Yes.

15     Q.    Did you supply defense counsel with this

16  information?

17     A.    Yes.

18     Q.    Were you involved in the EEOC investigation of

19  this matter in the year 2004?  Did you speak with any

20  EEOC investigators about the charge Mrs. Palmer had

21  brought against Sleep Inn for age discrimination?

22     A.    No.

23     Q.    You mentioned earlier in your deposition that you

24  spoke with Miss Hawthorne?
```



Joan Payne

85

1    A.    Yes.  Not spoke, through letters.

2    Q.    Did you know, at that time, that there was an

3 investigation going on about Sleep Inn and Mrs. Palmer's

4 charge of discrimination?

5    A.    Through Miss Hawthorne, yes.

6    Q.    So is it your testimony that you were involved in

7 the investigation process of the charge of discrimination

8 brought Mrs. Palmer against Sleep Inn?

9        MR. CONNORS:  Object to the form.  You may

10 answer.

11        THE WITNESS:  Can you repeat the question?

12 BY MS. SMITH:

13    Q.    Were you involved in the investigation of the

14 charge of discrimination that Mrs. Palmer brought against

15 Sleep Inn or Nabstar?

16    A.    Yes.

17    Q.    Do you recall Miss Hawthorne requesting the

18 customer complaints that you said that were in writing

19 that aided in your decision to terminate Mrs. Palmer?

20    A.    No.  I don't recall.

21        (Thereupon, a short recess was had.)

22        (Payne Deposition Exhibit No. 9, Letter from

23 Joan Payne Dated April 4, 2004, was marked for

24 identification.)



Joan Payne

86

BY MS. SMITH:

Q.    We're back on the record.    May I ask Miss Payne,
regarding documents Payne 7 and 8, why you submitted
these documents to defense counsel in regards to our
questions or requests for documents regarding the
complaints that you received for Mrs. Palmer?

A.    Just to clarify, I keep a folder of all the guest
comment cards.    And I just stuff them in there.    So as I
read through them, I didn't look at the dates and I just
read through them and I said, yeah, here they are.
Here's one and here's one.

Q.    Are you testifying that the comment cards do
exist?

A.    I keep them for so long, yes.

Q.    Is it your testimony then that at the time that
the investigation was ensuing that these comment cards
did exist in 2004?

The investigation regarding the charge that
Mrs. Palmer filed against Sleep Inn or Nabstar in your
writing letters back and forth to Miss Hawthorne, did you
represent to Miss Hawthorne that these comment cards did
in fact exist?

A.    I don't remember.

Q.    This has been marked as Payne 9.    Did you have an



Joan Payne

87

1    opportunity to read that?

2        A.    Yes.

3        Q.    Do you recognize this document?

4        A.    I recognize the letter somewhat, but I don't

5    recognize the name, Mrs. Hawthorne.

6        Q.    Is this your signature at the bottom left of

7    the --

8        A.    Yes.

9        Q.    Excuse me.  Is this your signature at the bottom

10   of Payne 9?

11       A.    Yes.

12       Q.    You just don't recall writing this letter?

13       A.    No.

14       Q.    What is the date of the letter?

15       A.    April 14th, 2004.

16       Q.    Is the information in this letter to Mr. Harris,

17   who is the enforcement manager at the US EEOC in

18   Philadelphia, is the information contained in this letter

19   to Mr. Harris accurate?

20       A.    Best of my knowledge.

21       Q.    Drawing your attention to the second paragraph,

22   "after speaking with her"?

23       A.    Yes.

24       Q.    Can you read that, just that paragraph, and then



Joan Payne

88

1    let me know when you are finished?

2        A.    "After speaking with her about her schedule, she

3    said she previously was working Saturdays and Sundays and

4    a Sunday the following week.  This, of course, did not

5    benefit the schedule of the owner's needed for breakfast.

6    Due to the scheduling conflict, she was let go by the

7    general manager."

8        Q.    At this time, did you realize that there was a

9    charge of discrimination against Nabstar?

10       A.    I don't know.

11       Q.    In the subject line it's written the EEOC charge

12   number, 17C-2004-0029.  Do you know if that refers to the

13   charge of discrimination --

14       A.    No, I do not.

15       Q.    -- with the EEOC?

16       A.    No, I do not.

17       Q.    Do you know why you would have written a letter

18   to the EEOC at that time?

19       A.    I would assume that he was upset that she was let

20   go.  But I didn't know if it was -- what about, if it was

21   age or race or I didn't know any discriminating.

22       Q.    I guess my main question is:  Is the information

23   that you wrote in here accurate?

24                MR. CONNORS:  Which information?



Joan Payne

89

1    Q.   The information starting "Dear Mr. Harris" and

2   ending "Sincerely, Joan Payne," all the information

3   contained in this letter.

4    A.   To the best of my knowledge.

5    Q.   So you testified today that the other reasons,

6   there are other factors that you considered when you

7   terminated Mrs. Payne; is that correct?

8    A.   Correct.

9    Q.   Is there a --

10    A.   You said Mrs. Payne again.

11    Q.   Excuse me.  Mrs. Palmer.  Is there a reason why

12   those reasons are not listed in this letter?

13    A.   My best recollection is I didn't want to go into

14   detail.  I wanted to keep it short.

15    Q.   Is there a reason why you did not want to go into

16   detail?

17    A.   I don't know.

18         (Payne Deposition Exhibit No. 10, Letter

19   From Joan Payne Dated December 10, 2004, was marked for

20   identification.)

21  BY MS. SMITH:

22    Q.   Here's a better copy.  It's a little more

23   legible.  Have you finished reading or reviewing Payne

24   10?

Joan Payne

90

1     A.    Yes.

2     Q.    Do you recognize this document?

3     A.    Yes.

4     Q.    Is this your signature at the bottom of Bates

5    stamped Page 185?

6     A.    Yes.

7     Q.    And is this a letter that you wrote to

8    Miss Hawthorne of the EEOC?

9     A.    Yes.

10     Q.    And that's December of 2004?

11     A.    Yes.

12     Q.    And in this letter, second paragraph, you

13    indicate that Mrs. Palmer showed up on the weekend of

14    August 16th and 17th of 2003 for breakfast duties; is

15    that correct?

16     A.    Yes.

17     Q.    Is that information accurate?

18     A.    Best of my knowledge.

19     Q.    When you wrote this letter, were you being

20    accurate and truthful when you wrote this letter to

21    Miss Hawthorne?

22     A.    I hope so.  Best of my knowledge.

23     Q.    When you say "we" in the second paragraph, who

24    are you referring to?  "We had already established a