Joan Payne

91

1    breakfast person since we were unaware of her

2    employment."

3        A.    We would be myself and the owners.

4        Q.    In that second paragraph, "When Ms. Palmer came

5    on her first weekend, she was screaming because she had

6    seen someone already working the breakfast area."  Am I

7    reading this accurately, second paragraph, second

8    sentence?

9        A.    Yes.

10        Q.    "We let her work the weekend and on the following

11    week she came in for her paycheck."  So who is we, and we

12    let her work the weekend?

13        A.    Myself and the -- we being Sleep Inn.

14        Q.    And then it says, "The week after she came in for

15    her paycheck and I had a meeting with her to discuss

16    breakfast attendant duties."

17        A.    Yes.

18        Q.    Is that true?

19        A.    Best of my knowledge.  I'm assuming it's that

20    same day she came in, we had that talk.

21        Q.    So you are saying the following Monday after the

22    16th is the first time that you met Mrs. Palmer; is that

23    correct?

24        A.    It's either that Monday or the Wednesday.  I'm

Joan Payne

92

1    not correct on what day it was.  I thought it was the

2    Wednesday when she came in to get her paycheck.  But I

3    think, again, it's the Monday.  So I'm not sure.

4        Q.   So you are not sure if it's the Monday or the

5    Wednesday?

6        A.   Correct.

7        Q.   But it is your testimony that the day that you

8    did meet with her is the same day that you terminated

9    her; is that correct?

10       A.   Correct.

11       Q.   Going down to the fourth paragraph where it says

12   Ms. Palmer had several desk complaints, is it the case

13   that you represented to Miss Hawthorne that there were

14   guest complaints after her first weekend of working?

15       A.   Yes.

16       Q.   Did you ever represent to her that you would

17   supply her with those guest complaints?

18       A.   I don't recall.

19       Q.   In the last paragraph it says she was let go due

20   the insubordination; is that correct?

21       A.   Correct.

22       Q.   Does it appear that in this letter dated December

23   10th, 2004, that the reason that she was let go at that

24   meeting was due to insubordination?



93

1    A.   I'm sorry.  What was the question?

2    Q.   Is the only reason that's indicated in this

3  letter for Mrs. Palmer's termination was because of

4  insubordination; is that the reason that's given in this

5  letter?

6    A.   It seems to be.

7    Q.   Is there a reason why no other reason was

8  indicated as far as why Mrs. Palmer was terminated in

9  this letter, December 10th, 2004?

10    A.   I don't recall.

11    Q.   So today, in 2006, it's your testimony that not

12  only was it the scheduling, which is what you indicated

13  was the sole reason in 2004, in the April 14th letter,

14  2004, that she was let go simply due to scheduling

15  conflicts; is that correct?

16           MR. CONNORS:  Object to form.

17    Q.   Is it the case that in the April, 2004, letter to

18  the EEOC you indicated the sole reason for Mrs. Palmer's

19  termination was because of a scheduling conflict; is that

20  correct?

21           MR. CONNORS:  Object to the form.

22    Q.   Is that correct?  You can answer.

23           MR. CONNORS:  The letter speaks for itself.

24           MS. SMITH:  And I'm asking if this is

Joan Payne

94

1    accurate, if this is the sole reason that she gave in

2    April, 2004.

3                MR. CONNORS:  I object to the form of the

4    question.  You may answer.

5                MS. SMITH:  She can answer it.

6                THE WITNESS:  I would say yes.

7    BY MS. SMITH:

8        Q.    And then later in December, 2004, your reason for

9    terminating Ms. Palmer is insubordination; is that

10   correct?

11       A.    Yes.

12       Q.    Is there a reason why the reasons are not

13   similar, or different I should say between the April,

14   2004, letter and the December 10th, 2004, letter?

15               MR. CONNORS:  Object to the form.  You may

16   answer.

17               THE WITNESS:  I thought they were one in the

18   same.

19   BY MS. SMITH:

20       Q.    Scheduling conflicts and insubordination are the

21   same?

22       A.    Yes, to me it was because I needed her to work a

23   certain schedule.  And she refused to work that schedule.

24   She already had a set schedule before we took over.  So

Joan Payne

95

1  that was insubordination of what I needed her to work, to

2  do at the Sleep Inn.

3      Q.   So an employee's conflict of schedule, it's the

4  Sleep Inn's policy that they are not allowed to have a

5  conflict of schedule and that is, therefore,

6  insubordination?

7              MR. CONNORS:  Object to form.  You may

8  answer.

9              THE WITNESS:  Yes.

10             (Payne Deposition Exhibit No. 11, Receipt

11 and Acknowledgment of Employee Handbook, was marked for

12 identification.)

13 BY MS. SMITH:

14     Q.   Have you finished reviewing Payne 11?

15     A.   Yes.

16     Q.   In Payne 10 at the end, the last sentence you

17 say, "I have enclosed a copy of Receipt and

18 Acknowledgment of Employee Handbook which has been signed

19 by Ms. Palmer that mentions that Sleep Inn has the right

20 to terminate employment at any time with or without

21 reason."  Did I read that correctly?

22     A.   Yes.

23     Q.   And on the bottom it's ENC, marked enclosure?

24     A.   Yes.

Joan Payne

96

```
 1      Q.    Payne 11, did you enclose that with that

 2   document?

 3      A.    I assume I did.

 4      Q.    Did you recognize that document, Payne 11?

 5      A.    Yes.

 6      Q.    Do you recognize the name at the bottom of the

 7   document?

 8      A.    Yes.

 9      Q.    What is the name that you see there?

10      A.    Islyn Palmer.

11      Q.    Over employee print name and employee signature?

12      A.    Islyn Palmer.

13      Q.    And the date that she signed it?

14      A.    August 9th.

15      Q.    Was that after you began working --

16      A.    Yes.

17      Q.    -- for Sleep Inn?

18      A.    Yes.

19      Q.    And are you the only person in charge of keeping

20   the files for employees or are there other managers in

21   charge of that?

22      A.    No.  I'm in charge of keeping employees' files.

23      Q.    Do you know where that would have been kept, that

24   document?
```



Joan Payne

97

1    A.   That would have been kept in our personnel file.

2    Q.   Is it your testimony that you never saw this

3 document before you terminated Ms. Palmer?

4    A.   I don't recall seeing it, no.

5    Q.   But you do note there that the date that she

6 signed it was August 9th, 2003?

7         MR. CONNORS:  Object to the form of the

8 question.  You may answer it.

9 BY MS. SMITH:

10   Q.   Is that the date that's indicated on that

11 document?

12   A.   Yes.

13   Q.   And when you supplied this document to the EEOC

14 and enclosed your letter, did you believe that that was

15 an accurate, that the information on that document,

16 including signatures, was accurate?

17   A.   Yes.

18        MR. CONNORS:  Object to the form of the

19 question.

20 BY MS. SMITH:

21   Q.   Earlier you testified that the first time you

22 knew that Mrs. Palmer was employed was the Monday or

23 Wednesday following the weekend of August 16th and 17th,

24 2003; is that correct?

Joan Payne

98

1 A. Yes.

2 Q. But it's also your testimony that that document

3 would have been in an employee file that only you would

4 have had access to; is that correct?

5 A. Yes.

6 Q. Is there a reason why that document dated August

7 9th, 2003, was not known to you before August 20th of

8 2003?

9 A. I did not have her sign this document.

10 Q. I didn't ask that.  I just asked:  Is there a

11 reason why you did not know of the existence of her

12 personnel file or that document before August 20th of

13 2003?

14 A. I'm sorry.  What was the question?

15 Q. The question was:  Is there a reason why you

16 would have no knowledge of that document prior to August

17 20th, 2003?

18 A. The reason I would not have no knowledge?

19 Q. Why you would have no knowledge, why you wouldn't

20 know about that document.

21 A. It could have been it was signed and put in her

22 file without me knowing because my office is an open door

23 office.  So it could have been turned in at the front

24 desk and they put it in her file without me knowing it.

Joan Payne

99

1      Q.    So when you testified that you are the only

2  person with access to the employee personnel files, that

3  was incorrect; is that true?

4      A.    Well, I have an open -- they are not supposed to

5  go in there.  It's not a locked cabinet.  But I'm not

6  saying they don't.

7      Q.    Have you ever had any other instances where

8  individuals have gone and put things into files and you

9  had no knowledge?

10      A.    Yes.  Actually, my front desk manager would go

11  into the files.

12      Q.    So your front desk manager also has access to the

13  personnel files?

14      A.    Yes.

15      Q.    Do you know the name of the front desk manager at

16  the time in August of 2003?

17      A.    Just her first name.

18      Q.    What is her first name?

19      A.    Her first name is Chris.

20      Q.    Christine?

21      A.    Yes.

22          MS. SMITH:  I'll make a request for the full

23  name of the front desk employee and I'll put that in

24  writing.

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Joan Payne

100

1    BY MS. SMITH:

2        Q.    When was the first time that you saw this

3    document?

4        A.    I don't recall.

5        Q.    When you submitted this document to the EEOC,

6    what was your purpose in doing that, in including this

7    document with your response to the charge of

8    discrimination?

9        A.    Well, I was trying to state that I thought, you

10   know, that Delaware was an at will employee and that she

11   had signed the handbook of that at will employment.

12       Q.    She had signed and dated that Payne 11?

13       A.    Yes.

14       Q.    And it's your testimony that you supplied that

15   document to show that she had read and received this

16   handbook and that as an employee at Sleep Inn at the time

17   she was aware of her rights as an employee; is that

18   correct?

19       A.    Correct.

20       Q.    So when you submitted this, did you believe that

21   she was employed on August 9th of 2003?

22       A.    Yes.

23       Q.    But you testified that you had no knowledge that

24   she worked there until after August 9th, 2003; is that



Joan Payne

101

1    correct?

2        A.    Correct.

3        Q.    So which is correct, which is true, did you know

4    that she worked August 9th, 2003, or did you know on

5    August 20th that Ms. Palmer was employed by Sleep Inn?

6        A.    I knew the day that she came in.

7        Q.    But no time before that?

8        A.    No.  Because that was when I did the time cards,

9    the payroll and everything.

10       Q.    You began working on August 4th?

11       A.    Yes.

12       Q.    2004.  Excuse me.  2003.  And that was a Monday.

13   What days did you normally do the payroll?  Do you

14   systematically do them on the same day?

15       A.    I did payroll every other Monday for employees to

16   get paid on Wednesday.

17       Q.    So the Monday that you worked you did not do any

18   payroll; is that correct?

19       A.    Correct.

20       Q.    The weekend after, did you do any payroll?

21       A.    No, not that I recall.

22       Q.    So one Monday went by, no payroll, the next

23   Monday no payroll.  So it's two Mondays you did no

24   payroll?

1    A.    I don't think so.

2    Q.    At that time, was it every other Monday or was it

3    customary for you to miss consecutive Mondays to do

4    payroll?

5    A.    We get paid biweekly.  So they would work the 4th

6    for that Sunday.  The pay period was Sunday -- Monday

7    through Sunday.  So they would work that Monday, work the

8    following week, and then the following Monday I would do

9    payroll for them to get a two-week paycheck.

10    Q.    So the two weeks after that would be the 18th of

11    August of 2003.  That's 14 days after August 4th.  And

12    you said there was time cards that you had to use?

13    A.    Correct.

14    Q.    Punch cards?

15    A.    Correct.

16    Q.    When is the first time that you saw the punch

17    cards?

18    A.    I don't remember.

19    Q.    But you did notice Miss Palmer's punch card on

20    the 18th?

21    A.    I'm assuming I did.

22    Q.    And what was your reaction if you did not know

23    that she was already employed?

24    A.    Who is this employee?



Joan Payne

103

1    Q.    Did you refer to the old schedule that you have

2    with her name on it?

3    A.    I don't remember.

4    Q.    At that time, did you have the old schedule with

5    her name on it?

6    A.    I don't remember.

7            MS. SMITH:  We can have the court reporter

8    go back when we talked about the old schedules.

9            (Thereupon, the reporter read back as

10   requested.)

11   BY MS. SMITH:

12   Q.    So that week that you first started using punch

13   cards, were they already the same punch cards that had

14   been in existence or did you create new punch cards?

15   A.    I don't remember.  I'm assuming I created new

16   ones.

17   Q.    And how did you create new punch cards?

18   A.    They are just blank cards.

19   Q.    Actually, strike that.  How did you know what

20   employees to place on the punch cards?

21   A.    I didn't do that.  The employees put their own

22   names on their punch cards.

23   Q.    How did you know how many punch cards to set

24   aside for employees?

Joan Payne

104

1    A.    There are just a handful back there.  I didn't

2    count.

3    Q.    So is it your testimony that any individual could

4    put in a punch card, that you had no knowledge that they

5    were employed but they could put in a punch card for a

6    paycheck?

7    A.    They could, yes.

8    Q.    Would you then pay that individual?

9    A.    No.

10    Q.    What would you do?

11    A.    Because the pay would be on whose name is already

12    listed.

13    Q.    And in Miss Palmer's case, you said earlier who

14    is this person?

15    A.    Right.

16    Q.    And then what was your next step after you saw

17    her punch card and you realized you had never heard of

18    her before?  What was your next step?

19    A.    Well, I saw that she works.  The next step was to

20    pay her.

21    Q.    So you just testified that you would not normally

22    pay someone that you didn't know was an employee of Sleep

23    Inn; is that correct?

24    A.    Correct.

Joan Payne

105

1    Q.    So in Miss Palmer's case, you didn't know she was

2    an employee but you paid her anyway?

3    A.    Correct.

4    Q.    Is there a reason why?

5    A.    Because I would -- I don't know.  I guess I'm an

6    honest person.  I'm thinking if she knew where the time

7    clock was and knew where the cards were, she must be an

8    employee there.

9    Q.    You didn't think about maybe asking around if she

10   was really an employee before you paid her?

11   A.    I could have.  I don't remember.

12              (Thereupon, a discussion was had off the

13   record.)

14   BY MS. SMITH:

15   Q.    When you met with Mrs. Palmer the day you

16   terminated her, did you mention to Mrs. Palmer that there

17   were customer complaints against her?

18   A.    I don't remember.

19   Q.    And you said that you wanted a full-time employee

20   and you discussed schedule.  Did you discuss any other

21   departments that Mrs. Palmer could work in?

22   A.    I thought I did.

23   Q.    What specific departments did you offer

24   Mrs. Palmer?



Joan Payne

106

1   A.   The housekeeping.

2   Q.   And what duties would that entail?

3   A.   Cleaning rooms and doing the hallways.

4   Q.   And I think you testified earlier that all the

5   different departments and positions were going to be

6   full-time; is that correct?

7   A.   Correct.

8   Q.   Was anyone else present in the meeting that you

9   had with Mrs. Palmer?

10   A.   I don't recall.

11   Q.   Was it just you and Mrs. Palmer?

12   A.   I think so.

13   Q.   Would there have been anyone else?

14   A.   Unless her daughter -- I know I met her daughter

15   once because she came down and gave me an earful.

16   Q.   When was this?

17   A.   I guess after I let Ms. Palmer go, shortly after

18   that.

19   Q.   You had you terminated Ms. Palmer on the 20th of

20   August, 2003?

21   A.   Sounds right.

22   Q.   And that you had gotten a call from her daughter

23   that day and that you sent a letter that same day

24   indicating that Mrs. Palmer was terminated; is that

Joan Payne

107

1    correct?

2        A.    Correct.

3        Q.    So you are saying that same day, that her

4    daughter received that letter the same day or you met her

5    after August 20th?

6        A.    Oh, I don't recall.    I remember her daughter

7    calling and saying that she needed a letter to say that

8    her mom was no longer working there.    That's why it's

9    made out to whom it may concern.

10       Q.    Have you ever disciplined any other employees

11   that worked for you?

12       A.    Since I have been there?

13       Q.    Yes.

14       A.    Yes.

15       Q.    And do you recall what types of discipline that

16   you had to issue to employees?

17       A.    Well, I've had to actually fire, verbal and

18   written.

19       Q.    I'm sorry?

20       A.    You said to discipline?    I fired.    I've written

21   and the verbal.

22       Q.    Okay.    When you verbally disciplined someone, do

23   you remember what the infraction was for that you had to

24   issue verbal discipline?

Joan Payne

108

1    A.    No, I don't remember.

2    Q.    What about the written discipline?

3    A.    It would be in their file.

4    Q.    Do you remember an employee by the name of

5    Petronila Corral?

6    A.    Yes.

7    Q.    Was she an employee of Sleep Inn?

8    A.    Yes.

9    Q.    Is she still working for Sleep Inn?

10    A.    No.

11    Q.    Do you remember what her dates of employment

12    were?

13    A.    No.

14    Q.    Did she work under you?

15    A.    Yes.

16    Q.    And do you know why she no longer works for Sleep

17    Inn?

18    A.    No.

19    Q.    Did you terminate Miss Corral?

20    A.    I don't remember.

21    Q.    The individuals that you had to terminate, do you

22    remember what the reasons were for their termination?

23    A.    Mostly terminate, majority is because they do a

24    no call, no show.

Joan Payne

109

1     Q.   Meaning they don't show up to work?

2     A.   Correct.

3     Q.   And is that grounds for immediate termination?

4     A.   Yes.

5     Q.   And it's your testimony that you don't recall

6 giving any written warnings to any other employee

7 specifically?

8           MR. CONNORS:  Object to the form.

9     Q.   I will rephrase.  Is it your testimony that you

10 have not given any written warnings to or that you cannot

11 recall the basis for the written warnings that you may

12 have given to any other employees?

13    A.   No, I don't recall.

14    Q.   Do you recall an employee who was attempting to

15 start a union?

16    A.   No.

17          MS. SMITH:  Go off the record for one

18 minute.  I may be done.

19           (Off the record.)

20           (Payne Deposition Exhibit No. 12, Letter

21 From Joan Payne Dated December 10, 2004, was marked for

22 identification.)

23 BY MS. SMITH:

24    Q.   And I'm just drawing your attention the question

Joan Payne

110

1    where it says Question Number 1.  It's really just the

2    first paragraph on Payne 12.

3        A.    Yes.

4        Q.    Do you recognize this document?

5        A.    Yes.

6        Q.    Is that your signature at the bottom?

7        A.    Yes.

8        Q.    Is this a letter to Miss Evangeline Hawthorne

9    from the EEOC?

10       A.    Yes.

11       Q.    And this is dated December 10th, 2004; is that

12   correct?

13       A.    Yes.

14       Q.    Do you recognize any of the names in Question 1?

15       A.    Some of them, yes.

16       Q.    Do you recall if these individuals were

17   terminated or did they leave voluntarily from employment

18   with Sleep Inn?

19       A.    I don't remember.

20             MS. SMITH:  That's all I have.

21             MR. CONNORS:  I have a few questions for

22   you.

23                      EXAMINATION

24   BY MR. CONNORS:



Joan Payne

111

1    Q.    Previously you testified that you did not know

2    Ms. Palmer's age, correct?

3    A.    Correct.

4    Q.    Did Ms. Palmer's age factor, in any way, in your

5    decision to terminate her?

6    A.    Absolutely not.

7    Q.    Now, there was some discussion previously about

8    guest comment cards that have the date of August, 2004,

9    as opposed to August, 2003?

10   A.    Correct.

11   Q.    When these comment cards were provided, might

12   they have been provided in error because you were

13   searching for them by the August date?

14   A.    Oh, I see what you are saying.  Yeah, that could

15   have been, yes.

16   Q.    So these might not apply to this?

17   A.    Correct.

18   Q.    And if they don't apply, they were supplied to

19   you in error.  However, Ms. Smith asked you about the

20   warning notice that was given, that you wrote up relating

21   to Ms. Palmer, correct?

22   A.    Correct.

23   Q.    And in that you said verbal warning was given due

24   to Ms. Palmer's work ethics.  After meeting, Ms. Palmer

Joan Payne

112

1   was let go as to work performance and scheduling

2   conflicts.   The work performance, was that based upon

3   verbal complaints that were made to you?

4       A.    Yes.

5       Q.    The when you were hired as general manager, did

6   you become familiar with the employee handbook?

7       A.    Not right away, no.

8       Q.    Can you tell me about how soon after you were

9   employed that you became familiar with it?

10      A.    I'm trying to think when we even had it together.

11  Maybe a month, two months later.

12      Q.    That's when you thought you looked at it for the

13  first time?

14      A.    Yes.

15      Q.    Well, in that book, that handbook there is a Code

16  of Conduct, correct?

17      A.    Yes.

18      Q.    And does it not state in part, "The following are

19  examples of some but not all of the conduct which may

20  result in immediate termination of the employment

21  relationship without warning?"   Is that what it says?

22      A.    Yes.

23      Q.    And is insubordination one of the examples of

24  conduct that may result in immediate termination without

Joan Payne

113

1  warning?

2      A.    Yes.

3      Q.    And if an individual was the subject of verbal

4  complaints about her job duties, keeping the breakfast

5  station filled with supplies and clean, would that

6  constitute a failure to carry out position

7  responsibilities?

8      A.    Yes.

9      Q.    And if you asked or required an employee to be

10  full-time or work a particular schedule, would that

11  constitute a reasonable work request of management?

12      A.    Yes.

13      Q.    And if an individual in your employ did not carry

14  out position responsibilities properly or did not concede

15  to or agree with a reasonable work request of management,

16  perhaps bearing on a schedule, would you view that as

17  insubordination?

18      A.    Yes.

19      Q.    And would you agree that under the Code of

20  Conduct, that person could be immediately terminated

21  without warning?

22      A.    Yes.

23          MR. CONNORS:   Those are all the questions I

24  have.  Thank you.



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Joan Payne

114

```
1            EXAMINATION

2   BY MS. SMITH:

3       Q.    Miss Payne, just to clarify, you just told

4   Mr. Connors that you did not become familiar with this

5   Code of Conduct until one month after you started working

6   at Sleep Inn; is that correct?

7       A.    Correct, thereabouts.

8       Q.    So you were not familiar with this Code of

9   Conduct when you decided to terminate Mrs. Palmer; is

10  that correct.

11      A.    I don't remember.  Yes.  I don't remember reading

12  the code, you know, the employee handbook in detail by

13  the time I terminated her, no.

14      Q.    Okay.  Well, just to clarify the question, I just

15  need a yes or no.  Were you familiar with the specifics

16  of the Code of Conduct at the time you terminated

17  Mrs. Palmer?

18      A.    Not in detail, no.

19      Q.    Were you familiar with Page 14 of the Code of

20  Conduct when you terminated --

21      A.    I don't remember.

22      Q.    I'll finish the question.  Were you familiar with

23  Page 14 of the Code of Conduct when you terminated

24  Mrs. Palmer?
```



WILCOX & FETZER LTD.
Registered Professional Reporters

Joan Payne

115

1    A.    I don't remember.

2    Q.    And when you cited insubordination as one of the

3    reasons for Mrs. Palmer's termination, did you have any

4    of the details listed on Page 14 of the Code of Conduct

5    in mind when you terminated Mrs. Palmer for that reason,

6    for insubordination?

7              MR. CONNORS:    Object to the form.

8    Q.    I'll rephrase the question.    You are probably

9    still going to object.

10             Did you have any of the specifics of Page 14

11   of the Code of Conduct in mind when you terminated

12   Mrs. Palmer's employment?

13   A.    I don't remember.

14   Q.    But you do recall that you did not become

15   familiar with this Code of Conduct until one month after

16   your employment with Nabstar, which was after Mrs. Palmer

17   is terminated; is that correct?

18             MR. CONNORS:    Object to the form, also

19   mischaracterizes her testimony.    The record will speak

20   for itself.

21             THE WITNESS:    I knew we had the handbook.    I

22   glanced through it.    I did not read it in detail.

23   BY MS. SMITH:

24   Q.    Until one month after your start of employment;

1    is that correct?

2              MR. CONNORS:  Object to the form.  You may

3    answer.

4              THE WITNESS:  Yes.

5              MS. SMITH:  For clarification, did you tell

6    Mr. Connors that -- can we just read back the testimony?

7              (Thereupon, the reporter read back as

8    requested.)

9    BY MS. SMITH:

10     Q.   So you testified that the first time you looked

11   at the Code of Conduct was one month after your

12   employment; is that correct?

13     A.   Yes.

14             MS. SMITH:  Thank you.

15             MR. CONNORS:  We will read and sign.  You

16   have the right to have the court reporter transcribe this

17   and have the transcript issued to the parties without you

18   having a chance to read it and make changes according to

19   our Delaware rules, federal rules.  And as your attorney,

20   we will read and sign.

21             (Thereupon, the deposition concluded at

22   12:50 p.m.)

23

24

```
 1                    INDEX TO TESTIMONY

 2   JOAN PAYNE                               PAGE

 3      Examination by Ms. Smith              2, 114
        Examination by Mr. Connors            110
 4
                        - - - - -
 5

                    INDEX TO EXHIBITS
 6
     PAYNE DEPOSITION EXHIBIT NO.             PAGE
 7   1, Letter from Joan Payne Dated
        August 20, 2003 .......................... 35:11
 8   2, Warning Notice........................ 39:15
     3, Employee Handbook..................... 43:20
 9   4, Social Security and Resident Alien Card
        of Marisol Gomez....................... 53:5
10   5, Housekeeping Schedule................. 55:1
     6, Housekeeping Schedule................. 64:6
11   7 and 8, Comment Cards.................... 78:22
     9, Letter from Joan Payne Dated
12      April 4, 2004 .......................... 85:22
     10, Letter From Joan Payne Dated
13      December 10, 2004 ...................... 89:18
     11, Receipt and Acknowledgment of
14      Employee Handbook...................... 95:10
     12, Letter From Joan Payne Dated
15      December 10, 2004...................... 109:20
16
17
18
19
20
21
22
23
24
```

**W&F**
WILCOX & FETZER LTD.
Registered Professional Reporters