Exhibit

"E"

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EQUAL EMPLOYMENT OPPORTUNITY          )
COMMISSION,                           )
                                      )
          Plaintiff,                  )
                                      )
v.                                    )   Civil Action No.
                                      )    05-cv-0375 (GMS)
NABSTAR, LLC, d/b/a Sleep Inn,        )
                                      )
          Defendant.                  )


          Deposition of ALICE Y.T. YANG taken
pursuant to notice at the offices of United States
Attorney, 1007 Orange Street, 7th Floor, Wilmington,
Delaware, beginning at 10:00 a.m. on Monday, March 20,
2006, before Ann M. Calligan, Registered Merit
Reporter and Notary Public.

APPEARANCES:
     RACHEL M. SMITH, Esquire
     EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
     PHILADELPHIA DISTRICT OFFICE
       21 South 5th Street - Suite 400
         Philadelphia, Pennsylvania  19106
       on behalf of the Plaintiff,

     KEVIN J. CONNORS, Esquire
     MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
       1220 North Market Street - Fifth Floor
       P.O. Box 130
       Wilmington, Delaware  19899-0130
       on behalf of the Defendant.

          WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
          (302) 655-0477

EEOC                                    v.                    Nabstar, LLC, d/b/a Sleep Inn
Alice Y.T. Yang            C. A. # 05-cv-0375 (GMS)                      March 20, 2006

Page 2

1         ALICE Y.T. YANG,
2     the witness herein, having first been
3     duly sworn on oath, was examined and
4     testified as follows:
5             EXAMINATION
6   BY MS. SMITH:
7   Q.  Good morning, Mrs. Yang.  My name is Rachel
8   Smith.  I'm a trial attorney with the United States
9   Equal Employment Opportunity Commission, and I'm here
10  today to take your deposition, which is basically just
11  asking you a series of questions related to our
12  matter, the EEOC's matter on behalf of Islyn Palmer
13  against Nabstar, LLC, who are currently the owners of
14  Sleep Inn in Newark, Delaware.
15          Have you ever had your deposition taken
16  before, Mrs. Yang?
17  **A.  No.**
18  Q.  Just for the record, could you state your full
19  name and address?
20  **A.  My name is Alice Yang.**
21  Q.  Could you spell your last name?
22  **A.  Y-a-n-g.**
23  Q.  And your address?
24  **A.  134 Chapel Hill Drive, Newark, Delaware.**

Page 3

1   Q.  That's Newark, Delaware?
2   **A.  Mm-hmm.**
3   Q.  Okay.
4   **A.  19711.**
5       **You ask for the Alice, Y.T. in between**
6   **Alice.**
7   Q.  You have initials Alice Y.T. Yang?
8   **A.  Right.  Alice.  Mm-hmm.  Thank you.**
9   Q.  During the course of the deposition, the court
10  reporter will be taking down your answers so you will
11  need to give a verbal response, a yes or a no, not
12  nodding or shaking the head.  The court reporter can't
13  take that down.  So every question that I ask, you can
14  say yes or no or verbally respond.
15  **A.  Okay.**
16  Q.  And when I ask you a question, even if you
17  anticipate or think you know what I'm about to say,
18  you have to let me completely say the question before
19  you respond.  That way the record will be clear.
20      MS. SMITH:  Can we go off the record for a
21  minute?
22      (Discussion off the record.)
23  BY MS. SMITH:
24  Q.  There will be points of the deposition where

Page 4

1   Mr. Connors may pose an objection.  So we'll resolve
2   the objection first, and most likely, most of the
3   time, you will be able to answer the question anyway.
4       If you need to take a break at any time,
5   please let me know.  And we'll take an appropriate
6   break.
7       Are you on any medication or under the
8   influence of any alcohol or drugs that may inhibit
9   your ability to testify truthfully today?
10  **A.  No.  But I need to change my sunglass because I**
11  **had surgery recently so I need to put sunglass instead**
12  **of regular glass.**
13  Q.  Okay.  That's fine.
14      But it won't impede your ability to
15  testify truthfully?
16  **A.  No.  Just too bright.**
17  Q.  Now, Ms. Yang, when did you first begin working
18  at Sleep Inn?
19  **A.  I think since 1996 when we open.**
20  Q.  And is that the Sleep Inn in Newark, Delaware?
21  **A.  Right.  Yes.**
22  Q.  What was your position at Sleep Inn when you
23  started in 1996?
24  **A.  I'm the president of the company.**

Page 5

1   Q.  What was the name of your company?
2   **A.  Five-T Enterprise.  Five spell out,**
3   **F-i-v-e-hyphen-T, T for tiger, Enterprise, Inc.**
4   Q.  Five-T Enterprises, Inc.?
5   **A.  Yeah.**
6   Q.  And prior to your being president of Five-T
7   Enterprises, Incorporated, what was your position?
8   **A.  Actually I'm the senior system programmer,**
9   **computer programmer at University of Delaware.**
10  **Actually, I didn't quit my job.  I, you know, I work**
11  **university and I, you know, I am the president of the**
12  **company.**
13  Q.  Are you still currently president of Five-T
14  Enterprises?
15  **A.  No.  No.  Because the company -- the hotel**
16  **sold.  So the company dissolved.**
17  Q.  And when did that occur?  When was the company
18  sold?
19  **A.  2003.  August of 2003.**
20  Q.  And was the company sold to Nabstar, LLC?
21  **A.  Yes.**
22  Q.  Are you still currently senior system computer
23  programmer?
24  **A.  Yes.  Yes.**

2 (Pages 2 to 5)

EEOC                                          v.                    Nabstar, LLC, d/b/a Sleep Inn
Alice Y.T. Yang                    C. A. # 05-cv-0375 (GMS)                    March 20, 2006

Page 6

1    Q.  I'll finish the question, and then you can
2    answer.
3    A.  I'm sorry.
4    Q.  That's okay.
5         Are you still senior system computer
6    programmer at the University of Delaware?
7    A.  Yes.  But I work part time now.
8    Q.  How long have you been with the University of
9    Delaware?
10   A.  30 years.
11   Q.  30 years?
12   A.  Mm-hmm.
13   Q.  Were you doing any other part-time work in
14   conjunction with the senior system computer
15   programming?
16   A.  No.  No.  Sorry.
17   Q.  That's okay.  I'll repeat the question.
18   A.  Okay.
19   Q.  Have you done any other part-time work in
20   conjunction with the senior system programming job at
21   the University of Delaware besides being president of
22   Five-T Enterprises?
23   A.  You mean now or before?
24   Q.  Before Five-T?

Page 7

1    A.  No.  No.  I just -- before I just, you know,
2    work -- you know work hotel and university, yeah.
3    Q.  So prior to Five-T you did not do any other --
4    A.  No.
5    Q.  -- other part-time work?
6    A.  No.  I didn't do anything.
7    Q.  So you were a full time university employee
8    prior to Five-T?
9    A.  Full time, yeah, and during -- during -- I work
10   part time.  I work part time.  I have full time.  Then
11   my hotel -- I work part time university and handle --
12   you know, and part time and after come -- I continue
13   part time.  I continue work part time.
14        Do you understand what I'm talking about?
15   Q.  I believe I do.
16   A.  I work full time, then part time university
17   and, you know, hotel.
18   Q.  Part time for Five-T?
19   A.  Yeah.  And then -- yeah.
20   Q.  So you worked for Five-T between 1996 and 2003,
21   is that correct?
22   A.  Yes.
23   Q.  During the time that you were president of
24   Five-T Enterprises, what were your duties and

Page 8

1    responsibilities as president?
2    A.  Okay.  Because I had -- I had a full employee.
3    I had manager.  I had manager, assistant manager,
4    supervise, you know, the structure.  I can oversee.  I
5    just kind of oversee since the -- actually, Five-T
6    Enterprise and I the only one local.  I'm the only one
7    living Delaware.  So I can oversee -- oversee the
8    operation.  Okay?  And then, you know, all the
9    manager, you know, report to me like we had once-a-
10   week meeting, you know, and all that.  Yeah.
11   Q.  So all of the managers reported to you?
12   A.  Right.  Right.
13   Q.  So if there were any -- continue.
14   A.  Okay.  Then, you know, I had like twice a year
15   I had partnership meeting and I report to partner.
16   Yeah.
17   Q.  So you had partners or investors in your
18   company?
19   A.  Right.  Yeah.  Yeah.  That's why I call Five-T,
20   you know.  Five Taiwanese.  Yeah.  Yeah.
21   Q.  Do you know an individual named Stephen Chen?
22   A.  Yes.
23   Q.  Is he any relation to you?
24   A.  He's my brother, yeah.

Page 9

1    Q.  Was he also employed by Five-T Enterprises?
2    A.  Yeah.  He was the one of the partners, and he
3    was employee.
4    Q.  He was a partner and an employee?
5    A.  Right.  He was partner/employee.
6    Q.  So as president, having all the managers report
7    to you, if there was ever any difficulty with staff or
8    problems with the staff, would you have -- would they
9    have notified you at these meetings?
10   A.  Mm-hmm.  Yeah.  Yeah.  They can solve the
11   problem.  They can -- you know, but usually, they will
12   bring up, you know, yeah.
13   Q.  Did these meetings happen for the duration of
14   your presidency between 1996 and 2003?
15   A.  Right.  Right.
16   Q.  And was Mr. Chen -- what was Mr. Chen's job or
17   employment with Five-T Enterprises?
18   A.  He -- actually he and his wife, they both
19   like -- like take care of the -- kind of supervise
20   over the housekeeping department and like ground, take
21   care of, like, outside, you know, like a team.  He and
22   his wife, they like a team.  They take care of the
23   housekeeping, housekeeping department and the
24   breakfast area, and something like that, yeah.

3 (Pages 6 to 9)

EEOC                                        v.                Nabstar, LLC, d/b/a Sleep Inn
Alice Y.T. Yang              C. A. # 05-cv-0375 (GMS)                    March 20, 2006

Page 10

1  Q.  What's Mr. Chen's wife's name?
2  A.  Mei.  Mei-Chen.
3  Q.  Is that M-a-e or --
4  A.  M-e-i C-h-e-n Mei-Chen and last name C-h-e-n,
5  Mei-Chen Chen.
6  Q.  What area exactly was Stephen Chen specifically
7  responsible for as a manager?
8  A.  Like take care of the housekeeping -- like kind
9  of schedule, you know, because the hotel, you need
10  to -- like housekeeping, clean the rooms.  So each
11  morning he would see how many room is occupied, how
12  many room is -- you know, people check out.  You know,
13  like he schedule like who clean what and how many, you
14  know, clean -- how many rooms and like he schedule for
15  the housekeeping.
16  Q.  Okay.  So he was in charge of scheduling --
17  A.  Schedule.
18  Q.  -- the staff for housekeeping?
19  A.  Yeah.  Housekeeping.  Yeah.
20  Q.  If you're aware of this, to the best of your
21  knowledge, do you know how many employees Mr. Chen was
22  in charge of supervising?
23  A.  I think we had a part time, full time, total
24  probably 22 to 24.

Page 11

1  Q.  Is that 22 to 24 part-time staff?
2  A.  No.  No.  That's the -- so that's entire.
3  Q.  Total?
4  A.  Total like 20 to 24 like entire operation, and
5  housekeeping.  I don't know -- you know, I don't know
6  how many actually housekeeping, how many in front
7  desk, that's why I say I really don't -- hire manager,
8  you know, take care of that.  I don't have to worry
9  about.  So that's why I don't know.  Probably half of
10  the housekeeping.  Half is front desk.  Something like
11  that.  You know.
12  Q.  Now, you mentioned that you had part-time
13  employees.
14  A.  Yeah.  We had many part-time employees.  We had
15  many -- okay.
16  Q.  Continue.
17  A.  Okay.  The part-time employee usually -- for
18  example, like some people only take care of breakfast
19  area because, you know, it only for -- that's only --
20  we only serve breakfast there and like some students,
21  like UD students, they come part time because, you
22  know, we can schedule like -- you know, even eight
23  hours but we can schedule two part time or three part
24  time according to their class schedule.  So we had

Page 12

1  many part time, you know, employee.  And this is like
2  manager would take care of that.  I never take care
3  of -- usually I'm not involved.  But he had also
4  part -- lots of part time, full time -- part-time
5  employee.
6  Q.  And I guess from your position as a president
7  of the entire company, Five-T Enterprises, did you
8  find any difficulty with having a part-time schedule
9  or part-time employees working on a part-time
10  schedule?
11  A.  No.  Because I think actually, you know, we
12  schedule -- you know, schedule fully.  It's benefit
13  employee and employer.  You know, so actually part
14  time, you know, actually is -- sometimes it really
15  benefit for us because.  For example, like a breakfast
16  area, you know, take care of breakfast.  You don't
17  want people to just work two or three hours.  You
18  know, seven to ten, three hours.  You know, is
19  difficult to find somebody.  You know something.  But
20  people say they want to work breakfast area, I think
21  actually benefit -- actually benefit both.  But I
22  think in this area, I think, we -- our company did a
23  good job for these.  Yeah.
24  Q.  When you say part-time employee benefitted the

Page 13

1  employer, was there a financial benefit for the
2  employer to hire --
3  A.  No.
4  Q.  -- only a part-time worker?
5  A.  Is not financial, I think, because sometimes
6  difficult to find worker.  You know, to find worker,
7  okay.  For example like -- so we always try -- you
8  know, we always nice -- always want to like talk to
9  the employees, what did they prefer.  You know, one
10  prefer 11 to 7, you know.  They like to -- you know,
11  and special -- you know, somebody want to quit a job
12  or something, we always ask them, say, why you want to
13  quit a job?  Okay.  They say, oh, because I like to
14  work 11 to 7.  That's no problem.  We can switch you
15  to 11 to 7.  Something like that.  Or I can only work
16  Saturday.  I cannot work on the weekday, you know.
17  Oh, I can only work -- we try to like, you know,
18  convenient for the employee and find out what is best
19  for them and what is best for company.  So I think for
20  in our management is like we kind of really flexible
21  for the employee.
22  Q.  So between 1996 and 2003, you never experienced
23  any problems having part-time employees?
24  A.  No.

4 (Pages 10 to 13)

EEOC                                    v.                    Nabstar, LLC, d/b/a Sleep Inn
Alice Y.T. Yang                C. A. # 05-cv-0375 (GMS)                    March 20, 2006

Page 14

1    Q.   At the time of the sale of Five-T Enterprises,
2    Sleep Inn, to Nabstar, LLC, what type of communication
3    did you have with the new owners?
4    A.   Almost no communication because actually
5    when we had Five-T, we want to share this.  One of
6    the -- one of the partner, one partner, he say he want
7    to be the broker.  So actually he is the one, you
8    know, that he want to -- so he contacted -- he
9    contact with the buyer.  He contact -- you know,
10   actually one of the partners deal with that, and you
11   know, one of the partner deal with the --
12   Q.   So he was the broker of the sale?
13   A.   He was broker the sale, and he got -- you know,
14   he even -- he is not professional, but he make -- he
15   contact new owner.  You know, he contact manager.  He
16   contact -- you know, yeah.  That's fine.  Partner
17   agree to that.  And he say, he will get -- he get a
18   certain percent of, you know, broker fee.  You know,
19   yeah.  So that's why this partner -- this
20   particular -- one of the partner, he deal always, you
21   know.  So actually, during the sale I don't have any
22   contact with the new owner.
23   Q.   So you had absolutely no contact with any of
24   the owners of Nabstar?

Page 15

1    A.   No.  Right.  Because if he want to contact, he
2    would do it.  I don't want second person also.  I
3    think that was good for the -- yeah.  Okay.
4    Q.   Did you speak to the partner at all about the
5    sale and what was going on with the sale?
6    A.   I think I did -- I think my manager, I think my
7    manager probably -- I think my manager probably called
8    a meeting, you know, I don't know.  I didn't involve
9    in this.  I didn't call the meeting.  I didn't -- you
10   know, I just talk to my manager, you know, what's
11   going on because I told you I only deal with my
12   manager.  So I told her, you know, we going to sell
13   hotel and that -- you know, then I think my manager
14   deal with all the -- you know.  Plus I don't know if
15   she call a meeting or the new owner call a meeting.  I
16   didn't involve this part.
17   Q.   You weren't involved in that?
18   A.   I don't get involved.
19   Q.   Let me ask you first, what was the partner's
20   name that brokered the sale?
21   A.   Okay.  George Yeh.
22   Q.   Do you spell that for record, please?
23   A.   G-e-o-r-g-e.
24   Q.   Is that a G?

Page 16

1    A.   G for girl.  George.
2    Q.   Oh, George.
3    A.   George Yeh, Y-e-h.
4    Q.   Y-e-h?
5    A.   Y for yes.  E for east.  H for house.
6    Q.   H for house.  Got it.
7    A.   He is the one, yeah.  Yeah.  He's in Florida.
8    He's a professional in Florida.  And he's the one deal
9    all this with the new owner and with all the sales,
10   with manager, with -- the sales part because I kind of
11   still take care of operation until the end.  But he
12   deal with this, you know, transaction, all that.  You
13   know, that's George Yeh.  Okay.
14   Q.   And the manager that you were in charge of that
15   let you know about a meeting being called, what was
16   her name?
17   A.   Lynn, L-y-n-n, Hopkins, H-o-p-k-i-n-s.
18   Q.   And she reported directly to you?
19   A.   Mm-hmm.  Yeah.
20   Q.   Are you still in contact with Ms. Hopkins?
21   A.   Not -- no.  Yeah.  I know she work -- I know
22   she work -- that's last time I think after that we had
23   like eat lunch couple times, you know.  And -- but
24   not -- you know, not -- and I don't know.  Last

Page 17

1    time we don't because I think -- because after we sold
2    the hotel, because they had like some credit card, you
3    know -- like, you know, usually when people check in a
4    hotel, check in, check out, the income from credit
5    card usually they go one month, two months, you know,
6    later.  So that's why in the beginning I still want
7    contact with her because all this we need to take
8    care, you know, the close up, the final close.  So I
9    see couple times with her, you know, to take care of
10   this end of the operation.  But after that, I don't
11   have any contact with her.
12   Q.   Do you know if she's working anywhere right
13   now?
14   A.   I think in that time she's working in the
15   Howard Johnson in Newark.  Howard Johnson in Newark.
16   Yeah.  She's manager.  General manager.  Yeah.
17   Q.   Newark, Delaware?
18   A.   Yeah.  Yeah.  And I think that's probably
19   two -- almost three years ago, you know, I didn't
20   contact at least.  I don't know if she still working
21   there.
22   Q.   And at the time you were president of Sleep Inn
23   or Five-T Enterprises which owns Sleep Inn, did Sleep
24   Inn have a complaint system set up to take in customer

5 (Pages 14 to 17)

EEOC                                         v.                    Nabstar, LLC, d/b/a Sleep Inn
Alice Y.T. Yang                    C. A. # 05-cv-0375 (GMS)                      March 20, 2006

Page 18

1  complaints?
2    A.  Yeah.  Because Sleep Inn is 100 percent -- 100
3  percent guarantee.  So that mean the complaint, the
4  hotel didn't take care, they would live there free.
5  That was 100 percent guarantee.
6    Q.  Oh, 100 percent guarantee.
7    A.  Yeah.  So that they had like card, the comment
8  card, the customer evaluation card, comment card,
9  always in the front desk.  Okay.  And they had -- you
10  know, they can list why they complain for, why they --
11  because we need to send -- they can complain to the
12  hotel or they can complain to the 800 number directly
13  to the headquarter.
14    Q.  If anybody ever contacted the 800 number, would
15  you eventually find out --
16    A.  Oh, they --
17    Q.  -- that somebody complained?
18    A.  You immediately find out because another thing
19  is because the hotel -- they had -- they come -- they
20  had like a score system.  They say what your service,
21  what your -- what your the service and how clean, you
22  know, the -- how clean and how -- what your book --
23  they had a score where they were rating you.  You are
24  the winning hotel.  They give a score and they come to

Page 19

1  hotel.  A maybe four to six months they actually come
2  to hotel without tell you, without -- you know, they
3  just --
4    Q.  It was like a surprise visit?
5    A.  Right.  And they talk -- you not even know
6  who's coming.  They talk to your customer.  They talk
7  to your employee without your notice.  And of course
8  they schedule twice.  They meet with us.  Okay.  This
9  is your score.  And this is your -- you know, your
10  feedback, you know.  And -- yeah.
11    Q.  And how often was this done, this surprise
12  visit?
13    A.  Probably usually maybe three to six months.
14    Q.  Every three to six months?
15    A.  Yeah, they come -- sometimes they come less.
16  You don't know.  So that's why you not prepared.  But
17  actually they usually come two times and they bring
18  all the score.  They bring the score.  Bring a score
19  and to check the room and to check the -- that time
20  you know -- that time you know they are in your hotel.
21  But when they surprise you don't know.  When they --
22  so they talk to your employee, talk to your customer.
23  So you don't know because hotel -- so many guests.
24  You don't know who is guest, who is, you know, from

Page 20

1  the headquarters.
2    Q.  Okay.  Just can you mark this as Yang 1?
3        (Yang Deposition Exhibit 1 was marked for
4  identification.)
5  BY MS. SMITH:
6    Q.  Ms. Yang, I ask you to take look at that form,
7  not for content but just to ask you if that's a form
8  that --
9    A.  Right.  Right.  Right.  Yeah.
10    Q.  So is this a form that was used during the time
11  that you were president of Sleep Inn from 1996 to
12  2003?
13    A.  Yeah.  That's required.  You needed to put that
14  in the front desk.
15    Q.  And these were at the front desk?
16    A.  Yeah.
17    Q.  Were these also in guest rooms?
18    A.  Yeah.  Yeah.  Desk.  Yeah.
19    Q.  We are done with Yang 1.
20        Excuse me.  Just for the record, Yang 1,
21  this is a comment card.
22    A.  Yeah.
23    Q.  Is that correct?
24    A.  I cannot read what --

Page 21

1    Q.  Is this a comment card?
2    A.  Yeah.  This is what I'm talking about, the
3  comment card, yeah.
4    Q.  And if someone complains to the 800 number, you
5  said you would find out if that was the case.  How
6  would you find out if someone complained through the
7  800 number?
8    A.  They call you.  Headquarter call you.  They
9  will call you.  Say in your report what they complain,
10  what -- you know, actually the 800 -- the headquarter
11  will call you.
12    Q.  Will this be logged somewhere in writing or
13  will they send you a follow-up writing or letter?
14    A.  Yeah.  Writing letter.  They always send you a
15  letter, and you know -- yeah.
16    Q.  And headquarters -- it's headquarters of Sleep
17  Inn?
18    A.  They call it Choice Hotel.  Actually they not
19  only own the Sleep Inn, they own Comfort Inn, Court
20  Inn something.  They had even several different brand.
21  The headquarter call Choice Hotel.  They're in D.C.
22    Q.  In Washington D.C.
23        And if someone filled out a comment card
24  such as Yang 1, would that be turned in to

6 (Pages 18 to 21)

Wilcox & Fetzer, Ltd.                Professional Court Reporters                (302)655-0477

EEOC                              v.                    Nabstar, LLC, d/b/a Sleep Inn
Alice Y.T. Yang              C. A. # 05-cv-0375 (GMS)              March 20, 2006

Page 22

1   headquarters?
2       A.  No.  This -- actually we are not -- unless they
3   complain we kind of collect, you know, like the
4   manager will collect and then actually we see every
5   day, you know, immediately, you know, what the
6   problem.  The problem, of course, most of the -- like
7   we all got good comment.  We are happy, employee
8   happy, but, you know, something we'll take care, why
9   had people come in, then we take care of immediately
10  because we had really good -- in our -- we had really
11  good communication between the, you know, manager --
12  owner and manager, manager and the employee and
13  supervisor.  We had really good communication, you
14  know, so -- yeah.
15      Q.  So if it was a good comment or a bad comment
16  written out on these comment cards, you were not
17  required to report any of that to the headquarters, is
18  that correct?
19      A.  We don't need -- we don't need to report, yeah.
20  That was for your own -- you can enter service.  You
21  can -- you know, from the feedback from the guests,
22  you can -- you can better service to the guest
23  because -- yeah.
24      Q.  And when persons from headquarters came in for

Page 23

1   a surprise visit, did they ever review your comment
2   cards when they came?
3       A.  Wouldn't be surprised -- no.  I don't think
4   that they -- you know, because they -- because they
5   know since you -- something bad enough they were
6   heard.  Usually we are not -- they would not -- I don't
7   think that they would read -- I don't recall they read
8   our comment card.  This 100 percent guarantee, so
9   that's -- you know, you need to...
10      Q.  Did you know an employee named Islyn Palmer?
11      A.  Mm-hmm.
12      Q.  What was her job at Sleep Inn?
13      A.  She only work for the breakfast area.  I think
14  seven to ten.  Seven to ten.
15      Q.  Do you remember when Mrs. Palmer began working
16  at Sleep Inn?
17      A.  I can't -- that was why -- see, I didn't, you
18  know, who, when, because that's -- manager take care
19  of that.
20      Q.  So you don't know when she started working?
21      A.  I don't know when she work.  But I only -- you
22  know, I only know in the breakfast area.  I stop by.
23  I see her in the breakfast area and to get a
24  breakfast, bring the breakfast from the storage room

Page 24

1   to the, you know, to the breakfast area and out.  Then
2   bring in coffee, make a juice.  After that, clean up,
3   kind of clean the floor.  That was all she did.
4       Q.  You said you purchased the Sleep Inn hotel
5   around 1996?
6       A.  No.  No.  We build from scratch.  We build.
7       Q.  You built the hotel from scratch?
8       A.  We build hotel from scratch, so we don't --
9   yeah.  We had -- we are the first.
10      Q.  First owners.  Okay.
11          So you built the Sleep Inn hotel around
12  1996, is that correct?
13      A.  Yes.  Yes.  Yes.
14      Q.  How soon after you opened Sleep Inn do you
15  recall meeting or knowing of Mrs. Islyn Palmer?
16      A.  I try -- because when you open a new hotel,
17  there was so much to take care.  Take care of bank.
18  Take care of Choice Hotel.  Actually I didn't recall,
19  you know, when I know her, but just later on I know
20  because -- that's why I say I never take care of --
21      Q.  Right.  Right.
22      A.  But I know because she's the breakfast area.
23  That's where I saw her, you know.  Yeah.  So I don't
24  know how she start, when she start.  I don't.  I

Page 25

1   don't.
2       Q.  Was she a part-time worker?  Do you know if
3   Islyn Palmer was a part-time employee?
4       A.  When I know her, she only work for -- each
5   month, she only work for four Saturday and two Sunday.
6   Four Saturday.  Two Sunday.  Because she says she
7   needs to go to church on Sunday, she work every other
8   Sunday.  But Saturday, she work every Saturday.  So
9   that's where I know her, you know.  She work in the
10  breakfast area, and when I go to hotel, you know, I
11  see there.
12      Q.  On her schedule, when you knew of her, she only
13  worked every Saturday and then every other Sunday?
14      A.  Every Saturday.
15      Q.  Every Saturday?
16      A.  Yes.
17      Q.  Every other Sunday?
18      A.  Every other Sunday, yeah.
19      Q.  Did you have a problem with that schedule as
20  the president of Five-T?
21      A.  I don't have problem because your manager no
22  problem, even supervisor no problem.  I don't have
23  problem.  Actually I'm -- my style is I always trust
24  my manager.  You know, I never take care of -- always

7 (Pages 22 to 25)

EEOC                                                        v.                        Nabstar, LLC, d/b/a Sleep Inn
Alice Y.T. Yang                              C. A. # 05-cv-0375 (GMS)                              March 20, 2006

Page 26

1    oversee the, you know, the big --
2    Q.  Big picture?
3    **A.  The big picture, yes. So I end up, you trust.**
4    **Then they decide what best for the hotel, what's best**
5    **for the employee. Yeah. Okay.**
6    Q.  Okay.
7    **A.  Okay.**
8    Q.  Did you ever receive any criticism or
9    complaints about Ms. Palmer's service from any of your
10   managers at any time?
11   **A.  I never heard. I never heard any complaint**
12   **about her.**
13   Q.  As supervisor of all the managers, did any of
14   your managers or her managers ever come to you
15   regarding -- you said you never received any
16   complaints, but did anyone ever report any accolades
17   that she might have gotten, any guests who
18   complimented Ms. Palmer on her services?
19   **A.  Compliment?**
20   Q.  Right. Like "good job" or anything like that?
21   **A.  I didn't particular heard about her, but I**
22   **constantly heard a guest say to me how nice, how**
23   **clean, you know, good comment about our hotel in**
24   **general, always say really clean, really good service,**

Page 27

1    **really. I constantly hear that, you know, that -- the**
2    **good thing about my hotel, yeah.**
3    Q.  Did your hotel receive awards?
4    **A.  Yeah.**
5    Q.  Could you expand? What kind of awards?
6    **A.  Okay. That's like they had -- you need to have**
7    **three -- you are near to certain point you are really**
8    **clean, like cleanest. The service, you know, and no**
9    **complaint -- you don't have any complaint to**
10   **headquarter. They had different -- it's difficult,**
11   **then you -- I think the point look like 1,000 point is**
12   **full point, but you above 975, then you continue two**
13   **years, then you get award.**
14   Q.  So the let me make sure I understand.
15   **A.  Okay.**
16   Q.  There's three or four different categories?
17   **A.  Right. Right.**
18   Q.  One of them is cleanliness?
19   **A.  Really clean. Hotel is really clean.**
20   Q.  Right.
21   **A.  And the service.**
22   Q.  The service?
23   **A.  Yeah. The front desk, the service to the**
24   **guest.**

Page 28

1    Q.  Does that include housekeeping?
2    **A.  Everything, yeah.**
3    Q.  People that work the breakfast areas as well?
4    **A.  Right. Yeah. Yeah.**
5    Q.  And if they complain, it was another category?
6    **A.  No. No. You cannot -- you want to reach**
7    **award. You don't have many -- I don't know is no**
8    **complaint or nothing, you know. Yeah.**
9    Q.  So if you have few to none, little to no
10   complaints?
11   **A.  I don't think zero complaint, you know, maybe**
12   **only certain -- really few complaints, I think. But I**
13   **don't remember, you know -- so you hear lots of**
14   **complaint, of course, you cannot because like you need**
15   **almost perfect score because 900 -- 975 out of 1,000,**
16   **that's almost perfect score, you know.**
17   Q.  And did you receive high scores in order to
18   receive awards while you were president of Five-T for
19   Sleep Inn?
20   **A.  Yeah. Yeah.**
21   Q.  Do you remember how many years you won awards
22   in those categories?
23   **A.  I think one year, yeah.**
24   Q.  Do you remember Ms. Palmer was working at the

Page 29

1    time that you received an award for good service?
2    **A.  Yeah. Yeah. Yes. Yeah.**
3    Q.  Did you ever receive any comments or criticisms
4    regarding absences, lateness, or failure to show up
5    for work for Mrs. Palmer.
6    **A.  I can't answer that because that -- you know,**
7    **the supervisor manager take care of that. My**
8    **position -- I'm not take care of that detail.**
9    Q.  Right.
10         Did any of your managers ever come to you
11   and inform you of anything like that?
12   **A.  No. No. Because I think you see only schedule**
13   **for Saturday and two Sunday, I don't think, you know,**
14   **she would not show up because that's her schedule.**
15   **She like to work, you know, four Saturday and two**
16   **Sunday.**
17   Q.  When you were aware of her employment, right?
18   **A.  Right. In the beginning, right.**
19         **You know, another thing is like so we try**
20   **to work out what the best for the employee, you know.**
21   **So I think you need best for employee, then that's why**
22   **our philosophy because, you know, you take care of**
23   **good employees. Take care of employee, take care of**
24   **guest. Guest will take care of business. So kind of**

8 (Pages 26 to 29)

EEOC
Alice Y.T. Yang

v.

C. A. # 05-cv-0375 (GMS)

Nabstar, LLC, d/b/a Sleep Inn
March 20, 2006

Page 30

1    circle.
2    Q.  Have you ever been to the breakfast area when
3    Mrs. Palmer was working?
4    A.  Yes, because that's first thing I go to hotel,
5    always go to get a cup of coffee say good morning to
6    my employee.  That's first thing.  I go to get cup
7    coffee.  That's why I always saw her there.  Yeah.
8    Good morning.  You know.
9    Q.  And during the times when you did go to the
10   breakfast area, did you see Mrs. Palmer?  Was she
11   pleasant to you and guests?
12   A.  Mm-hmm.  Yeah.  Yeah.
13   Q.  Did you ever notice her being rude or loud or
14   yelling at the guests or you?
15   A.  No.  I never recall any of that.
16   Q.  Was the breakfast area clean and in a
17   presentable state?
18   A.  Hotel is really clean, really clean.
19   Q.  How often would you say in a month would you go
20   to the hotel?
21   A.  I almost go every day because I can.  I always
22   go like in the morning, go before I go to work, go to
23   University of Delaware, and after that I go back.  Is
24   not like -- I like to -- you know, like to see my

Page 31

1    hotel, talk to my employee, talk to the guest.
2    That's -- I really enjoy.  I really enjoy.  I'm not
3    say, you need to do this.  I say hi.  You did a good
4    job.  But detail, manager will take care of that.
5    Q.  The details, right.  Okay.
6        Do you know was Stephen Chen Mrs. Palmer's
7    direct manager?
8    A.  Yeah.  During -- you know, because, for
9    example, like he only work every other Sunday.  Then
10   they need to schedule, you know, who going to take
11   care of breakfast.  Stephen and his wife is like kind
12   of take care of schedule housekeeping, schedule the
13   breakfast area, who clean the floor, who clean, you
14   know, this and that?  They schedule, yeah.
15   Q.  So basically Mr. Chen was Mrs. Palmer's
16   immediate supervisor?
17   A.  Right.  Yes.
18   Q.  Were you acquainted with all the employees of
19   Sleep Inn?
20   A.  Yeah.  Yeah.  Yeah.  That's -- I enjoy the most
21   because in there -- in the front, in the front, the
22   first -- I always see that first front.  You know, I
23   like to talk to them so I can -- you know, especial I
24   always ask their opinion what we can improve better.

Page 32

1    I always like to talk to our employee.  And I think
2    that they really enjoy too because actually many
3    people, many employee told me not owner always ask
4    their opinion as their -- you know, what their
5    feedback and you know.  But actually, it was really
6    good.  So we have really good communication between
7    the -- between the management and -- yeah.
8    Q.  Among all the employees, do you know if
9    Mrs. Palmer was the oldest employee as far as age who
10   worked for you?
11   A.  Yeah.  Yeah.  I know -- I know she's oldest.
12   Q.  How do you know that she's oldest?
13   A.  Because I can see from -- how she -- you know,
14   and she work slow, and I mean she talk slow.  She
15   talk, walk slow, everything.  I know because I know
16   who's young.  I can --
17   Q.  You can just see for yourself?
18   A.  I can see myself.  I can see, yeah.  And so
19   that's why I see only -- she only work few hours every
20   day, you know.  I think that -- you know.
21   Q.  But did her age affect the quality of her work?
22   A.  You know, because -- you know, since she only
23   take care of breakfast, you know -- okay.  Only few
24   hours.  You know, so it really -- you know, because

Page 33

1    because she make coffee, she make juice, and she talk
2    to the guests there, and you know, she kind of really
3    pleasant, you know, to talk to the guests in breakfast
4    area.
5    Q.  Did she do a good job with the breakfast area?
6    A.  Yeah.  Yeah.  She just do breakfast, yeah.
7    So....
8    Q.  Why did Five-T Enterprises sell the Sleep Inn
9    to Nabstar?
10   A.  I don't know because that's -- George Yeh
11   contact the one -- one of the partner, he -- I don't
12   know how he contact them or how -- I don't know.
13   Q.  Okay.  Well, I'll try to repeat the question.
14   A.  Okay.  Why did we decide to sell hotel?
15   Q.  Yes.  Why did you decide to sell the hotel?
16   A.  Because partner decide to sell hotel.  Our
17   partner.  Because we had twice -- we had twice
18   meetings, you know -- you know, partner, shareholder
19   meeting twice a year and decide, fine, everybody
20   decide to, you know, end it.
21   Q.  Do you know if it was financial or whether it
22   was --
23   A.  No.
24   Q.  -- a financial reason?

9 (Pages 30 to 33)

EEOC                                    v.                    Nabstar, LLC, d/b/a Sleep Inn
Alice Y.T. Yang                  C. A. # 05-cv-0375 (GMS)              March 20, 2006

Page 34

1    A.  No.  Is not financial.  We had really good --
2  you know, good profit.  We had good profit hotel.
3  Really good hotel.  But everybody decide to sell.  No.
4  We always in the meeting, we decide -- I report to
5  them and then, you know, and -- yeah.
6    Q.  So you did not inquire as to why the partners
7  wanted to sell?
8    A.  Because I think like partner -- I think
9  everybody getting older.  Everybody going to retire.
10  And this is a property everybody can have some money,
11  you know.
12    Q.  Are you aware of any communication about
13  employees to the new owners?
14    A.  I don't know what -- I didn't.
15    Q.  So you don't know?
16    A.  I don't know.
17        MS. SMITH:  I think that's all I have,
18  Mr. Connors, if you have any.
19            EXAMINATION
20  BY MR. CONNORS:
21    Q.  Ms. Yang, my name is Kevin Connors.  I
22  represent Nabstar, the new owner.
23    A.  Okay.
24    Q.  And I have some questions for you too.

Page 35

1    A.  I just answer what I know.
2    Q.  Yes.
3        You testified in response to Ms. Smith's
4  questions that Islyn Palmer was the oldest.  You could
5  tell by observing her?
6    A.  Yeah.  Yeah.
7    Q.  You said that she talked more slowly?
8    A.  Mm-hmm.
9    Q.  Did you say she walked and worked more slowly?
10  Did I hear you correctly?
11    A.  Yeah.  Yeah.  I can -- yeah.
12    Q.  So the answer to my question is yes?
13    A.  Right.  Right.  But -- okay.  But I think
14  that's different.  You know, you work slow but you
15  finish a job.  You clean the area really clean, make
16  coffee.  You know, that's why you know, for us, we
17  think that -- okay.
18    Q.  Did Ms. Palmer work other departments in your
19  hotel besides just the breakfast area?  For example,
20  did she work in housekeeping or at the front desk?
21    A.  No.  She didn't work -- she never work there
22  because I think -- I call it -- I think my brother
23  told me or manager told me she only want to work only
24  a few hours, you know, and that's why she did work --

Page 36

1  you know, okay.
2    Q.  In the breakfast area?
3    A.  Yeah.
4    Q.  What were the hours for the breakfast area
5  attendant, from what time in the morning until what
6  time?
7    A.  Seven to ten.  Seven to ten.
8    Q.  Do you know whether an orientation meeting was
9  held for your employees who wanted to work for the new
10  owners?
11    A.  You ask me do I know?
12    Q.  Yes.
13    A.  I think I know, but I didn't -- I was not
14  there.  I don't know it was scheduled.  I don't know
15  if my manager schedule, new owner schedule.  I don't
16  know.  But I was not there.  Yeah.
17    Q.  Who hired Islyn Palmer to work for your
18  company?
19    A.  I think long time ago had one manager, I
20  think -- because we change the manager, the general
21  manager few times.  So I don't know who hire -- which
22  manager hire her.  I didn't know the detail who hire
23  and when hire, what positions he would hire.  I don't
24  recall for that.  I only know because, in the

Page 37

1  beginning, there's so many thing to take care of until
2  they -- later, you know, I know her, but in the
3  beginning, I don't know her.
4    Q.  To your knowledge, did Ms. Palmer ever work
5  full time for you?
6    A.  Probably in the begriming, probably -- I'm not
7  sure, but probably in the beginning probably work in
8  the area too, you know, but I'm not sure.  You know,
9  yeah.  Because I think later on she work only
10  breakfast.  That's only I know her, you know, where
11  because work in housekeeping, you know, I not go to
12  room.  I always go talk to desk and the front, you
13  know.  Okay.  So I don't know.  Okay.
14    Q.  Did you go to the breakfast area even on
15  Saturdays and Sundays to get your coffee?
16    A.  Yeah.  I always go there.  Yeah.  Special --
17  special events.  For special events, so busy.  Many
18  people.  You know.  And -- yeah.
19    Q.  How many employees would work in the breakfast
20  area from seven to ten, just one?
21    A.  Just one.
22    Q.  Now, when --
23    A.  But --
24    Q.  Go ahead.

10 (Pages 34 to 37)

Page 38

1   A.  But in the special event, we had other people,
2   you know, because in the special event we need to open
3   another meeting area, you know, for that, and we were
4   assign -- that's why the supervisor or manager will
5   assign, you know, more people to help her out because
6   you cannot handle that full house, you know, so many
7   people, and so many student go to meet parent.  So
8   some special occasion we always have more people.  I
9   don't know how many people work.  Yeah.
10   Q.  On the Sundays that Ms. Palmer did not work the
11   breakfast area --
12   A.  Mm-hmm.
13   Q.  -- do you know the name of the person who would
14   work on the Sunday?
15   A.  I think Mei, probably Mei.  Mei-Chen.
16   Mei-Chen.
17   Q.  Stephen Chen's wife?
18   A.  Right.  She probably work there or she was
19   assigned.  That's right.  The area, either they work
20   there or they assign other people working there
21   because sometimes you need extra because, you know --
22   yeah.  That was why I don't -- I didn't take care of
23   that.  I don't know, do that part.
24   Q.  Did your company have personnel files or

Page 39

1   employee files for all the employees?
2   A.  Mm-hmm.
3   Q.  And did you keep them on the hotel premises?
4   A.  Yeah.  My manager did.
5   Q.  In an office?
6   A.  Yeah.  I think, yeah.  I never -- and I didn't
7   take care of that part.  My manager will do that.
8   Q.  Do you know whether your company's personnel
9   files were given to the new owners when they took
10   over?
11   A.  I don't know.
12   Q.  Go ahead.  If you want to finish, you can
13   finish.
14   A.  Because, when George Yeh say he want to sell, I
15   say, you want to sell?  You need to, from beginning to
16   the end, to take it.  You know, if -- I don't want
17   to -- then I involve -- you know, so that transaction
18   that I didn't -- you know, yeah.  So how they -- from
19   the -- you know, he -- okay.
20   Q.  So George basically handled the sale from the
21   beginning until the end?
22   A.  End, right.
23   Q.  And you were not involved in that?
24   A.  Not involved.  That's me.  I involve, I want

Page 40

1   100 percent involve.  If not involved, you're involve
2   I don't want to -- too many input, too many output,
3   too many -- you know, so, yeah.  So how they handle,
4   how they call a meeting, how they transaction, I
5   didn't know.
6   Q.  Did your company have an employee handbook?
7   A.  Mm-hmm.  Yeah.
8   Q.  Did the employees have to sign a paper --
9   A.  Yes.
10   Q.  -- that said that they received it and read it?
11   A.  Yeah.  That's required, yeah, since you are a
12   franchisee from Choice Hotel.
13   Q.  Did your company have time cards that the
14   employees had to fill out or punch?
15   A.  Mm-hmm.  Yeah.  That is why the punch -- the
16   supervisor will recall how many hours and then report
17   ADP, our payroll system.
18   Q.  Where were those cards kept at the hotel?
19   A.  You mean the hotel, the site?
20   Q.  Yes.
21   A.  Yeah.
22   Q.  Were they in the manager's office?
23   A.  Usually is like a -- I think a -- like a
24   supervisor will give to the manager.  Okay.  And the

Page 41

1   manager report ADP.  So usually they keep supervisor's
2   place and then give to the manager and manager report
3   to ADP.
4   Q.  Where was the punch clock?
5   A.  In the laundry room.
6   Q.  In the laundry room.  And all the employees who
7   had to punch their tickets there --
8   A.  Yeah.
9   Q.  -- that's where they went?
10   A.  Yeah.  In, out.  Yeah.  In and out.  When they
11   go in and out.
12   Because, without that, you cannot do the
13   payroll.  You know.
14   Q.  Right.  Did your brother Stephen ever tell you
15   that Islyn Palmer worked too slowly or she didn't
16   clean very well?
17   A.  I didn't -- you know, because something like
18   this, he never report to me something like that, you
19   know, and so -- yeah.  Answer is no.
20   Q.  Did your company ever terminate an employee
21   because they couldn't work or wouldn't work a
22   particular schedule that you needed?
23   A.  Say that again.
24   Q.  Did your company ever terminate or fire an

11 (Pages 38 to 41)

EEOC                                    v.                    Nabstar, LLC, d/b/a Sleep Inn
Alice Y.T. Yang              C. A. # 05-cv-0375 (GMS)                    March 20, 2006

Page 42

1  employee because they couldn't work the days or hours
2  that you wanted them to work?
3      **A.  I didn't recall.  I didn't recall.  Nobody**
4  **report to me.  I didn't recall any.  I only know one**
5  **of front desk was fired because she yell at the**
6  **manager, really loud yell at the manager.  And I think**
7  **she was fired.  And because there is sign that you**
8  **cannot yell at your supervisor or something like that,**
9  **you know, and she -- I think that's -- I recall only**
10 **that front desk, that employee was fired.  I aware of**
11 **that because she yelled at the manager really loud.**
12 **Something like that.**
13      MR. CONNORS:  I think those are all the
14 questions I have.
15      THE WITNESS:  Okay.
16      MS. SMITH:  I think that's all I have too.
17      THE WITNESS:  Okay.  Because so many thing
18 I don't know.  So many thing.
19      MS. SMITH:  No.  That's fine.  It's not a
20 test.  We're just asking questions.
21      We're off the record.
22      (Discussion off the record.)
23      MS. SMITH:  You have the option, your
24 choice, you can review the transcript to make sure

Page 43

1  it's accurate.
2      THE WITNESS:  I believe I think
3  probably -- no.  That's okay.
4      (Deposition ended at approximately
5  11:00 a.m.)
6
7              -----
8
9          INDEX TO TESTIMONY
10
11 ALICE Y.T. YANG              PAGE
12    Examination by Ms. Smith      2
13    Examination by Mr. Connors   34
14              -----
15          INDEX TO EXHIBITS
16
   YANG DEPOSITION EXHIBIT NO.      PAGE
17
    1     Comment Card            20
18
19
20
21
22
23
24

Page 44

State of Delaware )
                 )
New Castle County )

CERTIFICATE OF REPORTER

    I, Ann M. Calligan, Registered Merit
Reporter and Notary Public, do hereby certify that
there came before me on the 20th day of March, 2006,
the deponent herein, ALICE Y.T. YANG, who was duly
sworn by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed into
typewriting under my direction.
    I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.
    I further certify that reading and signing of
the deposition were waived by the deponent and
counsel.
    I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


              Ann M. Calligan, RMR
              (Certification No. 186-RPR)
              (Expires January 31, 2008)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

Exhibit

"F"

| EEOC | v. | Nabstar, LLC, d/b/a Sleep Inn |
|---|---|---|
| Islyn Azasse Palmer | C.A. # 05-cv-0375 (GMS) | March 17, 2006 |

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EQUAL EMPLOYMENT OPPORTUNITY       )
COMMISSION,                        )
                                   )
            Plaintiff,             )
                                   )
v.                                 )    Civil Action No.
                                   )    05-cv-0375 (GMS)
NABSTAR, LLC, d/b/a SLEEP INN,     )
                                   )
            Defendant.             )


            Deposition of ISLYN AZASSE PALMER taken
pursuant to notice at the offices of Marshall,
Dennehey, Warner, Coleman & Goggin, 1220 North Market
Street, Fifth Floor, Wilmington, Delaware, beginning
at 9:00 a.m. on Friday, March 17, 2006, before Ann M.
Calligan, Registered Merit Reporter and Notary Public.

APPEARANCES:
        RACHEL M. SMITH, Esquire
        EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
        PHILADELPHIA DISTRICT OFFICE
          21 South 5th Street - Suite 400
            Philadelphia, Pennsylvania  19106
          on behalf of the Plaintiff,

        KEVIN J. CONNORS, Esquire
        MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
          1220 North Market Street - Fifth Floor
          P.O. Box 130
          Wilmington, Delaware  19899-0130
          on behalf of the Defendant.


                WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477

EEOC                                      v.                    Nabstar, LLC, d/b/a Sleep Inn
Islyn Azasse Palmer              C.A. # 05-cv-0375 (GMS)                     March 17, 2006

Page 2

1          ISLYN AZASSE PALMER,
2      the witness herein, having first been
3      duly sworn on oath, was examined and
4      testified as follows:
5              EXAMINATION
6   BY MR. CONNORS:
7   Q.  Good morning, Ms. Palmer.
8   **A.  Good morning, Mr. Connors.**
9   Q.  My name is Kevin Connors.  We met before at the
10  depositions of the two Nabstar individuals, and I've
11  asked you to come here today to give a deposition like
12  the deposition that those two folks previously gave.
13      I'm going to give you some instructions
14  before we start.  The first instruction is to please
15  wait until I'm finished asking my question before you
16  begin to answer your question.  So that it's easier
17  for the court reporter to take our question and answer
18  down.  Okay?
19  **A.  Yes.**
20  Q.  And next instruction is, when you respond to my
21  questions, you have to do so verbally, out loud so the
22  court reporter can take down your answers as opposed
23  to simply nodding your head.  Okay?
24  **A.  Okay.**

Page 3

1   Q.  If you didn't hear a question or don't
2   understand it, please let me know and I'll repeat it
3   or rephrase it.  Okay?
4   **A.  Okay.**
5   Q.  And if you need to take a break for whatever
6   reason, just let us know.  We'll take a break.  If you
7   do give an answer, I will assume that you heard my
8   question, understood it, and that the answer which you
9   gave was true and correct to the best of your
10  recollection, okay?
11  **A.  Okay.**
12  Q.  Would you please state your full name for the
13  record?
14  **A.  Islyn Azasse Palmer.**
15  Q.  Ma'am, you where do you presently reside?
16  **A.  10 Farnsworth Road, Newark, Delaware.**
17  Q.  How long have you lived at that address?
18  **A.  1980 -- 1998 until the present time.**
19  Q.  Do you live there with anyone else?
20  **A.  My husband.**
21  Q.  Can you tell me what your employment history
22  has been in the United States?
23  **A.  Well, it has been very good.  I don't have a**
24  **complaint.**

Page 4

1   Q.  Were you born in the United States?
2   **A.  No.**
3   Q.  Were you born in Jamaica?
4   **A.  I was born in Jamaica.**
5   Q.  When did you come to the United States to live
6   permanently?
7   **A.  August 1990.**
8   Q.  When you came to the United States in August of
9   1990, did you become employed?
10  **A.  Not directly.  It was 1993 when I became**
11  **employed.**
12  Q.  Where did you work in 1993?
13  **A.  I worked as a seamstress with Erlene Hall.  Her**
14  **business name is Seams to Be by E.  And the address,**
15  **4242 Mondale Road, Newark, Delaware.**
16  Q.  How long did you work for Seams to Be?
17  **A.  I worked until 2000 -- 2001.  I was 70 years.**
18  **I stop because I was having problems with my eyes.**
19  Q.  What year did you turn 70?
20  **A.  1999.**
21  Q.  1999 you think?
22  **A.  Yeah.**
23  Q.  What's your date of birth?
24  **A.  5/6/29.**

Page 5

1   Q.  Are you currently a U.S. citizen?
2   **A.  Yes.**
3   Q.  When did you become a United States citizen?
4   **A.  April 2002.**
5   Q.  How many hours a week did you work for Seams to
6   Be?
7   **A.  It wasn't really hourly.  It was like a job**
8   **whenever I'm finished.**
9   Q.  What types of work did you do, for example, did
10  you make clothing or draperies or things like that?
11  **A.  I did everything in sewing, men, women,**
12  **repairs, everything, cutting, everything you can think**
13  **of, designing, everything.**
14  Q.  Did you do that previously when you were in
15  Jamaica?
16  **A.  Yes, sir.  That was my chief business is what I**
17  **did.**
18  Q.  Do you ever have your own business --
19  **A.  Yes.**
20  Q.  -- as a seamstress?
21  **A.  Yes.**
22  Q.  Is that only in Jamaica?
23  **A.  Yes.**
24  Q.  Is the Seams to Be business still existing now?

2 (Pages 2 to 5)

EEOC                                    v.              Nabstar, LLC, d/b/a Sleep Inn
Islyn Azasse Palmer          C.A. # 05-cv-0375 (GMS)              March 17, 2006

Page 6

1    A.  Yes.  I think so.
2    Q.  And who was the person who owned that business?
3    A.  Erlene Hall.
4    Q.  Now, you testified that you stopped working
5    there because of your eyesight when you turned 70,
6    correct?
7    A.  It was that, but it was getting worse because I
8    had to do a lot of night work, and it was just too
9    much for my eyes.  Beading and all.  You know,
10   technical things.  So I had to stop.
11   Q.  When you worked as a seamstress for Seams to
12   Be, were you working anywhere else?
13   A.  No.
14   Q.  Did you work during the daytime and at
15   nighttime?
16   A.  During the day and the night.
17   Q.  Did you ever work any weekends?
18   A.  With Seams to Be?
19   Q.  Yes, ma'am.
20   A.  I worked chiefly at my home.
21   Q.  I see.
22   A.  So it didn't matter when.
23   Q.  You just had a specific project that you had
24   to --

Page 7

1    A.  Yes.
2    Q.  -- work on and finish?
3    A.  Yes.
4    Q.  When you stopped working for Seams to Be, did
5    you become employed anywhere else?
6    A.  Sleep Inn.  That's the first one after I stop
7    work for her.
8    Q.  Now, your answers to some questions that we
9    sent to your attorney, and in some other documents, it
10   says that you started working at the Sleep Inn in
11   1997?
12   A.  Yes.
13   Q.  Were you working at the Sleep Inn in 1997?
14   A.  Yes.
15   Q.  And also for the seamstress?
16   A.  Yes.
17   Q.  From 1997 to 1999?
18   A.  Yeah.
19   Q.  When you started to work for Sleep Inn in 1997,
20   how many days a week did you work?
21   A.  Five.
22   Q.  Was that Monday through Friday?
23   A.  Yes.
24   Q.  And what were your hours from Monday through

Page 8

1    Friday?  Was it eight to four, seven to three?
2    A.  I think it was eight to five, something like
3    that at first.
4    Q.  What was your position at Sleep Inn when you
5    first started in '97?
6    A.  I started doing laundry.  That's the first
7    thing.
8    Q.  For how long did you do laundry there?
9    A.  I don't remember the exact time.  It was
10   when -- I did it for quite a while.
11   Q.  Several years?
12   A.  Yeah.  Years.
13   Q.  Did you ever work on the weekend when you first
14   started at the Sleep Inn?
15   A.  No.
16   Q.  Did there come a time when you started to work
17   on the weekends at Sleep Inn?
18   A.  Yes.
19   Q.  And what year did that happen?
20   A.  It was after I remove -- I was living at Marvin
21   Drive at the time, just next door to Sleep Inn, and
22   then I remove to Farnsworth Road, and then I work
23   there for a little while.  But it was kind of
24   difficult for my husband had to go to work -- I don't

Page 9

1    drive -- like six o'clock sometimes, and so it was
2    very difficult, then when I have to take the bus.  It
3    was too much for me.
4    Q.  Okay.  So because of those difficulties did you
5    change from weekday work to weekend work?
6    A.  Yes.
7    Q.  Do you know about what year that was?
8    A.  I think it was 2001 or 2000, something like
9    that.
10   Q.  How far away is Farnsworth from Marvin?
11   A.  It's about -- are you talking miles or --
12   Q.  Yes.
13   A.  -- or the time to drive there?
14   Q.  Let's do both.
15   A.  Well, I don't -- it's a little distance and it
16   will take like five minutes, if there's a lot of
17   traffic could take up to ten minutes.
18   Q.  When you worked on weekdays at the Sleep Inn,
19   how did you get to and from work?
20   A.  You mean before I remove?  After I removed?
21   Q.  No.  When you lived at Marvin?
22   A.  Yeah.
23   Q.  How did you get to work?
24   A.  It was just across the street.

3 (Pages 6 to 9)

EEOC                                v.                    Nabstar, LLC, d/b/a Sleep Inn
Islyn Azasse Palmer            C.A. # 05-cv-0375 (GMS)              March 17, 2006

Page 10

1   Q.  So you walked over?
2   A.  Yes.
3   Q.  When you moved to Farnsworth, how did you get
4   to work?
5   A.  My husband would take me.  Sometimes I take the
6   bus.
7   Q.  When you lived at the Marvin address, did your
8   husband also work?
9   A.  Yes.
10   Q.  Where did he work?
11   A.  He was a taxi driver.
12   Q.  A taxi driver, okay.
13        When you moved to Farnsworth, was he still
14   working as a taxi driver?
15   A.  Yes.
16   Q.  When you moved to Farnsworth, were you still
17   working as a seamstress for Seams to Be?
18   A.  Yes.
19   Q.  Do you know what year you moved to Farnsworth?
20   A.  1998.
21   Q.  Do you know who owned the Sleep Inn when you
22   first started working there?
23   A.  Well, Alice Yang.
24   Q.  Do you know how to spell her last name?

Page 11

1   A.  I think it's Y-a-n-g, something like that.
2   Q.  Did Alice Yang hire you?
3   A.  Yes.  She was -- she didn't do the hiring.  Our
4   manager did the hiring.  Gigi Wilson.
5   Q.  So you were hired by Gigi Wilson?
6   A.  Yes.
7   Q.  Do you know a person named Stephen Chen?
8   A.  Yes.
9   Q.  Did he also own the hotel when you first
10   started?
11   A.  No.  I don't know.  I don't think so.
12   Q.  Do you know what position or role he had at the
13   hotel?
14   A.  Well, when he came there at first, he -- he was
15   just doing all around.  I worked in the laundry,
16   worked at the household -- what you call it?
17   Director.  Something like that.  He worked different
18   places.
19   Q.  When you worked at the Sleep Inn before it
20   changed ownership from Ms. Yang, did you have any
21   customers or did you have any management make any
22   complaints about your work performance?
23   A.  Never.
24   Q.  When you changed your schedule from weekday

Page 12

1   work to weekend work at the Sleep Inn, did you have to
2   discuss that with a manager at the hotel?
3   A.  I told Stephen that I was going to do something
4   else because it was difficult for me to get by during
5   the week, to travel by bus every day, and to walk a
6   distance to get the bus.  So I did seek another job
7   which was just across in Newark, senior citizen active
8   care center.  That was --
9   Q.  I'm not sure if I understood you, ma'am.  At
10   some point in time you told Mr. Chen that you had to
11   seek out another job because it was difficult to get
12   to the Sleep Inn?
13   A.  Yeah.
14   Q.  Okay.  And that job was with what company?
15   A.  Adult active care.
16   Q.  I see.  And was that closer to your house?
17   A.  It was just across the street.
18   Q.  And what year did you tell Mr. Chen about this
19   new job?
20   A.  I think 2001, something like that.  I'm not
21   quite certain.
22   Q.  And this new job at the location across the
23   street from your house --
24   A.  Yes.

Page 13

1   Q.  Was that going to be for weekday work, Monday
2   through Friday?
3   A.  Yes.
4   Q.  Did you also want to do weekend work for Sleep
5   Inn at the same time?
6   A.  Yes.
7   Q.  Did you do that for a while, work both weekday
8   work at the other job and weekend work at the Sleep
9   Inn?
10   A.  Yes.
11   Q.  When you did weekend work for Sleep Inn, what
12   was your work schedule on the weekend?
13   A.  In the breakfast area, the lobby, and around
14   like the passage.
15   Q.  Let me ask this question again, ma'am.  How
16   many hours did you work and what days did you work on
17   the weekends at the Sleep Inn?
18   A.  Saturdays and Sunday.
19   Q.  Did you work both weekend days every weekend?
20   A.  No.  I work every other weekend two days.
21   Q.  So you'd work Saturday and Sunday and skip a
22   weekend?
23   A.  Yeah.
24   Q.  Then work Saturday, Sunday?

EEOC                                    v.                    Nabstar, LLC, d/b/a Sleep Inn
Islyn Azasse Palmer            C.A. # 05-cv-0375 (GMS)                    March 17, 2006

Page 14

1    A.  Yes.
2    Q.  And skip a weekend.
3        Was that the schedule that you were on for
4    the weekends when the new owners took over?
5    A.  I should be on that weekend, but it was -- when
6    I went, she said she didn't know if I was working
7    there.
8    Q.  I understand that, ma'am.  Right before the new
9    owners took over --
10   A.  Yeah.
11   Q.  -- you were still on that one weekend on, one
12   weekend off schedule --
13   A.  Yes.
14   Q.  -- for the old owners?
15   A.  Yes.
16   Q.  And just before the new owners took over --
17   this is during the year 2003 -- were you still working
18   at the adult center?
19   A.  I had stopped working there because it was
20   another owner took it over.
21   Q.  And why couldn't you stay on at the adult
22   center?
23   A.  Because it was different management.  They had
24   different types of people doing that.  Like the nurses

Page 15

1    did what I was doing.
2    Q.  What were you doing before the nurses took
3    over?
4    A.  I was the kitchen attendant.
5    Q.  They had nurses being kitchen attendants?
6    A.  No.  They have nurses kitchen attendants now.
7    Q.  Were you fired from your job at the adult
8    center?
9    A.  I wasn't fired for any reason beside that it
10   was a new management.
11   Q.  Did anyone ever complain about your work
12   performance at the adult center?
13   A.  No.
14   Q.  Have you brought any legal action against the
15   adult center?
16   A.  No.
17   Q.  What was the street address for the adult
18   center that you worked at?
19   A.  200 White Chapel Drive.
20   Q.  Tell me what you specifically did in terms of
21   job duties at the adult center?
22   A.  I had to make the breakfast.  The lunch was
23   being cooked over the main part.  I have to go take --
24   pick it up and, at the lunchtime, serve it.  And the

Page 16

1    break time, I had to make something for break, like
2    chocolate.
3    Q.  Did you ever do the cooking yourself?
4    A.  No.  We don't.  No cooking has been done over
5    there unless like a special treat.  And most of the
6    time, they ordered special lunch from the
7    university -- not -- from the Delaware University.
8    Q.  At some point in time did you become aware that
9    the Sleep Inn was being sold to someone else?
10   A.  I heard that it was on sale, but I didn't know
11   when it had been sold until Stephen Chen called me and
12   say I'm to come in.  I think it was a Monday or
13   Tuesday.  That was for the 4th or 5th of August.
14   Q.  And what did he tell you in that conversation?
15   A.  When I ask him what happened and how this is
16   going with the job wise, he said, all the employees'
17   jobs were there.  Only the management was being
18   changed is what he told me.
19   Q.  So Mr. Chen told you that, with the new owners,
20   only the management was going to change?
21   A.  Yes.
22   Q.  When did he tell you this, what date?
23   A.  That was either the 4th or 5th.  I don't
24   remember exactly, but it was either Monday or Tuesday.

Page 17

1    I'm not quite certain which of the days.
2    Q.  If you talked to him on a Monday or Tuesday,
3    August the 4th or 5th, had you worked the weekend
4    before that?
5    A.  Yes, I did.
6    Q.  Did you work both Saturday and Sunday or just
7    one weekend day?
8    A.  I don't remember if I work two days or it was
9    just one day.
10   Q.  Who was in charge of making up the employees
11   schedule for when Ms. Yang owned the hotel?
12   A.  Well, I think it's the manager like for the --
13   who made up the household department schedule.
14   Q.  Who worked in the breakfast area, say, in July
15   2003 before the new owners took over when you were not
16   working the breakfast area?
17        MS. SMITH:  Objection.
18   Q.  On the weekends -- you may answer.
19        MS. SMITH:  You can answer.
20   A.  Well, either Stephen or Stephen's wife.
21   Q.  Who was Stephen's wife?
22   A.  Her name was Mei.  I don't know whatever they
23   call it, pronounce it.  Chen.  It sounds a little
24   different.

EEOC                                    v.                    Nabstar, LLC, d/b/a Sleep Inn
Islyn Azasse Palmer              C.A. # 05-cv-0375 (GMS)              March 17, 2006

Page 18

1  Q.  You were told by Mr. Chen, either on Monday or
2  Tuesday, August 4th or 5th, that management would be
3  changed but the employees would stay?
4  A.  Yes.
5  Q.  Did you report to work at Sleep Inn sometime
6  thereafter?
7  A.  Not until Saturday following that same week.
8  Q.  Okay.
9  A.  It was the 9th.
10  Q.  It was the 9th.  What time did you report to
11  work that day?
12  A.  Seven o'clock.
13  Q.  How did you get to work that day?
14  A.  I just walk across -- I slept at my daughter's
15  house the night before because it is more convenient
16  for me to stay over and just walk across because she
17  was living at the adjoining premises.
18  Q.  At what address did your daughter live then?
19  A.  18 Marvin Drive.
20  Q.  Was that the same address that you used to live
21  at?
22  A.  No.
23  Q.  Did you live close to your daughter previously
24  on Marvin?

Page 19

1  A.  Yeah.  This is apartment buildings.
2  Q.  I see.
3        Did you live in the same apartment with
4  your daughter previously?
5  A.  No.  Just for a while, and then she got her own
6  apartment.
7  Q.  Why did you move from Marvin to Farnsworth?
8  A.  Because we bought the house there.
9  Q.  So you came in to work the following Saturday,
10  August 9th?
11  A.  Yes.
12  Q.  Tell me what happened.
13  A.  When I came in, I saw a woman in the breakfast
14  area was working, and I spoke to the front desk and
15  asked him what happened.  He said she's working.  She
16  doesn't know.  I told him I was supposed to work that
17  Saturday.  And he said he couldn't do anything.  I
18  went in the laundry room to check if I didn't see my
19  name on the schedule.
20  Q.  Okay.
21  A.  I didn't see no punch card.  So I wrote down my
22  time on a piece of paper and I ask him, and he said
23  the manager would come in shortly or some time
24  Saturday.  So I sat down and waited until she came.

Page 20

1  The front desk guy told her -- called me and told me
2  that the manager was there.  And I spoke with her.
3  Q.  What was the name of the manager?
4  A.  Joan Payne.
5  Q.  Do you know the name of the front desk person
6  that you spoke with that time?
7  A.  I don't remember his name because he was fairly
8  new and I don't see them every day.
9  Q.  When you spoke with Joan Payne, what was the
10  substance of your conversation?
11  A.  I told her that I was supposed to work because
12  Stephen said the work hours are just the same, nothing
13  has been changed.  She says she don't know about that.
14  So she was there, and she was still there, and she
15  didn't say anything to me.  Ask her again, what was
16  the -- what am I to do?  She said she don't know.  All
17  I can do is fill out an application.
18  Q.  Okay.
19  A.  I told her that my file was there and whatever.
20  It's in the file.  That's what I'm working under.
21  Q.  She said there was no file there for me.
22  A.  I said there must be a file for me.  Well, she
23  went down.  She found the file.  She said I have to
24  fill out an application, and she gave me an

Page 21

1  application form, which I did fill out.
2  Q.  Did Ms. Payne show you your file on the 9th?
3  A.  No.  She didn't show me the file, but she found
4  it.
5  Q.  Did she tell you that she found it?
6  A.  Yes.
7  Q.  Did you see her with your file in hand?
8  A.  Yes.
9  Q.  What color was the folder?
10  A.  I don't remember the color of the folder.
11  Maybe brown or white.  I don't know something.  I
12  didn't take note of the color.
13  Q.  When did you fill out an application?
14  A.  I filled out Saturday morning like between
15  ten -- between 10 and 11.  I gave it to her.  She
16  said, I'll have to get an interview with the owner.
17  Q.  And what happened next that day?
18  A.  The owner came in, and he interviewed me.
19  Q.  Do you know the name of owner?
20  A.  Patel.
21  Q.  J. Patel?
22  A.  Yeah.
23  Q.  What time of day did he come in?
24  A.  It was about 11 and 12, something like that.

6 (Pages 18 to 21)

EEOC                                                            v.                                Nabstar, LLC, d/b/a Sleep Inn
Islyn Azasse Palmer                              C.A. # 05-cv-0375 (GMS)                                    March 17, 2006

Page 22

1  Q.  During this time was the breakfast area staffed
2  by someone?
3  **A.  Yes.**
4  Q.  Do you know the name of that person?
5  **A.  I didn't know her name at that time.**
6  Q.  Had she worked for the previous owners?
7  **A.  No.  It was a strange person there.**
8  Q.  Did you talk to that person who was doing the
9  breakfast that day.
10  **A.  All I did when I came in and saw her in the**
11  **breakfast area working, ask her if she's working**
12  **there.  She said, yes.  I say that I'm supposed to be**
13  **working there.  She only shook her shoulder and went**
14  **on and did her work.  So I went and sat down in the**
15  **passage at the little table and waited on Joan.**
16  Q.  Did you have any further conversation with Joan
17  Payne that day, August 9?
18  **A.  No.**
19  Q.  You testified that Mr. Patel interviewed you
20  that day, correct?
21  **A.  Yes.**
22  Q.  What was discussed during the interview?
23  **A.  He asked me if I work the breakfast area.  Told**
24  **him just as though I worked it.  He ask -- told me**

Page 23

1  **that, if I was willing to work in other department.  I**
2  **said yes.  And that's it.**
3  Q.  Did he ask you how old you were?
4  **A.  No.  Because my age is on there.  I think it's**
5  **on the application form.**
6  Q.  But he didn't ask you when he was interviewing
7  you how old you were, correct?
8  **A.  No.**
9  Q.  Did Ms. Payne ask you how old you were when you
10  talked to her earlier?
11  **A.  No.**
12  Q.  Did you fell Mr. Patel or Ms. Payne how long
13  you had worked for Sleep Inn --
14  **A.  Yes.**
15  Q.  -- before?
16  **A.  Yes.**
17  Q.  After Mr. Patel asked you whether you would be
18  willing to work in other departments, your answer was
19  that you said you would be willing, correct?
20  **A.  Yes.**
21  Q.  What happened after that?
22  **A.  He accept it and employed -- being employed, he**
23  **accept the application.**
24  Q.  Okay.

Page 24

1  **A.  And it was that late.  It was like 12:00**
2  **o'clock.  I should be leaving at that time, so I**
3  **didn't work for that day.**
4  Q.  So you didn't work that Saturday?
5  **A.  No.**
6  Q.  What times did you typically work on the
7  weekend?  Was it like 7 to 12 or --
8  **A.  7 to 12.  And sometimes -- it all depends on**
9  **what I have to do because sometimes I'll set the**
10  **table for a guest coming in.  They have parties.  They**
11  **have -- I mean and other things, I have to set up the**
12  **table.**
13  Q.  For the previous owner, Ms. Yang, did you
14  normally start at 7:00 a.m. on either Saturday or
15  Sunday?
16  **A.  Yes.**
17  Q.  So that was your usual starting time?
18  **A.  Yes.**
19  Q.  But your stopping time would change depending
20  on what you had to do?
21  **A.  Yes.**
22  Q.  Did Mr. Patel tell you anything further besides
23  accepting your application?
24  **A.  No.**

Page 25

1  Q.  Did he tell you when you were supposed to work
2  or did he tell you that you were supposed to come back
3  to work at some time?
4  **A.  I told him I won't be working that Sunday until**
5  **the other Saturday, and he said it was okay.  That's**
6  **all he said.**
7  Q.  Was there a reason why you couldn't work that
8  following Sunday, which would have been August 10th I
9  guess?
10  **A.  That was my Sunday off.**
11  Q.  Aside from it just being your day off, was
12  there any particular reason why you couldn't work?
13  For example, did you have another job on that Sunday?
14  **A.  I did not have another job.  I needed -- he**
15  **didn't say I'm to start work at that time because**
16  **he -- only it was my 12:00 o'clock.  And he was done,**
17  **and that was my time I come off most of the days when**
18  **I don't have an extra workday.**
19  Q.  Did he ask you whether you could work the next
20  day, Sunday?
21  **A.  No.**
22  Q.  But you told him that you couldn't because that
23  was your day off?
24  **A.  I told him the Sunday was my day off.  I didn't**

7 (Pages 22 to 25)

EEOC                                          v.              Nabstar, LLC, d/b/a Sleep Inn
Islyn Azasse Palmer            C.A. # 05-cv-0375 (GMS)              March 17, 2006

Page 26

1 tell him I couldn't work.
2 Q. Were you working for the adult center?
3 A. Not at that time.
4 Q. At that time?
5 A. No.
6 Q. So your only job at that time, you believe, was
7 at the Sleep Inn, correct?
8 A. Yes.
9 Q. When you worked for the previous owners at the
10 Sleep Inn, was there a manager who was your boss or
11 your supervisor?
12 A. Yes.
13 Q. Who was that?
14 A. You mean from the beginning to the day I
15 stopped?
16 Q. Let's say for the few months before the new
17 owners took over?
18 A. So --
19 Q. Say, May, June, and July of 2003, who was your
20 boss or supervisor?
21 A. Stephen Chen.
22 Q. Have you spoken to Alice Yang or Stephen Chen
23 since August of 2003?
24 A. I met Stephen once after that in supermarket.

Page 27

1 I say hello. That's all.
2 Q. What did you talk about when you saw him in the
3 supermarket?
4 A. I told him I wasn't working at Sleep Inn any
5 more. That was maybe a year after or something.
6 Q. And did you tell him why?
7 A. No.
8 Q. Did he ask why?
9 A. He didn't ask me why because we didn't have a
10 long chat.
11 Q. What was the next time that you reported to
12 work at the Sleep Inn after August 9?
13 A. It was following Saturday. That would be the
14 16th and the 17th.
15 Q. Did your workday on both Saturday and Sunday
16 start at 7:00 a.m.?
17 A. Yes.
18 Q. It didn't change at all from the previous
19 owners?
20 A. Could you repeat?
21 Q. Yes. When you worked the breakfast area for
22 the old owner, Ms. Yang, your start time on the
23 weekend was 7:00 a.m. When you worked for the new
24 owners on August 16 and 17, on the weekend, was your

Page 28

1 start time still the same?
2 A. Saturday it was not the same because the person
3 that I saw the week before, she was there and I sat
4 down and I asked if Joan is coming in and the front
5 desk guy say, yes, she'll be there. And I waited
6 until she come, maybe 9 or something, 8:30, 9, or --
7 after 9. And I told her that I was supposed to work
8 and there is somebody in the breakfast area. And she
9 was kind of reluctant. And afterwards says, since
10 Mr. Patel see I'm -- I'm fit employee, I can work with
11 her.
12 Q. Did you work with her that day Saturday?
13 A. I work, yes, I did.
14 Q. What duties or tasks did you perform that
15 Saturday?
16 A. I only helped her. I clean up the table when
17 the clients left it. I helped her to put the things
18 in the right and proper place which they didn't have
19 it there. They have it scattered all over the
20 counter. And I think I did the cleaning up after the
21 breakfast was over.
22 Q. Did you talk with the other woman who was
23 working that area that Saturday?
24 A. Not much. Not very much.

Page 29

1 Q. Did she discuss with you whether she would be
2 continuing to work in the breakfast area?
3 A. No.
4 Q. Did she tell you that she would be working
5 somewhere else in the hotel?
6 A. No.
7 Q. What time did you leave that day?
8 A. I left around 12, going to about one because
9 when I finish -- almost finished cleaning up, John
10 came in and told me that the wash area was under water
11 and I'm to go and dry it, which I went and did.
12 Q. The wash area had become flooded?
13 A. Yeah.
14 Q. Did you work the next day, Sunday?
15 A. The Sunday, yes.
16 Q. What time did you come to work?
17 A. Seven.
18 Q. When you came to work on that Sunday and on the
19 day before Saturday, how did you get to work.
20 A. I just walked across because I tell you I
21 stayed at my daughter's for the two nights that we are
22 out there.
23 Q. And did you work in the breakfast area again?
24 A. On the Sunday, yes.

8 (Pages 26 to 29)

EEOC                                                              Nabstar, LLC, d/b/a Sleep Inn
                                    v.
Islyn Azasse Palmer              C.A. # 05-cv-0375 (GMS)                    March 17, 2006

Page 30

1 Q. Was the same woman who was there on Saturday
2 there on Sunday?
3 **A. No.**
4 Q. It was just you there?
5 **A. Yes.**
6 Q. When you worked that Saturday and Sunday, the
7 16th and 17th, did you have discussions with any of
8 the clients or customers who were in the area?
9 **A. No.**
10 Q. Do you know whether any of the clients or
11 customers made any complaints about your work
12 performance on those days?
13 **A. No.**
14 Q. When you filled out your application, where did
15 you fill it out? Did you go into the manager's office
16 or did you sit out in the breakfast area or --
17 **A. Right by the -- in the walkway. At the tables**
18 **there with two chairs. I sat there.**
19 Q. And to whom did you turn the application in?
20 **A. I went to the front desk, and I turn it in.**
21 **I'm not quite certain if the front desk worker took it**
22 **at that time, but if he took it, he gave it to Joan**
23 **because I went there and she wasn't at the front desk**
24 **at that time. Then she was somewhere else in the**

Page 31

1 **building.**
2 Q. Do you know if Ms. Payne ever saw your
3 application on that day, the 9th, that you filled it
4 out?
5 **A. I don't know if she read it, but they gave it**
6 **to Mr. Patel to -- Mr. Patel came out from the office**
7 **with the application.**
8 Q. Did you have any discussions with Ms. Payne or
9 Mr. Patel on Sunday, August 17th?
10 **A. Only discussion when I ask -- Mr. Patel ask me**
11 **the question, answer. I did not have any more**
12 **conversation with Joan. But when she told me I could**
13 **work with the lady that Saturday, and the Sunday she**
14 **told me after I had finished cleaning up, I was to go**
15 **and clean up the wash area because it was flooded.**
16 Q. Okay. On Sunday, August 17th, did you see Joan
17 Payne at the hotel?
18 **A. Yes.**
19 Q. And did you discuss with her your continued
20 employment at the hotel?
21 **A. No.**
22 Q. Did you discuss anything with her?
23 **A. I did not.**
24 Q. Did you see Mr. Patel there that day, Sunday

Page 32

1 the 17th?
2 **A. The 17th? I don't know. I didn't notice.**
3 Q. After you finished up your work on Sunday the
4 17th, what was your next contact with anybody at the
5 hotel?
6 **A. I had no more contact with them about it.**
7 Q. At some point in time did you learn that you
8 were terminated from your job at the hotel?
9 **A. I did not know. I was not at home when Joan**
10 **called, and my daughter was at home. And she called**
11 **and tell my daughter to tell me to come in and pick up**
12 **my pay for the two days because I'm terminated.**
13 Q. Now, you said your daughter was at home?
14 **A. At my house. Not her house. My house.**
15 Q. At Farnsworth?
16 **A. Yes.**
17 Q. Do you remember where you were when the phone
18 call came to your daughter at your house?
19 **A. I don't remember. Maybe I gone to the doctor,**
20 **gone shopping. I don't really know. I have no idea**
21 **of that day.**
22 Q. When did you first learn that you had been
23 terminated?
24 **A. When I came back home, I got the message.**

Page 33

1 Q. Was your daughter still there when you came
2 home?
3 **A. Yes, she was there.**
4 Q. When you got that information from your
5 daughter, did you contact the hotel?
6 **A. I did not contact it that day until the**
7 **following day I went and collected my pay.**
8 Q. Who did you collect your pay from?
9 **A. I think it was left at the front desk. I think**
10 **it was the only person that was working at the front**
11 **desk. I'm not certain.**
12 Q. What information did your daughter give to you
13 about your termination besides that you were
14 terminated and that you could pick up your pay?
15 Anything else?
16 **A. No.**
17 Q. Did you ask to meet with Ms. Payne or Mr. Patel
18 when you went to pick up your pay?
19 **A. No.**
20 Q. Did you see them there when you went to pick up
21 your pay?
22 **A. Ms. Payne was there, but I didn't speak to her**
23 **she was going down -- further down in the area.**
24 Q. Is there any reason why you didn't ask

9 (Pages 30 to 33)

EEOC                                                v.                      Nabstar, LLC, d/b/a Sleep Inn
Islyn Azasse Palmer              C.A. # 05-cv-0375 (GMS)                           March 17, 2006

Page 34

1  Ms. Payne or ask to speak with her to find out why it
2  was that you were terminated?
3  **A. No. I didn't ask her.**
4  Q. Is there any reason why you didn't?
5  **A. No.**
6  Q. Were you upset that you were terminated?
7  **A. I wasn't really upset.**
8  Q. Why were you not?
9  **A. I say it look very funny. That's what I said.**
10  Q. Who did you say that to?
11  **A. I say it to myself.**
12  Q. Why did you think it looked funny or seemed
13  funny?
14  **A. Because there was somebody working there in my**
15  **space.**
16  Q. What did you think seemed funny about somebody
17  else working in your breakfast area?
18  **A. Well, I said something must be -- something is**
19  **looking funny because I was told that my job was as**
20  **usual and now it's been terminated.**
21  Q. If you felt this way, why didn't you ask
22  Mr. Patel or Ms. Payne why you were being terminated?
23  **A. Because I didn't know what to do and I did not**
24  **think of asking them. I just took it as granted.**

Page 35

1  Q. After you collected your pay for the two days
2  that you worked, you had no further contact with the
3  Sleep Inn hotel personally, correct, or did you?
4  **A. No. Before my daughter told her that I'm going**
5  **to need a letter because I have to go to the labor**
6  **department to get assistance, that's all was said that**
7  **day when she called at the house and I wasn't there**
8  **and my daughter answered her.**
9  Q. Is that when your daughter asked Ms. Payne to
10  send a letter?
11  **A. Yes.**
12  Q. And did Ms. Payne send you a letter?
13  **A. Yes.**
14  Q. Did Ms. Payne or Mr. Patel tell you when they
15  were talking with you before you were terminated that
16  they wanted a full-time person for the breakfast area?
17  **A. No.**
18  Q. Do you know whether the woman you saw when you
19  came in to work on August 9th, do you know whether she
20  was a full-time employee or not?
21          MS. SMITH: Objection.
22  Q. You can still answer. Do you know whether she
23  was full time?
24  **A. No.**

Page 36

1  Q. You don't know?
2  **A. No.**
3  Q. When you filled out the application on August
4  9th, were you given like an employee handbook.
5  **A. Yes.**
6  Q. And was there a page that you had to sign
7  saying that you received the employee handbook?
8  **A. I don't think so.**
9  Q. I'm going to show you a document.
10          MS. SMITH: Would you like the court
11  reporter to mark it first?
12          MR. CONNORS: Possibly.
13          MS. SMITH: Can we go off the record for a
14  second?
15          (Discussion off the record.)
16  BY MR. CONNORS:
17  Q. Ms. Palmer, I've shown you a document that's
18  headed "Receipt and Acknowledgement of Employee
19  Handbook." I'll just direct your attention down
20  towards the bottom of the page and ask you whether
21  that is your signature there?
22  **A. Yes. That's my signature.**
23  Q. That's your signature. Okay.
24          MR. CONNORS: Let's mark that as Palmer 1,

Page 37

1  please.
2          (Palmer Deposition Exhibit 1 was marked
3  for identification.)
4  BY MR. CONNORS,
5  Q. Mrs. Palmer, you have in your hands the
6  document which I've just marked as Palmer 1 and you
7  said that was your signature, correct?
8  **A. Yes.**
9  Q. Is there a date at the bottom near your
10  signature also?
11  **A. Yes.**
12  Q. What is that date?
13  **A. 8/9/03.**
14  Q. Do you remember signing this on August 9?
15  **A. Well, I didn't remember, but I see where I did**
16  **sign the employee name.**
17  Q. I think I'm done with that, ma'am.
18          Ma'am, I'm going to show you a document
19  which we'll have marked Palmer 2 before I show it to
20  Ms. Palmer.
21          (Palmer Deposition Exhibit 2 was marked
22  for identification.)
23  BY MR. CONNORS:
24  Q. It's a document headed "Employment

10 (Pages 34 to 37)

EEOC                                    v.              Nabstar, LLC, d/b/a Sleep Inn
Islyn Azasse Palmer          C.A. # 05-cv-0375 (GMS)                    March 17, 2006

Page 38

1  Application."
2         Ma'am, I'm going to show you Palmer 2
3  which is headed "Employment Application." I'm going
4  to ask you to review it and tell me whether that
5  document has your handwriting on it and whether it was
6  filled out by you?
7  **A.  Yes.**
8     Q.  Would you agree that there is no date of birth
9  asked for or reported on that document?
10        Do you agree, ma'am, that there's no
11  question about your date of birth on that application,
12  correct?
13  **A.  Yes.**
14        MS. SMITH:  Was that a yes, Ms. Palmer?
15  Are you saying yes to his question that there is no
16  date of birth?
17        THE WITNESS:  Yes.
18  BY MR. CONNORS:
19     Q.  There's no date of birth on there?
20  **A.  Right.**
21     Q.  Okay.  Thank you.
22        Did anyone at the Sleep Inn from August
23  4th until the date that you learned that you were
24  terminated ever ask you how old you were?

Page 39

1  **A.  I haven't spoken to them.**
2     Q.  That wasn't my question, ma'am.  My question
3  was, from August 4th until the day you were terminated
4  did anyone, any employee, manager, owner, of the Sleep
5  Inn ever ask you how old you were?
6  **A.  No.**
7     Q.  Did you ever tell anyone in that time period
8  how old you were?
9  **A.  Not the man.  I don't remember telling anyone.**
10    Q.  Do you believe that you were discriminated
11  against because of your age when you were terminated?
12  **A.  Well according to what happened, it looks very
13  much so.**
14    Q.  Well, that wasn't my question.  Do you believe
15  that you were discriminated against based upon your
16  age when you were terminated?
17  **A.  Yes.**
18    Q.  And why do you believe that?
19  **A.  Because I was the oldest one at that time.**
20    Q.  At the time that you were terminated?
21  **A.  Yes.**
22    Q.  Do you know the ages of any of the other
23  employees who began employment at the Sleep Inn when
24  the new owners took over?

Page 40

1  **A.  I don't know the age.  I just know that they
2  are much younger age people than I am.**
3     Q.  Do you know whether any of the full-time
4  workers who worked for the new owners when you were
5  not working weekdays were older or about as old as
6  you?
7         MS. SMITH:  Objection.
8     Q.  You can still answer.
9  **A.  I could not tell because I don't see everybody
10  at the same time.**
11    Q.  After you learned that you were terminated at
12  the Sleep Inn, did you seek other employment?
13  **A.  Not right away.**
14    Q.  Eventually did you?
15  **A.  It's maybe a year after or something.  I don't
16  remember but I did not seek any other employment that
17  I joined the senior companion.**
18    Q.  Let's back up a little bit.  Your daughter
19  asked the hotel to send a letter so that you could go
20  to the assistance office to obtain financial
21  assistance, correct?
22  **A.  Yes.**
23    Q.  And that was unemployment compensation?
24  **A.  Yes.**

Page 41

1     Q.  And did you go to the unemployment office, to
2  department of the labor to get unemployment benefits?
3  **A.  Yes.**
4     Q.  For how long did you get those benefits?
5  **A.  I think because -- maybe 20 or 26 weeks, I
6  don't remember.**
7     Q.  Do you remember how much you received on a
8  weekly or monthly basis?
9  **A.  I think it was hundred and something.  I don't
10  quite remember hundred and how much.**
11    Q.  Hundred and some dollars?
12  **A.  Yeah.**
13    Q.  Was that a week, a month?
14  **A.  Per week.**
15    Q.  And why did you stop getting unemployment
16  benefits?
17  **A.  That's the time when they say they could afford
18  it.**
19    Q.  And at some point, after you stopped receiving
20  benefits, did you obtain new employment?
21  **A.  Well, that -- let me see.  I think I got a
22  couple days with Comfort Keepers.**
23    Q.  Comfort Keepers?
24  **A.  Mm-hmm.**

11 (Pages 38 to 41)

EEOC                                              v.                    Nabstar, LLC, d/b/a Sleep Inn
Islyn Azasse Palmer                    C.A. # 05-cv-0375 (GMS)              March 17, 2006

Page 42

1    Q.   Are they located in Newark?
2    A.   Yes.
3    Q.   And where in Newark are they located?
4    A.   Salem Church Road.
5    Q.   And what year did you work for them?
6    A.   I think it was 2003, 2004.
7    Q.   Okay.
8    A.   I think. But it wasn't for long. It was just
9    a short time.
10   Q.   What did you do for Comfort Keepers?
11   A.   It was like take care of old people. Like they
12   have to wait until they are ready to come home, I
13   would go and sit there for two hours or -- it wasn't a
14   big job.
15   Q.   Do you know how many days you worked for them?
16   A.   It was just -- it wasn't -- it was just a
17   couple of days.
18   Q.   Why did you stop working for Comfort Keepers?
19   A.   Because it was inconvenient for me because all
20   their clients were out, and I don't drive, and there
21   was no bus. So I had to stop.
22   Q.   How much did you earn per hour for Comfort
23   Keepers?
24   A.   I don't quite remember if it was seven --

Page 43

1    eight -- or eight dollars I don't quite remember how
2    much it was.
3    Q.   Did you become employed by someone else after
4    Comfort Keepers?
5    A.   I joined the senior companion.
6    Q.   Was that a company that pays you for your
7    working?
8    A.   Just -- what they call it now? Not -- what
9    they call it?
10   Q.   Are you a volunteer?
11   A.   Volunteer, yes. Stipend or something like
12   that.
13   Q.   Staffing?
14       MS. SMITH:  She said stipend.
15       MR. CONNORS:  Stipend. I'm sorry.
16   BY MR. CONNORS:
17   Q.   What was the name of this company again?
18   A.   It was caring -- caring something. I don't
19   quite remember. But it was Comfort Keepers. Caring
20   something or other.
21   Q.   No. I understand that you worked for Comfort
22   Keepers. What was the company that you worked for
23   after Comfort Keepers that paid you a stipend?
24   A.   First State Senior Companion.

Page 44

1    Q.   Do you have pay stubs or paychecks, copies of
2    old paychecks from those companies, Comfort Keepers
3    and First State?
4    A.   I have First State. I'm not quite certain.
5    Comfort Keepers maybe.
6    Q.   When did you start working for First State?
7    A.   1999 -- 4 -- 2004.
8    Q.   Do you still work for them?
9    A.   Yes.
10   Q.   How many hours a week do you work for them?
11   A.   Four hours a day. 20 hours a week.
12   Q.   So you work Monday through Friday?
13   A.   Yes.
14   Q.   And where do you work?
15   A.   At the active care adult. Active day care
16   adult.
17   Q.   What address is that?
18   A.   2000 White Chapel Drive.
19   Q.   How do you get there?
20   A.   Walk.
21   Q.   Is this the same facility that you previously
22   worked at?
23   A.   Different -- under different management.
24   Q.   To your knowledge, have there been any

Page 45

1    complaints made against you about your performance at
2    this facility where you currently work?
3    A.   No.
4    Q.   There have been none or you don't?
5    A.   There have been none.
6    Q.   Did Mr. Chen ever have any complaints about
7    your work performance?
8    A.   Never.
9    Q.   Did Ms. Yang ever --
10   A.   Never.
11       MS. SMITH:  Let him finish his question
12   completely.
13       THE WITNESS:  Sorry.
14       MS. SMITH:  That's okay.
15   BY MR. CONNORS:
16   Q.   Did Ms. Yang ever have any complaints about
17   your work performance?
18   A.   No. Not to my knowledge.
19   Q.   To your knowledge, did any guests ever complain
20   about the breakfast area when you worked for the
21   previous owners?
22   A.   No.
23   Q.   Before you reported to work on August 9th, did
24   you make any effort to find out who the new owners

12 (Pages 42 to 45)

EEOC                                          v.                    Nabstar, LLC, d/b/a Sleep Inn
Islyn Azasse Palmer              C.A. # 05-cv-0375 (GMS)                    March 17, 2006

Page 46

1  would be to make sure that you had a job there?
2  **A. I didn't because Stephen told me it was nothing**
3  **has been changed.**
4  Q. Did you become aware of an orientation meeting?
5  **A. No.**
6        MS. SMITH: I'm sorry. Were you finished
7  your question, Mr. Connors?
8        MR. CONNORS: Well, sort of.
9  BY MR. CONNORS:
10  Q. At some point in time did you become aware that
11  there had been an orientation meeting scheduled for
12  employees transitioning to the new owners?
13  **A. No.**
14  Q. You mentioned a person named Gigi?
15  **A. Yes.**
16  Q. That last name was --
17  **A. Wilson.**
18  Q. -- Wilson?
19        Do you know a person named Lynn Hopkins?
20  **A. I know a Lynn Philbin. I guess that's the same**
21  **person. She got married before she left the hotel.**
22  Q. Did she work for the previous owners, Ms. Yang?
23  **A. Yes.**
24  Q. And what was her job?

Page 47

1  **A. Manager.**
2  Q. Did you know an Aaron Smith?
3  **A. Aaron Smith? Yes. I think so.**
4  Q. How did you know him?
5  **A. I think he worked at the front desk.**
6  Q. Under the previous owners, Ms. Yang?
7  **A. Yeah.**
8  Q. Ma'am, I'm going to show you answers to written
9  questions called interrogatories that were previously
10  provided to me by your attorney. I'm going to ask you
11  to look at interrogatory number 1, which is
12  question 1, and take a look at the answers that were
13  provided underneath it. It was a question that asks
14  about witnesses to the incident. And it identifies
15  several individuals in response to the question.
16        MS. SMITH: Can we go off the record for a
17  minute? I want to make sure she understands the
18  question here.
19        (Discussion off the record.)
20        MR. CONNORS: Unfortunately, this is not
21  permitted under Delaware practice. So the witness is
22  going to have to just answer the questions.
23        MS. SMITH: Okay. So --
24        MR. CONNORS: She can still take the time

Page 48

1  to look at it.
2        MS. SMITH: Take the time to review it.
3  If you don't understand the question or don't
4  understand what is in writing on this paper --
5        MR. CONNORS: Let me know.
6        MS. SMITH: -- then let Mr. Connors know.
7  I'm sorry. You're just referring to
8  question 1?
9        MR. CONNORS: Just 1.
10        THE WITNESS: I don't quite understand
11  what it means by here.
12  BY MR. CONNORS:
13  Q. Let me ask you this question, then, ma'am. Do
14  you know a woman named Petralina Corrale?
15  **A. Yes.**
16  Q. Did she work with you for the previous owners?
17  **A. Yes.**
18  Q. Did she stay on and continue working with the
19  new owners?
20  **A. I don't know. She was there working first**
21  **Saturday morning I came in, and she was there.**
22  Q. She was there on the 9th?
23  **A. Yeah.**
24  Q. Do you know whether she was there on the 16th

Page 49

1  and 17th?
2  **A. I really don't know.**
3  Q. Do you know an Anna Sanchez?
4  **A. Yes.**
5  Q. Did she work for the previous owners?
6  **A. Yes.**
7  Q. Did she continue to work for the new owners?
8  **A. I guess so.**
9        MS. SMITH: I'm sorry. Are you asking
10  about after she was terminated?
11        THE WITNESS: Yeah. I don't know because
12  they don't work on --
13        MS. SMITH: I'm sorry. Is that a yes or
14  no, Mr. Connors?
15  BY MR. CONNORS:
16  Q. Let me rephrase my question, ma'am. Okay?
17        Did you see Anna Sanchez on August 9 when
18  you came to work?
19  **A. I don't remember. I can't tell you because**
20  **oftentimes I don't see who comes in until lunchtime**
21  **or quitting time.**
22  Q. When you reported to work on the 16th and 17th,
23  did you see Anna Sanchez?
24  **A. I don't remember.**

13 (Pages 46 to 49)

EEOC                                    v.                 Nabstar, LLC, d/b/a Sleep Inn
Islyn Azasse Palmer          C.A. # 05-cv-0375 (GMS)              March 17, 2006

Page 50

1   Q.   Do you know whether Ms. Petrolina Corrale
2   witnessed your satisfactory performance as a breakfast
3   attendant?
4   A.   Yes.
5        MS. SMITH:  Objection.  You can answer.
6   A.   Yes.
7   Q.   Why do you say that?
8   A.   Because I have been doing that satisfactory
9   to -- from the time I started working in that area.
10  Q.   Do you know whether she saw you do your job as
11  a breakfast attendant when you worked with the old
12  owners?
13       MS. SMITH:  Objection.  You can answer.
14  Q.   You can answer.
15  A.   Yes.  She saw me working there.
16  Q.   Do you know whether she saw you when you worked
17  the breakfast area after the new owners took over?
18       MS. SMITH:  Objection.  You can answer.
19  A.   I don't remember who I saw that Saturday
20  morning because they just came in and went to work
21  while I was sitting there.
22  Q.   Do you know whether Anna Sanchez witnessed your
23  satisfactory performance as a breakfast attendant when
24  you worked for the old owners, previous owners?

Page 51

1        MS. SMITH:  Objection.
2   A.   Yes.
3   Q.   How do you know that she was a witness?
4   A.   I don't -- could you rephrase that?  I don't
5   understand.
6   Q.   How do you know that she saw you?  Did she see
7   you do your job?
8        MS. SMITH:  Same objection, but you can
9   answer.
10  A.   Yes.  Because sometime they would come and get
11  a cup of coffee.
12  Q.   Okay.  Did Ms. Corrale and Ms. Sanchez, did
13  they ever work the breakfast area with you for the
14  previous owners?
15  A.   No.
16  Q.   Did they ever work with you in the breakfast
17  area for the new owners?
18  A.   No.
19  Q.   Do you know Maria Cristale?
20  A.   I guess so.  I think she worked in the laundry.
21  I don't remember where she worked.
22  Q.   Did she work in the laundry for the previous
23  owners?
24  A.   I couldn't tell you.

Page 52

1        MS. SMITH:  I'm sorry.  Objection to the
2   first question.  I know you already answered, but
3   continue.
4   Q.   Do you know whether Maria Cristale witnessed
5   your satisfactory performance as a breakfast attendant
6   when you worked for the previous owners?
7        MS. SMITH:  Objection.
8   A.   Yes.
9   Q.   How do you know that she witnessed your
10  performance at all?
11  A.   Because sometimes she would pass by and get a
12  cup of coffee or tea.
13  Q.   Did she continue to work with the new owners --
14       MS. SMITH:  Objection.
15  Q.   -- after you became employed by the new owners?
16  A.   I don't know she worked on a Saturday or a
17  Sunday.
18  Q.   Do you remember whether you saw her on August
19  9th, August 16th, or August 17th, 2003?
20  A.   I can't tell you that.
21  Q.   I'm going to show you the answers that you just
22  had the chance to look over.  Do you remember speaking
23  with anyone from the Equal Employment Opportunity
24  Office about question number 1 in these

Page 53

1   interrogatories?
2        MS. SMITH:  I'm going to object.  You can
3   continue to review and answer his question if you
4   know.
5   A.   I don't know if they saw when they came in -- I
6   don't know who came in.  I remember Petralina.
7   Q.   That wasn't my question, ma'am.  My question
8   was, did you discuss the answers that were provided in
9   response to question 1-A through C with an attorney
10  from the Equal Employment Opportunity Commission, and
11  did you supply those answers?
12       MS. SMITH:  Objection to form, but you can
13  answer if you know.
14  A.   Well, they asked who I can identify was there
15  when I was there.  That's all.  I gave them what they
16  were -- name I could remember.
17  Q.   Did you ever see, before coming here today, the
18  answers to all of the questions in the defendant's set
19  of interrogatories that I have in front of you?  Did
20  you ever see this document before?
21       And feel free to page through it if you
22  like, ma'am.  I'll represent to you that this contains
23  a number of different questions that have answers to
24  them.

14 (Pages 50 to 53)

EEOC                                    v.                        Nabstar, LLC, d/b/a Sleep Inn
Islyn Azasse Palmer            C.A. # 05-cv-0375 (GMS)                        March 17, 2006

Page 54

1    A.  I never seen these before.
2    Q.  Let me take this back for a second, ma'am.
3    When you worked for the old previous owners -- I
4    shouldn't say old -- the previous owners of the Sleep
5    Inn, what job title did you have?
6    A.  Could you repeat?
7    Q.  Yes.  Did you have a specific job title when
8    you worked for the previous owner of the Sleep Inn?
9    A.  I don't understand that question.
10   Q.  When you worked for the previous owners of
11   Sleep Inn, what job duties did you have specifically?
12   A.  Well, I worked in the laundry area.  I do
13   rooms.  I clean -- I work at the breakfast.  I was
14   just a general worker.
15   Q.  When you worked in the breakfast area, what did
16   you have to do?
17   A.  Could you repeat?
18   Q.  When you worked in the breakfast area of the
19   Sleep Inn, what jobs did you have to do?  What tasks
20   did you have to perform?
21   A.  For the breakfast area, I had to make the
22   coffee, make the tea, put the orange juice in the
23   container, the orange juice in the container, and the
24   utensils.  They were plastic.  They were in the -- put

Page 55

1    it in different containers, the forks, the spoons --
2    forks to themselves, spoons to themselves, knives to
3    themselves, and like for the butter and the jelly or
4    whatever you call it.
5    Q.  All the breakfast --
6    A.  Had to be placed in separate containers.
7    Q.  Did you have to clean the tables?
8    A.  Yes.  I have to clean the table after each
9    company or each person had their breakfast.
10   Q.  Did you have to vacuum the floor in the
11   breakfast area?
12   A.  I wash, not vacuum.
13   Q.  How much were you earning on an hourly basis at
14   the Sleep Inn when you were terminated?
15   A.  7.50.
16   Q.  How did you know that you had the most
17   seniority of the workers at the Sleep Inn when you
18   were discharged?
19   A.  Because I did most of the departments.  I would
20   do the breakfast.  Sometimes when Stephen has to go
21   out, he would say check the room.  I would see
22   everything was in order.
23       MS. SMITH:  I'm actually going to object
24   to the question even though you've already answered,

Page 56

1    but...
2    BY MR. CONNORS:
3    Q.  You started with the previous owners in 1997,
4    correct?
5    A.  Yes.
6    Q.  And you stayed there until the new owners took
7    over, correct?
8    A.  Yes.
9    Q.  Were there any other employees of the previous
10   owners who started in 1997 and stayed over until the
11   new owners took over?
12   A.  Petralina.  I don't know what -- remember what
13   year she started.  I have to remember that, her
14   starting date, but I know she was the next oldest one
15   to me in the company.
16   Q.  Do you know how old she was?
17   A.  Not the oldest in age.  Working.
18   Q.  Like length of service?
19   A.  The service.
20   Q.  Did you ever tell Mr. Patel or Ms. Payne that
21   you were willing to move to a different department
22   when they took over?
23   A.  They did not tell me that they were going to
24   remove me to a different department.  The question

Page 57

1    was, are you willing to do -- to work in another -- in
2    any other department?
3    Q.  What other departments were there besides --
4    well, what other departments were available to your
5    knowledge to work in?
6    A.  Housekeeping.
7    Q.  Do you know under the previous owners whether
8    anyone in housekeeping only worked on weekends?
9        MS. SMITH:  Objection.  You can answer.
10   A.  Could you repeat the question?
11   Q.  Yes.  When you worked for the previous owners,
12   did any employees in housekeeping work only on
13   weekends?
14   A.  I don't know about that.
15       MS. SMITH:  Same objection.
16   Q.  Did Ms. Payne or Mr. Patel ever tell you that
17   any guest had filled out a comment card that
18   criticized your work performance?
19   A.  No.
20   Q.  Did Marisol Gomez work for the previous
21   owners --
22       MS. SMITH:  Objection.
23   Q.  -- if you know?
24   A.  I don't know.

15 (Pages 54 to 57)

EEOC                                    v.                      Nabstar, LLC, d/b/a Sleep Inn
Islyn Azasse Palmer              C.A. # 05-cv-0375 (GMS)                  March 17, 2006

Page 58

1  Q.  To your knowledge, did any of the employees who
2  worked for the previous owners not continue to work
3  with the new owners?
4        MS. SMITH:  Objection.
5  Q.  You can answer.
6  **A.  I don't know.**
7  Q.  Do you know how many employees the new owners
8  employed on the day that you first worked for the new
9  owners?
10       MS. SMITH:  Objection.  You can answer.
11  **A.  No.**
12  Q.  Do you know how many employees the new owners
13  employed at the hotel when you learned that you were
14  discharged?
15       MS. SMITH:  Same objection.  You can
16  answer.
17  **A.  No.**
18  Q.  Do you know whether the new owners ever had
19  more than 20 employees working at the hotel when you
20  appeared for work on August 9th or August 16th or
21  August 17th?
22       MS. SMITH:  Objection.  You can answer.
23  **A.  No.**
24  Q.  Did Mr. Patel or Ms. Payne ever ask you to work

Page 59

1  full time at the hotel?
2  **A.  No.**
3  Q.  Did you ever offer to work full time at the
4  hotel?
5  **A.  No.**
6  Q.  You mentioned punch time cards earlier in your
7  deposition, ma'am, today.  I think you said you went
8  to look for your cards when you showed up on the 9th?
9  **A.  Yes.**
10  Q.  And you didn't see one of your cards there,
11  correct?
12  **A.  Yes.**
13  Q.  Where were those cards typically kept by the
14  previous owners?
15  **A.  In the laundry room.**
16  Q.  For the previous owners, how was it determined
17  how much time you actually put in?  For example, did
18  you have to punch a clock with the time card?
19  **A.  I didn't punch any cards.  I didn't get any to
20  punch.**
21  Q.  No.  For the previous owners?
22  **A.  That's what I'm saying.  I did not get a card
23  from them.**
24  Q.  The cards that you went to look for in the

Page 60

1  laundry room, what kind of cards were they, then?
2  **A.  They are like from -- it's about like -- say
3  about three inches.  It's about seven, eight inches.**
4  Q.  What's on that card?
5  **A.  The name of the person is on the card and the
6  time and the date you work.**
7  Q.  Did you have to fill that card out when you
8  worked for the previous owners?
9  **A.  I did not get a card.**
10  Q.  Did other workers get a card from the previous
11  owners?
12  **A.  Well, I don't know because I didn't check that.**
13       MS. SMITH:  Objection.  But you already
14  answered.
15  Q.  Why was it that you went to the laundry room to
16  look for cards when you showed up for work with the
17  new owners?
18  **A.  Because that's the rule of the previous owner.**
19  Q.  It was a rule of the previous owner?
20  **A.  Yes.**
21  Q.  But if you didn't get any cards from the
22  previous owner, why would you know to go in the
23  laundry room to look for cards?
24  **A.  Did you say previous owner or the new owner?**

Page 61

1  Q.  Previous owner.  You testified that you didn't
2  receive any cards that were kept in the laundry room
3  from the previous owner?
4  **A.  From the new owner.**
5  Q.  From the new owner?
6  **A.  Yes.**
7  Q.  How about the previous owner?
8  **A.  Yes.**
9  Q.  You did get a card?
10  **A.  Yes.**
11  Q.  Okay.  When you were paid by the previous
12  owners, were you issued a paycheck?
13  **A.  Can you repeat?**
14  Q.  When you were paid by the previous owners, were
15  you issued a paycheck?
16  **A.  Yes.  I got a check.**
17  Q.  And did the check have the words "Sleep Inn" on
18  it?
19  **A.  I don't remember.**
20  Q.  Did the check have the name of Ms. Yang or
21  Mr. Chen on it?
22  **A.  I don't think so.  I don't remember seeing
23  written on that check.  It was just a check.**
24  Q.  The checks that you received from the

16 (Pages 58 to 61)

Page 62

1  previous -- in conjunction with your employment by the
2  previous owners, did you deposit them in a bank
3  account or did you simply cash them?
4  **A.  In a bank account.**
5  Q.  Did you report the income on tax returns to the
6  State of Delaware and the federal government that you
7  received from the previous owners?
8  **A.  Yes.**
9  Q.  Ma'am, when you worked for the previous owners,
10  did you know a woman named Lorenza?
11  **A.  Would you repeat?**
12  Q.  When you worked for the previous owners,
13  Ms. Yang, did you know a lady named Lorenza?
14  **A.  I don't remember everybody name.**
15  Q.  That wasn't my question.  Did you know a woman
16  by the name of Lorenza?
17  **A.  I don't remember that name.**
18  Q.  Did you remember a woman named Isabel?
19  **A.  I don't know everybody name that works there,**
20  **sir.**
21  Q.  So you don't remember a woman named Isabel?
22  **A.  I'm not familiar with most of the names.**
23  Q.  I understand that, ma'am, I'm just asking you
24  whether some of these names you are familiar with?

Page 63

1  **A.  Yes.**
2  Q.  Do you remember a woman named Isabel from the
3  old previous owners?
4  **A.  No.**
5  Q.  How about a woman named Marisol?
6  **A.  No.**
7  Q.  How about a woman named Laura or Edith?
8  **A.  I remember Laura.**
9  Q.  What was Laura's job?
10  **A.  I think she did the rooms.**
11  Q.  How about Edith?
12  **A.  I don't remember that name.**
13  Q.  Do you know a person named Secorro or Secarro.
14  **A.  Sir, I'm not familiar with everybody name.**
15  Q.  When you appeared for work on August 9th, did
16  you raise your voice in the lobby or become outwardly
17  upset with anyone?
18  **A.  No.**
19  Q.  Did you yell at anybody?
20  **A.  No.**
21  Q.  In the complaint that was filed against my
22  client by the Equal Opportunity Commission, it says
23  that since at least January of 2003, defendant
24  employer has engaged in that unlawful employment

Page 64

1  practices at its hotel basically.  Do you know why it
2  says since at least January of 2003?
3  MS. SMITH:  Objection.  You can answer.
4  **A.  I don't know.  I never heard that complaint.  I**
5  **never heard that before.**
6  Q.  Did you review the complaint that was filed
7  against the hotel in this case by the EEOC?
8  **A.  Not all of them.**
9  MR. CONNORS:  That's all the questions I
10  have.
11  MS. SMITH:  I just have a few.
12  EXAMINATION
13  BY MS. SMITH:
14  Q.  Ms. Palmer, you had testified earlier that you
15  worked at 200 White Chapel Drive or 2000 White Chapel
16  Drive back at the same time that you were working for
17  Sleep Inn, is that correct?
18  **A.  Yes.  The part time.**
19  Q.  Part time.  And you mentioned that you had been
20  terminated from that employment, is that correct?
21  **A.  Yes.**
22  Q.  Were you the only person terminated?
23  **A.  No.**
24  Q.  Were there other employees also terminated?

Page 65

1  **A.  All the staff.**
2  Q.  When you applied to Sleep Inn -- I show you
3  Palmer 2 -- when you filled this application out on
4  August 9 of 2003, did you also supply them with this
5  document, which we'll have marked as Palmer 3?
6  (Palmer Deposition Exhibit 3 was marked
7  for identification.)
8  **A.  If it has my initials --**
9  Q.  I'm sorry.  Let me back up.  Is this your
10  signature --
11  **A.  Yes.**
12  Q.  -- at the bottom -- let me finish the question
13  for the record?
14  **A.  Sorry.**
15  Q.  That's okay.
16  Is this your signature at the bottom left?
17  **A.  Yes.**
18  Q.  And what date is this -- there is a date stated
19  on the bottom right?
20  **A.  Yes.**
21  Q.  And what is that date?
22  **A.  8/9/03.**
23  Q.  What is the title of the form or the document?
24  **A.  Form W 4203.**

17 (Pages 62 to 65)

EEOC                              v.                 Nabstar, LLC, d/b/a Sleep Inn
Islyn Azasse Palmer        C.A. # 05-cv-0375 (GMS)              March 17, 2006

Page 66

1   Q.  2003 or --
2   A.  2003.
3   Q.  Do you recall submitting this document with
4   your application or the document marked Palmer 2?
5   A.  I think in -- I don't know about this.
6   Q.  But did you testify just now that it was dated
7   August 9, 2003?
8   A.  Yes.
9   Q.  Did you have to give any type of documentation
10  regarding your identity like a Social Security card,
11  an identification card from the State of Delaware?
12  A.  I think I just wrote down my Social Security
13  number.
14  Q.  Did you ever supply them with an identification
15  card or social security card for your file?
16  A.  Do you mean the first owner or --
17  Q.  I mean the new owners when you filled out this
18  application on August 9, 2003?
19  A.  No.  But I know the number, and I could write
20  it down.
21      MS. SMITH:  So I'll mark this as Palmer 4.
22      (Palmer Deposition Exhibit 4 was marked
23  for identification.)
24

Page 67

1   BY MS. SMITH:
2   Q.  Mrs. Palmer, can you tell me what you see on
3   this page, the first item on Palmer 4?
4   A.  Here's supposed to look like a face but it's
5   copied.  I don't know.
6   Q.  What does this say at the top?
7   A.  Delaware identification card.
8   Q.  And is this your signature underneath of
9   what --
10  A.  Yes.  That is my signature.
11  Q.  Okay.  I'll finish the question.
12      Is this your signature under what appears
13  to be a blurred -- a black square?
14  A.  Yes.
15  Q.  And is this your name under ID number?
16  A.  Yes.
17  Q.  Do you recall ever supplying the old owners or
18  the previous owners with a Delaware identification
19  card for your employee file?
20  A.  I think so.
21  Q.  Does your identification card have your date of
22  birth?
23  A.  Yes.
24  Q.  What does it state?  Can you read that for the

Page 68

1   record, Mrs. Palmer?  If you see your date of birth,
2   can you read that for the record?
3   A.  5/06/1929.
4   Q.  What does it say above that date?
5   A.  Social Security.
6   Q.  No.  What does it say above that date, the word
7   directly above the date you just read to me?
8   A.  Birth date.
9   Q.  And did you earlier testify that Ms. Payne had
10  your employment file?
11  A.  Yes.
12      MS. SMITH:  Okay.  That is all I have.
13      (Deposition ended at approximately
14  11:10 a.m.)
15
16
17
18
19
20
21
22
23
24

Page 69

1           INDEX TO TESTIMONY
2
3   ISLYN AZASSE PALMER                    PAGE
4       Examination by Mr. Connors           2
5       Examination by Ms. Smith           64
6           -----
7           INDEX TO EXHIBITS
8
     PALMER DEPOSITION EXHIBIT NO.          PAGE
9
10  1 Receipt and Acknowledgement of Employee
        Handbook                           37
11  2 Employment Application               37
12  3 Form W-4 (2003)                      65
13  4 Copy of Delaware Identification Card and
        Social Security card               66
14
15
16
17
18
19
20
21
22
23
24

18 (Pages 66 to 69)

EEOC                                    v.                    Nabstar, LLC, d/b/a Sleep Inn
Islyn Azasse Palmer                C.A. # 05-cv-0375 (GMS)                      March 17, 2006

Page 70

State of Delaware )
                 )
New Castle County )

CERTIFICATE OF REPORTER

    I, Ann M. Calligan, Registered Merit
Reporter and Notary Public, do hereby certify that
there came before me on the 17th day of March, 2006,
the deponent herein, ISLYN AZASSE PALMER, who was duly
sworn by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed into
typewriting under my direction.
    I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.
    I further certify that reading and signing of
the deposition were waived by the deponent and
counsel.
    I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


            Ann M. Calligan, RMR
            (Certification No. 186-RPR)
            (Expires January 31, 2008)


DATED:  March 24, 2006

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Exhibit

"G"

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EQUAL EMPLOYMENT OPPORTUNITY          )
COMMISSION,                           )
                                      )
          Plaintiff,                  )
                                      )
v.                                    )    Civil Action No.
                                      )    05-cv-0375 (GMS)
NABSTAR, LLC, d/b/a SLEEP INN,        )
                                      )
          Defendant.                  )


          Deposition of LYNN HOPKINS taken pursuant
to notice at the offices of The United States
Attorney, 1007 Orange Street, 7th Floor, Wilmington,
Delaware, beginning at 1:45 p.m. on Tuesday, April 11,
2006, before Ann M. Calligan, Registered Merit
Reporter and Notary Public by telephone.

APPEARANCES:
          RACHEL M. SMITH, Esquire
          EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
          PHILADELPHIA DISTRICT OFFICE
            21 South 5th Street - Suite 400
              Philadelphia, Pennsylvania  19106
            on behalf of the Plaintiff,

          KEVIN J. CONNORS, Esquire
          MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
            1220 North Market Street - Fifth Floor
            P.O. Box 130
            Wilmington, Delaware  19899-0130
            on behalf of the Defendant.

                WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477

EEOC                                    v.              Nabstar, LLC, d/b/a Sleep Inn
Lynn Hopkins              C.A. # 05-CV-0375 (GMS)                 April 11, 2006

Page 2

1         LYNN HOPKINS,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5         EXAMINATION
6  BY MS. SMITH:
7    Q.   Ms. Hopkins, my name is Rachel Smith, and I'm a
8  trial attorney with the U.S. Equal Employment
9  Opportunity Commission. I'm here to today to ask you
10 a series of questions relating to your employment
11 with -- your association with Sleep Inn hotel in
12 Newark, Delaware. This is involving a lawsuit that
13 the EEOC has filed against Nabstar LLC on behalf of
14 Islyn Palmer.
15       For the record, could you state your full
16 name and address?
17   **A.  Lynn Ann Hopkins, 211 South Avon Drive,**
18 **Claymont, Delaware, 19703.**
19   Q.   And Ms. Hopkins, are you represented by counsel
20 today?
21   **A.  No.**
22   Q.   Have you ever been deposed before?
23   **A.  Yes.**
24   Q.   How many times have you been deposed before?

Page 3

1   **A.  Twice.**
2   Q.   What types of lawsuits were they?
3   **A.  Discrimination case filed at Hotel DuPont.**
4   Q.   Were you the filer?
5   **A.  Witness.**
6   Q.   And do you know what type of discrimination
7  cases they were?
8   **A.  One was a person felt she was discriminated**
9  **against. It was a female. And the other one, sort of**
10 **sexual discrimination from one employee to the other.**
11  Q.   Do you know the outcomes of the lawsuits?
12  **A.  Only one.**
13  Q.   And what do you recall that outcome to be?
14  **A.  It was in the favor of the hotel.**
15  Q.   Do you recall when this was?
16  **A.  Deposition was back in the nineties, early**
17 **nineties. I don't remember exactly when.**
18  Q.   Okay. Just to refresh your memory about
19 depositions, you're under oath and your testimony is
20 being recorded under the same penalty of perjury as if
21 you were in a court of law. Do you understand that?
22  **A.  Yes.**
23  Q.   The court reporter can only take down one
24 person at time, and especially due to our special

Page 4

1  circumstances today, let's allow me to fully finish my
2  question even if you anticipate what I'm going to ask
3  you, you know the answer. For the record, it's best
4  to let me fully get out my question and then you can
5  answer.
6        If you do answer my question, I will
7  assume you understand it. However, if you do not
8  understand my question, ask me to repeat it and let me
9  rephrase the question, help you better understand it.
10       If Mr. Connors who is defense counsel for
11 Nabstar makes an objection to any of my questions,
12 please allow him to fully make his objection before
13 you answer. We will most likely be able to resolve it
14 and you will be able to answer the question anyway.
15       Are you under any medications or under the
16 influence of any drugs or alcohol that would impede
17 your ability to testify truthfully today?
18   **A.  No.**
19   Q.   Did you understand the instructions as I have
20 explained them to you so far?
21   **A.  Yes.**
22   Q.   Have you looked at any documents in advance of
23 your testimony today?
24   **A.  No.**

Page 5

1   Q.   Ms. Hopkins, what is your current employment?
2   **A.  I am regional director of operations for SSN**
3  **Hotel Management.**
4   Q.   And where is it located?
5   **A.  Our main office is out of the Howard Johnson's,**
6  **1119 South College Avenue in Newark, Delaware.**
7   Q.   And do you work for the Howard Johnson hotel?
8   **A.  For that particular Howard Johnson, yes.**
9  **That's a franchise of that hotel, one of them.**
10  Q.   How long have you been a regional director of
11 operations for SSN management?
12  **A.  Year and a half.**
13  Q.   And prior to becoming regional director of
14 operations, what was your appointment?
15  **A.  I was general manager of the Howard Johnson.**
16  Q.   Between the general manager and regional
17 director, do you consider that to be a promotion?
18  **A.  Yes.**
19  Q.   How long were you general manager of Howard
20 Johnson's?
21  **A.  About 11 months.**
22  Q.   Prior to becoming general manager of Howard
23 Johnson, what was your employment?
24  **A.  I was general manager of the Sleep Inn in**

2 (Pages 2 to 5)

EEOC                                v.                Nabstar, LLC, d/b/a Sleep Inn
Lynn Hopkins              C.A. # 05-CV-0375 (GMS)                    April 11, 2006

Page 6

1  **Newark, Delaware.**
2  Q.   How long were you general manager of the Sleep
3  Inn?
4  **A.   A little over two years.**
5  Q.   Do you recall what year you began serving as
6  general manager?
7  **A.   2001.**
8  Q.   Prior to being general manager at Sleep Inn,
9  what was your employment?
10 **A.   I was assistant general manager of the**
11 **Brandywine Suites in Wilmington.**
12 Q.   Ms. Hopkins, are you college educated?
13 **A.   Yes.**
14 Q.   What year did you graduate?
15 **A.   My main degree was 1990.**
16 Q.   What did you receive your degree in?
17 **A.   I received my degree in hotel and restaurant**
18 **management.**
19 Q.   And did you go on to receive any more degrees
20 after 1993?
21 **A.   Yes, I received my master's in human resource**
22 **management in '92.**
23 Q.   And where did you receive your bachelor's and
24 master's, from the same institution?

Page 7

1  **A.   Yes.**
2  Q.   Where was this?
3  **A.   Widener University.**
4  Q.   Let's go back to 2001 when you were general
5  manager at Sleep Inn.  What were your duties and
6  responsibilities as general manager of Sleep Inn?
7  **A.   I was responsible for training, overseeing the**
8  **front desk, housekeeping, in charge of sales,**
9  **marketing.**
10 Q.   When you say training, what were you in charge
11 of training, or who were you in charge of training?
12 **A.   New employees as they came in, training them on**
13 **the computer system, and kind of general procedure of**
14 **housekeeping.**
15 Q.   Did you train housekeeping employees on the
16 computer system?
17 **A.   No.**
18 Q.   The new employees that you trained on the
19 computer system, were they front desk personnel?
20 **A.   Yes.  Front desk.**
21 Q.   Were you in charge of hiring and firing as
22 well?
23 **A.   Yes.**
24 Q.   Did you have any supervisors over you when you

Page 8

1  were general manager?
2  **A.   Alice Yang who represented the owners.**
3  Q.   And who were the owners at that time?
4  **A.   Five-T Enterprises.**
5  Q.   Was she your only manager?
6  **A.   Yes.**
7  Q.   Did you have any assistant managers working
8  under you?
9  **A.   Yes.**
10 Q.   And do you recall who they were?
11 **A.   Stephen Chen.  Chen was the last name.  And his**
12 **wife Mei.**
13 Q.   Did you have any responsibilities with
14 scheduling for any of the departments?
15 **A.   Front desk.**
16 Q.   You said you were only in charge of scheduling
17 front desk workers, correct?
18 **A.   Yes.**
19 Q.   Do you recall how many departments there were
20 at Sleep Inn at the time, 2001?
21 **A.   Basically two.  Front desk and housekeeping.**
22 Q.   And were the housekeeping staff also in charge
23 of providing services to the breakfast area?
24 **A.   Yes.**

Page 9

1  Q.   Was there a breakfast area?
2  **A.   Yes.**
3  Q.   Between 2001 and 2003, did your duties and
4  responsibilities as general manager ever change, and
5  if so how?
6  **A.   No.  Remained the same.**
7  Q.   Do you recall how many employees including all
8  of housekeeping, all management, and all of the front
9  desk were employed between 2000 and 2003?
10 **A.   Approximately 20.**
11 Q.   Out of those 20 employees, do you know if any
12 of those employees worked on a part-time schedule?
13 **A.   Yes.**
14 Q.   Do you recall who they were?
15 **A.   Not everyone.  Probably part-time breakfast**
16 **person, two part-time front desk clerks, and there was**
17 **some in housekeeping, but I don't remember how many.**
18 Q.   Do you recall on average, of those individuals,
19 how many in total you had on a part-time schedule?
20 **A.   Five, six, depending on the season.**
21 Q.   So if you had a busier season, there would be
22 less part-time employees?
23 **A.   No.  More part-time employees.**
24 Q.   More part-time employees, okay.

3 (Pages 6 to 9)

EEOC                                    v.                    Nabstar, LLC, d/b/a Sleep Inn
Lynn Hopkins                    C.A. # 05-CV-0375 (GMS)                    April 11, 2006

Page 10

1        Did you ever have any problems with
2    employees working on part-time shifts?
3    **A.  No.**
4    Q.  When did you leave Sleep Inn?
5    **A.  August 2003.**
6    Q.  And why did you leave your employment at Sleep
7    Inn in August of 2003?
8    **A.  Five-T Enterprises had sold the hotel to a new**
9    **owner.  They brought in their own general manager.**
10   Q.  And did you know of the sale prior to August
11   2003?
12   **A.  Yes.  About a week or two weeks possibly.**
13   Q.  So mid to late July?
14   **A.  Yes.**
15   Q.  And who made you aware of the sale?
16   **A.  Alice Yang.**
17   Q.  Do you recall what Ms. Yang told you so far as
18   the sale was concerned?
19   **A.  That her and the partners that she worked with**
20   **in Five-T Enterprises had decided to sell.  The hotel**
21   **was doing well, would be a good time to sell the**
22   **property, and everything would take place in August,**
23   **and as far as she knew, everyone was staying.  They**
24   **were not replacing anyone but perhaps me because that**

Page 11

1    **was up in the air.**
2    Q.  After your conversation with Ms. Yang sometime
3    in mid to late July, did you have any involvement with
4    whatsoever with the transition and/or sale of the
5    property, of the Sleep Inn?
6    **A.  I transferred information, cashed things out**
7    **during the --**
8    Q.  Could you repeat, transferred information?
9    **A.  Transferred files and the actual cash we had at**
10   **the front desk, things of that nature over to the**
11   **owner when they officially signed the papers.**
12   Q.  So do you recall the dates that that occurred?
13   **A.  August 1st I believe.**
14   Q.  And when you say transferred information and
15   files, did you transfer employee files?
16   **A.  Yes.**
17   Q.  And do you recall what other information that
18   you transferred to the new owners after they took
19   ownership of the property?
20   **A.  Figures, sales information, accounts that we**
21   **worked with, clients, training manuals, anything that**
22   **was needed for day-to-day operations.**
23   Q.  Prior to their acquisition of the property in
24   August of 2004, did the new owners attempt to contact

Page 12

1    you regarding employees who worked there?
2    **A.  Not about other employees, no.**
3    Q.  Do you have any knowledge as to whether they
4    attempted to contact Mrs. Yang or Mr. Chen regarding
5    existing employees?
6    **A.  No.**
7    Q.  Do you know, was there ever an orientation held
8    for the existing employees prior to the new owners
9    taking over the property?
10   **A.  There was a meeting held by Jay and Bob Patel,**
11   **meeting those employees.  That was prior to the**
12   **take-over by a couple of days.**
13   Q.  Were you present?
14   **A.  Yes.**
15   Q.  You said it was a couple days before the
16   sale --
17   **A.  Yes.**
18   Q.  -- was final, and where was this meeting held?
19   **A.  In the breakfast area of the Sleep Inn.**
20   Q.  Were any employees present, any existing
21   employees at the time present as well?
22   **A.  We invited all employees to attend.**
23   Q.  When you say we, do you mean yourself?
24   **A.  Alice Yang and myself.**

Page 13

1    Q.  How did you go about inviting all the
2    employees?
3    **A.  Normally word of mouth.  We might have posted**
4    **something by the time cards.  I'm not sure.**
5    Q.  Do you know if all the employees, in fact, were
6    notified about the orientation?
7    **A.  Yes.**
8    Q.  Are you aware if all of the part-time employees
9    were aware of the orientation?
10   **A.  Yes.**
11   Q.  How are you sure of that?
12   **A.  Well, we made sure that we personally talked to**
13   **everyone, either Alice, myself, or Stephen and Mei.**
14   Q.  And did you arrange the orientation meeting?
15   **A.  Alice Yang and Mei-Chen.**
16   Q.  Do you recall an employee by the name of Islyn
17   Palmer?
18   **A.  Yes.**
19   Q.  And do you recall what her role was, or how do
20   you know Islyn Palmer?
21   **A.  She was part-time breakfast attendant at the**
22   **Sleep Inn.**
23   Q.  Do you recall speaking to Ms. Palmer personally
24   about the orientation meeting.

4 (Pages 10 to 13)

EEOC                                    v.                Nabstar, LLC, d/b/a Sleep Inn
Lynn Hopkins                    C.A. # 05-CV-0375 (GMS)              April 11, 2006

Page 14

1   A.  Yes.
2   Q.  What was discussed at the orientation meeting?
3   A.  Jay Patel was speaking, talked about his goals
4   for the motel, and assured everyone that he was
5   keeping them on board for an orientation period.  I
6   believe it was for two to four weeks, but I'm not 100
7   percent sure.  And he answered any questions that were
8   asked by the staff.
9   Q.  Going back for one second to Ms. Palmer, do you
10  recall if Ms. Palmer was present at the orientation
11  meeting?
12  A.  No, I don't.
13  Q.  And you just stated that Mr. Patel spoke about
14  the goals for the hotel and said there was an
15  orientation period.  What did he mean by that?
16  A.  I took that to mean that he was keeping the
17  employees but he will be evaluating their performance
18  and decide from there who was staying and who wasn't.
19  Q.  Do you know if Mr. Patel asked for a show of
20  hands as to who wanted to stay, who wanted to leave
21  the hotel?
22  A.  I don't remember.
23  Q.  As general manager at the time, did you have a
24  thorough knowledge of who was employed by Sleep Inn

Page 15

1   between or at the time of the sale?
2   A.  I'm not sure I understand.
3   Q.  Did you know each person that worked under you
4   as a general manager, do you know who everyone was?
5   A.  Yes.
6   Q.  Had you personally met each employee at any
7   given time throughout your tenure as general manager?
8   A.  Yes.
9   Q.  Were you familiar with the employee files what
10  was inside of each employee file?
11  A.  Yes.
12  Q.  Where were the employee files kept when you
13  were general manager?
14  A.  In the front office, general manager's office.
15  Q.  You said you sent the files to the new owners.
16  Do you remember who you actually gave the files to?
17  A.  Joan Payne was there.  I showed her where
18  everything was.
19  Q.  Just to be specific, did you show Joan Payne
20  where all the employee files were?
21  A.  I showed her what was in the filing cabinets.
22  We didn't go through individual files.  I showed her
23  the general location.
24  Q.  For personnel files?

Page 16

1   A.  Yes.
2   Q.  Do you know if Ms. Palmer's personnel file was
3   included with the employee files that you showed
4   Ms. Payne the location of?
5   A.  It should have been, yes.
6   Q.  Did you give any other information to Joan
7   Payne at the time of the sale?
8   A.  Reviewed keys with her.  We counted out the
9   cash drawer, guests.  I don't remember anything else
10  at that time specifically.
11  Q.  Did you show Ms. Payne where the time cards
12  were kept?
13  A.  I don't remember.
14  Q.  Let me back up.  Were there time cards?
15  A.  Yes.
16  Q.  And when you were general manager, do you
17  remember where they were kept?
18  A.  After the time period was over, they were kept
19  in a box either in my office or upstairs in the
20  storage room because -- to be stored.  And active time
21  cards were in the laundry room where the time clock
22  was.
23  Q.  When you were general manager, did you have the
24  opportunity to hire any new employees?

Page 17

1   A.  Yes.
2   Q.  How did you go about hiring new employees?
3   A.  Generally people come in quite often.  They are
4   told to fill out applications.  We keep it in a file
5   for about a year.  We review them for what we were
6   looking for.
7   Q.  Did you ever interview candidates for
8   employees?
9   A.  Yes.
10  Q.  What type of questions would you ask potential
11  candidates before you hired them?
12  A.  Their experience, if they were able to work all
13  shifts or limited shifts.  I ask them to give me
14  examples, if they had to work at a hotel, good day,
15  bad day.  We talked about procedures.
16  Q.  When you did hire an employee, did you request
17  that they give you copies of their Social Security
18  card and driver's license --
19  A.  Yes.
20  Q.  -- or state identification card?
21  A.  Yes.
22  Q.  Do you know if the employee files that you had
23  had that information for persons you maybe didn't
24  hire?

5 (Pages 14 to 17)

EEOC                                        v.                          Nabstar, LLC, d/b/a Sleep Inn
Lynn Hopkins              C.A. # 05-CV-0375 (GMS)                            April 11, 2006

Page 18

1    A.  I believe they did not.  100 percent sure.
2    Q.  Do you know if an individual's date of birth is
3    on one's driver's license or state identification
4    card?
5    A.  On the driver's license, yes.
6    Q.  So, as a manager, if you wanted to look to see
7    how old an employee was, could you refer to a driver's
8    license and find out that information?
9    A.  Yes.
10   Q.  And again, you said that, when you would hire
11   someone, you would ask for a copy of that driver's
12   license or ID card, correct?
13   A.  Correct.
14   Q.  Do you have any personal knowledge as to
15   whether the files that you left in the possession of
16   the new owners were moved or destroyed?
17   A.  No.
18   Q.  When you were general manager, was there a
19   procedure for taking customer complaints?
20   A.  Yes.  The initial person who would see the
21   guests, take down the information, then transfer to me
22   as the general manager, and I would follow up as
23   needed.
24   Q.  Now, when you got word of a customer complaint,

Page 19

1    and it was verbal, do you know if the person who took
2    in the complaint, if they would make a log of that, a
3    written log?
4    A.  Yes.  We had a logbook at the desk while I was
5    there to log in every complaint, good or bad, from the
6    guests.
7    Q.  Now, during the transition, did you make
8    Ms. Payne or any other of the new owners aware of the
9    guest logbook for complaints?
10   A.  I pointed it out, yes.
11   Q.  So is your testimony that, when you were
12   general manager any complaints, written or verbal,
13   would be reported somehow, is that correct?
14   A.  Correct.
15   Q.  And what action would you take when you
16   received a customer complaint regarding an employee?
17   A.  Well, with regards to the guest, if there was a
18   refund or whatever to satisfy the guest.  The
19   employee, we would look at the situation, make any
20   corrections that was needed, and if severe enough, we
21   would usually write up the employee.
22   Q.  Did you ever have instances where you had to
23   fire an employee?
24   A.  Not at the Sleep Inn.

Page 20

1    Q.  If an employee was no longer able to work a
2    part-time schedule, would that be reason for you to
3    terminate that employee's employment?
4    A.  Well, if they weren't able to work, I would
5    assume that they would resign.
6    Q.  Maybe I can ask it a different way also.  If
7    you needed an employee to change their schedule but
8    they needed to keep their original schedule; they were
9    still able to work just not a requested schedule, was
10   their inability to work a requested schedule reason
11   for termination?
12   A.  They would not result in termination, but it
13   would result in a decrease in work schedule hours.
14       MS. SMITH:  I have a document that I want
15   to mark.
16       (Discussion off the record.)
17       MS. SMITH:  I'm going to mark Hopkins 1.
18       (Hopkins Deposition Exhibit 1 was marked
19   by counsel for identification.)
20   BY MS. SMITH:
21   Q.  If you can take a second to look at that, I'll
22   draw your attention to page 14.
23   A.  Okay.
24   Q.  Have you had an opportunity to peruse page 14

Page 21

1    of Hopkins 1?
2    A.  Yes.
3    Q.  The first set of bullet points, the longer
4    list?
5    A.  Yes.
6    Q.  The last bullet point where it reads,
7    "Insubordination"?
8    A.  Yes.
9    Q.  Can you read that phrase and then I can ask
10   you --
11   A.  Insubordination:  The failure to carry out
12   position responsibilities, reasonable work requested
13   by management despite warnings.
14   Q.  If an employee -- again, same question but with
15   applying this -- well, first of all, have you ever
16   seen this document, Hopkins 1?
17   A.  I believe so.  It looks like something we
18   created while I was there.  I don't know whether there
19   were any changes or not.  I don't remember word for
20   word.
21   Q.  And is this the employee handbook --
22   A.  Yes.
23   Q.  -- for workers at Sleep Inn?
24   A.  Correct.

Wilcox & Fetzer, Ltd.            Professional Court Reporters            (302)655-0477

EEOC                                          v.                    Nabstar, LLC, d/b/a Sleep Inn
Lynn Hopkins                        C.A. # 05-CV-0375 (GMS)                        April 11, 2006

Page 22

1   Q.  And when you say we created, were you part of
2   the drafting of this document?
3   **A.  Yes.**
4   Q.  And did you help draft what appears to be on
5   page 14?  It says, "Code of conduct."
6   **A.  I believe so.  I don't know, though, that there**
7   **was changes since I left.  But I did have something**
8   **like this in place, yes.**
9   Q.  Again, drawing your attention to the last
10  bullet point where it says, "Insubordination," you've
11  already read it.  If an employee seems unable to work
12  a certain schedule, if you requested that she change a
13  schedule, would you consider that act to be
14  insubordination as a general manager?
15  **A.  Not if it caused undue hardship to the**
16  **employee.**
17  Q.  So if the employee is unable to work a certain
18  schedule, you would not consider that to be
19  insubordination and be cause -- if it did not cause
20  undue hardship to the management?
21  **A.  Correct.**
22  Q.  We are done with Hopkins 1.
23  **A.  Okay.**
24  Q.  Earlier you said that you recalled a woman

Page 23

1   named Islyn Palmer, that she was an employee that
2   worked under you?
3   **A.  At the Sleep Inn, yes.**
4   Q.  Do you recall what Mrs. Palmer's specific duty
5   was as an employee?
6   **A.  Yes.  She was part-time breakfast attendant.**
7   **She worked two mornings a week.**
8   Q.  And was this a problematic schedule for the
9   management?
10  **A.  No.**
11  Q.  At any time did it ever become problematic?
12  **A.  No.**
13      MR. CONNORS:  We are referring to
14  management as you suggested before my client took
15  over?
16      MS. SMITH:  Exactly.  As it existed while
17  Ms. Hopkins was general manager.
18      MR. CONNORS:  Okay.
19  BY MS. SMITH:
20  Q.  Do you recall what her duties and
21  responsibilities were as a part-time breakfast
22  attendant?
23  **A.  Yes.  She would come in before breakfast**
24  **started, make the coffee, bring out the food that was**

Page 24

1   **involved, clean the table, restock.  Breakfast was**
2   **over, put everything away and clean the breakfast**
3   **area.**
4   Q.  To the best of your knowledge, did you ever
5   observe Mrs. Palmer performing her breakfast attendant
6   duties?
7   **A.  Yes.**
8   Q.  Can you tell me what your impression was when
9   you saw Mrs. Palmer perform her duties?
10  **A.  Seemed to work very hard, and the guests**
11  **enjoyed speaking with her.**
12  Q.  How often would you see Mrs. Palmer, between
13  2001 and 2003, how often would you see her perform her
14  duties?
15  **A.  Three times a month.**
16  Q.  And did she ever perform any other duties
17  besides those prescribed to her in her job
18  description?
19  **A.  Not that I recall.**
20  Q.  To the best of your knowledge of the staff
21  during the time that you were general manager, do you
22  know if Mrs. Palmer was the oldest and most senior
23  employee at Sleep Inn?
24  **A.  I believe that she was.**

Page 25

1   Q.  And what makes you believe that Mrs. Palmer was
2   the oldest and most senior employee?
3   **A.  Well, by age I know -- I don't know exactly**
4   **what her age is, but by appearance, she was the oldest**
5   **employee that we had.  Seniority-wise, she was there**
6   **before I started and there was very few employees that**
7   **were.**
8   Q.  Did you ever receive any guest complaints
9   against Mrs. Palmer during the time that you were the
10  general manager at Sleep Inn?
11  **A.  Not that I remember.**
12  Q.  Would there be an instance where there was a
13  complaint that a customer had against Mrs. Palmer that
14  you would not be made aware?
15  **A.  Possibly.  Unlikely.**
16  Q.  Do you know, were you Mrs. Palmer's immediate
17  supervisor?
18  **A.  No.**
19  Q.  Do you recall who was?
20  **A.  Stephen Chen.**
21  Q.  Would Mr. Chen have equal or better
22  understanding or recollection of what Mrs. Palmer's
23  duties and responsibilities were at the time you were
24  general manager at the Sleep Inn?

7 (Pages 22 to 25)

EEOC                                      v.                    Nabstar, LLC, d/b/a Sleep Inn
Lynn Hopkins              C.A. # 05-CV-0375 (GMS)                        April 11, 2006

Page 26

1    A. Yes.
2    Q. Did you ever request that Mrs. Palmer work a
3  full-time schedule?
4    A. No.
5    Q. Did you ever request that Mrs. Palmer work in
6  other departments besides doing breakfast work?
7    A. No.
8        MS. SMITH: I think that's all I have.
9        Yeah. That's all I have for right now.
10       MR. CONNORS: Okay.
11           EXAMINATION
12  BY MR. CONNORS:
13   Q. Ms. Hopkins, my name is Kevin Connors, and I
14  have some questions for you too.
15       Ms. Hopkins, did you have any previous
16  contact with Ms. Smith or anyone from her office about
17  this deposition?
18   A. Just one phone call asking me if I was Lynn
19  Hopkins who worked at the hotel and if I would be able
20  to do this.
21   Q. You mentioned earlier that your employees were
22  told about the new owners either verbally by you or by
23  Mr. and Mrs. Chen or Ms. Yang either verbally or you
24  thought someone may have posted a notice somewhere?

Page 27

1    A. Correct.
2    Q. If a notice had been posted, where would that
3  have been posted?
4    A. By the time clock in the laundry room.
5    Q. Do you remember yourself actually drafting a
6  notice and posting it there?
7    A. No.
8    Q. Do you remember, as you sit here today, ever
9  seeing one posted there?
10   A. No.
11   Q. What typically would be in an employee's
12  personnel file.
13   A. Their application, the I-9 form, copies of
14  identification, W-2 forms. Then I always kept any
15  notes from the employees when they were requesting
16  time off. That was always kept. Vacation requests.
17  And then if there's any time that they needed to write
18  them up for any reason, that went in the file.
19   Q. If a guest filled out a comment card -- I take
20  it that there were such comment cards?
21   A. Correct.
22   Q. When you were there, would those comment cards
23  be placed in the personnel file of the employee?
24   A. A copy would.

Page 28

1    Q. You testified that Jay Patel did most of the
2  speaking at the orientation meeting held before the
3  transfer of the hotel to the owners.
4    A. Yes.
5    Q. You also mentioned that there would be a period
6  of two to four weeks that he would keep the employees
7  on and review them during that time period.
8    A. Yes.
9    Q. Do you recall specifically what Jay Patel said
10  about that time period or probationary period, for
11  want of a better term?
12   A. The only thing that I do remember is that he
13  told the employees, as long as they continued doing
14  their work and everything was fine, that he had no
15  intentions of letting anyone go.
16   Q. Did he mention the requirement that any
17  transitioning employees would have to fill out a new
18  application?
19   A. I believe so, yes.
20   Q. The time cards, say, that were one year old at
21  the date of the sale settlement, would they be kept
22  upstairs or would they be thrown out?
23   A. My understanding, they were kept upstairs.
24  Alice Yang and Stephen Chen arranged everything in the

Page 29

1  office space upstairs before the sale.
2    Q. Were any employee personnel files kept
3  upstairs?
4    A. Not to my knowledge.
5    Q. Do you know whether Alice Yang or Mr. and
6  Mrs. Chen discarded any employee personnel files
7  before transfer to the new owners occurred?
8    A. Not to my knowledge.
9    Q. Do you know whether any time cards of existing
10  employees were destroyed prior to the transition?
11   A. Not to my knowledge.
12   Q. Earlier you testified as to what Mrs. Palmer's
13  duties were as breakfast attendant. Did her duties
14  include vacuuming the breakfast area?
15   A. I believe someone else did that for her.
16   Q. Do you know why that was?
17   A. It was something that was in place when I
18  started, and it just continued. When the entire lobby
19  was cleaned by vacuuming, the breakfast area was done
20  at that time.
21   Q. Was there a rest room close by the breakfast
22  area?
23   A. Yes.
24   Q. And whose job was it to clean that when

8 (Pages 26 to 29)

EEOC                                    v.                    Nabstar, LLC, d/b/a Sleep Inn
Lynn Hopkins              C.A. # 05-CV-0375 (GMS)                      April 11, 2006

Page 30

1   Mrs. Palmer was working as a breakfast attendant?
2   **A.  Generally I saw Stephen chen cleaning it.**
3   Q.  Did you ever see Mrs. Palmer clean it?
4   **A.  No.**
5   Q.  Did you ever see Mrs. Palmer working in the
6   laundry room or help out in the laundry when she was
7   working as a breakfast attendant?
8   **A.  Not that I recall, no.**
9   Q.  You said that you saw Mrs. Palmer three times a
10  month?
11  **A.  Yes.**
12  Q.  Would that be because your schedules coincided?
13  **A.  Yes.  She was mainly there on weekends.**
14  Q.  Did you yourself work during the week also?
15  **A.  Yes.**
16  Q.  You saw her three times a month.  It was always
17  on a Saturday or would it be on a Saturday and a
18  Sunday?
19  **A.  Perhaps both.  Generally, when I was there on**
20  **the weekend, it was our special event weekend and we**
21  **had everyone scheduled working.**
22  Q.  Was there ever times when another individual
23  was assigned to work as a breakfast attendant with
24  Mrs. Palmer at the same time?

Page 31

1   **A.  Probably, yes.  Busy weekends.**
2   Q.  The information that has been developed in this
3   case so far is that Mrs. Palmer would work, say,
4   Saturday and Sunday and actually just work Saturday
5   the next week.  That's how her schedule was.  Do you
6   recall that to be her schedule?
7   **A.  Something like that, yes.  Friday and Saturday**
8   **or Saturday and Sunday, yes.**
9   Q.  When Mrs. Palmer did not work both days of the
10  weekend, was there someone who took her place in the
11  breakfast area?
12  **A.  Generally one of the housekeepers or Mei Chen.**
13  Q.  Do you know why Mrs. Palmer did not work both
14  days of the weekend every weekend?
15  **A.  I heard, but nothing definite, no.**
16  Q.  Can you tell me what you did hear?
17  **A.  It was her church purposes.  She needed to**
18  **attend service.  And also her daughter drove her to**
19  **work so she had to be, have a ride.**
20  Q.  During your tenure at Sleep Inn, did
21  Mrs. Palmer ever leave Sleep Inn and work somewhere
22  else and then return?
23  **A.  Not that I recall, no.**
24  Q.  Do you know whether Mrs. Palmer worked another

Page 32

1   job elsewhere during your tenure at Sleep Inn?
2   **A.  Not that I know of.**
3   Q.  Was there someone first named Todd at the Sleep
4   Inn in a supervisory capacity?
5   **A.  Yes.  Assistant general -- assistant to me,**
6   **yes.**
7   Q.  What was Todd's last name?
8   **A.  Gerhardt.**
9   Q.  Do you know how to spell that?
10  **A.  G-e-r-h-a-r-d-t.**
11  Q.  Do you know whether he transitioned to the new
12  owners?
13  **A.  I believe no.**
14  Q.  Do you know where he went?
15  **A.  Right after the Sleep Inn he went to an**
16  **apartment complex and worked as an apartment manager.**
17  Q.  Do you know which apartment complex that was?
18  **A.  I think Abbey Green, Abbey Walk.  It had Abbey**
19  **in the title.  In Newark.**
20  Q.  In Newark?
21  **A.  Yes.**
22  Q.  Do you know where Todd Gerhardt works now?
23  **A.  He actually left my employment again and is**
24  **working in Wisconsin.**

Page 33

1   Q.  Do you know what city or town in Wisconsin?
2   **A.  No.**
3   Q.  When your employees were verbally notified
4   about the orientation meeting, were they told that it
5   was mandatory?
6   **A.  No.**
7   Q.  You may have been asked the question.  Do you
8   know whether Mrs. Palmer attended the orientation
9   meeting?
10  **A.  I don't remember.**
11  Q.  Ms. Hopkins, I'm going to show you two
12  documents.  One is headed "Housekeeping Schedule," and
13  it has the word "old" on it, which was marked at a
14  previous depositions, and another document which is
15  also headed "Housekeeping Schedule."  It has the word
16  "new" on it, which was also marked at previous
17  depositions as an exhibit.  I'm going to show both of
18  them to you.
19  **A.  Okay.**
20  Q.  Do you recognize the handwriting on either of
21  these documents, the old schedule or the new schedule?
22  **A.  The new schedule -- I'm sorry.  The correct --**
23  **the old schedule.**
24  Q.  That's the one you recognize?

9 (Pages 30 to 33)

EEOC                              v.              Nabstar, LLC, d/b/a Sleep Inn
Lynn Hopkins          C.A. # 05-CV-0375 (GMS)                  April 11, 2006

Page 34

1   A. Yes.
2   Q. Do you know whose handwriting that was?
3   A. Mine is over on the far column that says
4   breakfast and then breakfast and laundry.
5   Q. Okay.
6   A. Then the numbers are Stephen Chen.
7   Q. How about the days of the employee in the
8   left-hand numbers, whose writing is that, if you know?
9   A. Either I recognize it -- I assume it was
10  Stephen. Not 100 percent sure on that. The numbers I
11  am. And this is definitely mine there.
12  Q. Looking at the old schedule, was it Mr. Chen
13  who was responsible for scheduling the folks in the
14  left-hand column?
15  A. Yes.
16  Q. Why would you have your writing on this
17  schedule at all then?
18  A. To me, it looks like I was writing down who --
19  they were trying to explain to someone that this was
20  housekeeping, this was the breakfast, and this person
21  was breakfast and laundry.
22  Q. Do you know why you would have written those
23  designations down?
24  A. This appears to be the first part of August

Page 35

1   schedule. So it was -- I'm assuming it was when we
2   turned over the hotel. It was probably pointing out
3   which department the employees were working in, that
4   they weren't actually housekeepers, that they did
5   something else.
6   Q. Did you assist anyone at the new employers with
7   getting a schedule set up for August 1 and thereafter?
8   A. No. We had it scheduled ourselves already
9   through a two-week period and showed that and then
10  left it up to them.
11  Q. When you posted your work schedule for
12  housekeeping where was that schedule typically posted?
13  A. In the laundry room.
14  Q. Do you know whether the old schedule was left
15  posted at the laundry loom at the time of the
16  transition, formal transition?
17  A. No. I left once everything was turned over and
18  that was the last I saw of it.
19  Q. On the old schedule there is listed as an
20  individual doing breakfast and laundry, and woman by
21  the name of Lorenza. Do you know why she was listed
22  as doing breakfast and laundry when Islyn Palmer was
23  only doing breakfast?
24  A. Islyn only worked breakfast in those days,

Page 36

1   didn't work any other department. The other employee
2   did work laundry some days, breakfast other days, but
3   she was still actually more than one department.
4   Q. Did Lorenza work the breakfast area and assist
5   in the laundry area at the same time sometimes?
6   A. Possibly, yes.
7   Q. What duties would Lorenza have had at the
8   laundry?
9   A. As the dirty linens came to the laundry room,
10  she put them in the washers and dryers, fold them
11  afterwards, and have them ready to go back to the
12  shelf.
13  Q. How far away from the breakfast area is the
14  laundry room at the Sleep Inn?
15  A. About 50, 60 feet.
16  Q. I think I'm just about done. Bear with me.
17      Did Alice Yang, Stephen Chen, or Mei Chen
18  ever tell you that they had a problem with the way
19  Islyn Palmer worked, whether she was slow or didn't do
20  a good job cleaning, things like that?
21  A. No.
22      MR. CONNORS: Those are all the questions
23  I have for you.
24

Page 37

1             EXAMINATION
2   BY MS. SMITH:
3   Q. When you were general manager at Sleep Inn, was
4   Mrs. Palmer ever late to work?
5   A. Not that I remember.
6   Q. When you were general manager was Mrs. Palmer
7   ever written up for not calling in and not showing up
8   at all?
9   A. Not that I remember.
10  Q. Was Mrs. Palmer ever written up for anything,
11  any disciplinary issues when you were general manager?
12  A. Not that I remember.
13  Q. Is it possible that Mrs. Palmer could have
14  performed additional duties that you were not aware of
15  if you were not in the office on a particular day?
16  A. Yes.
17  Q. You testified earlier that occasionally there
18  would be other workers working with Mrs. Palmer in the
19  breakfast area. Were those times usually designated
20  for busy work ends, conferences?
21  A. Yes. Associated with the University of
22  Delaware.
23  Q. On non-busy weekends was Mrs. Palmer scheduled
24  to work the breakfast area alone?

10 (Pages 34 to 37)

EEOC                                    v.                    Nabstar, LLC, d/b/a Sleep Inn
Lynn Hopkins                  C.A. # 05-CV-0375 (GMS)                    April 11, 2006

Page 38

1   **A.  Yes.**
2           MS. SMITH:  I think that's all I have.
3           You can read and sign the transcript for
4   accuracy and make sure the court reporter took down
5   your testimony properly or you can waive that.  Or you
6   can ask that a transcript be sent to you to confirm
7   that everything is correct.
8           THE WITNESS:  I'll waive that.
9           (Deposition ended at approximately
10  2:50 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 39

1                   INDEX TO TESTIMONY
2
3   LYNN ANN HOPKINS                    PAGE
4       Examination by Ms. Smith          2
5       Examination by Mr. Connors       26
6       Examination by Ms. Smith         37
7
                          -----
8
                   INDEX TO EXHIBITS
9
10  HOPKINS DEPOSITION EXHIBIT NO.       PAGE
11  1...........................................20
                   (Retained by counsel)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 40

State of Delaware )
                  )
New Castle County )

CERTIFICATE OF REPORTER

        I, Ann M. Calligan, Registered Merit
Reporter and Notary Public, do hereby certify that
there came before me on the 11th day of April, 2006,
the deponent herein, LYNN ANN HOPKINS, who was duly
sworn by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed into
typewriting under my direction.
        I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.
        I further certify that reading and signing of
the deposition were waived by the deponent and
counsel.
        I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


                    Ann M. Calligan, RMR
                    (Certification No. 186-RPR)
                    (Expires January 31, 2008)


DATED:  April 19, 2006

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Exhibit

H

# EMPLOYEE HANDBOOK



DEPOSITION
EXHIBIT
Payne 3
PENGAD 800-631-6989

# SLEEP INN

630 South College Avenue
Newark, Delaware 19713
Tel 302.453.1700
Fax 302.453.1710

## CODE OF CONDUCT

As supervisors and managers, we have a responsibility to develop and administer work rules, practices, procedures and disciplinary measures in a fair and consistent manner. As employees, we have an obligation to conform to the rules, practices and procedures applicable to our job. Current rules, practices and procedures as well as other that may be established in the future, will be published in order to promote understanding of what is expected and to encourage consistent and fair action in the event of the need for discipline.

The following are examples of some but not all of the conduct which may result in the immediate termination of the employment relationship, without warning:

- Intoxication or use of drugs
- Refusal to work
- Possession of weapons or any device deemed aggressive or potentially harmful to anyone
- Theft or the removal of property belonging to a guest, another employee or the hotel
- Willful destruction of Company, guest or employee property
- Gross misconduct unbecoming an employee and detrimental to the image of the Company
- Conviction of a felony
- Falsifying any administrative document
- Failure to report to work for three consecutive days without notification
- Any act that endangers the safety or health of others
- Releasing confidential information without proper authority
- Fighting, hitting or similar disorderly conduct on property
- Removing, duplicating or transferring possession of a hotel key, without authorization
- Insubordination (the failure to carryout position responsibilities reasonable work requests of management, despite warnings)

Examples of conduct resulting in a first or second written warning, and the ultimate termination of the employment relationship:

- Gambling
- Careless, negligent or improper use of property
- Unauthorized or improper use of any type of leave
- Violation of, or failure to comply with, the company policies, practices or procedures

Example of offences resulting in first, an oral warning; second a written warning; and third, an immediate termination of the employment relationship:

- Uncivil conduct toward others
- Tardiness
- Failure to maintain satisfactory and harmonious working relationships with the public or other employees
- Failure to record start and stop times of work, where appropriate
- Foul and abusive language
- Inefficiency, incompetence or negligence in the performance of duties

Any employee whose work is not governed by the terms of a written contract is considered to be an "at will" employee. Employment of such workers may be terminated at any time at the discretion of either the employer or employee. Normally, the terminating party will give the other a minimum of two weeks notice.

**THE AFOREMENTIONED POLICIES ARE NOT INTENDED TO BE ALL-INCLUSIVE. *SLEEP-INN,* MAY ESTABLISH ADDITIONAL POLICIES DEEMED NECESSARY FOR THE ORDERLY AND EFFICIENT FULFILLMENT OF THE PROPERTY'S RESPONSIBILITIES.**


# GROOMING STANDARDS

**(NOTE: Management is expected to be in appropriate business attire during all hours on the property)**


Personal Appearance

- All employees must follow the dress code and are expected to dress conservatively.

- No extreme shirts, pants, or shoe styles should be worn anywhere in the property. Jeans, shorts, T-shirts, dungarees or similar items do not present a professional image and should not be worn

- Canvas shoes, sandals, thongs, platform shoes or moccasins are not allowed for safety reasons

- No combs or other large objects should be carried in the pockets so as not to be visible

Exhibit

"I"

# Receipt and Acknowledgement
# Of Employee Handbook

Please read the following statements, sign below and return this page to your manager.

## Understanding and Acknowledging Receipt of Sleep Inn Employee Handbook

I have received and read a copy of Sleep Inn Employee Handbook. I understand that the policies and benefits described in it are subject to change at sole discretion of Sleep Inn at any time.

## At Will Employment

I Further understand that my employment is at will, and neither Sleep Inn nor myself has entered into a contract regarding the duration of my employment. I am free to terminate my employment with Sleep Inn at any time, with or without reason. Likewise, Sleep Inn has the right to terminate my employment at any time, with or without reason, at their discretion. No employee of Sleep Inn can enter any agreement contrary to this policy without the written approval from the President of Sleep Inn.

## Confidential Information

I am aware that during the course of my employment confidential information will be made available to me, for instance, product designs, marketing strategies, customer lists, pricing policies and other related information. I understand that this information is proprietary and critical to the success of Sleep Inn and must not be given out or used outside Sleep Inn's premises or with Non-Sleep Inn employees. In case of termination of employment, whether voluntary or involuntary, I hereby agree not to utilize or exploit this information with any other individual or company.

_Islyn Palmer_
Employee Printed Name

_Kitchen Aid_
Position

_Islyn Palmer_
Employee Signature

_8 - 9 - 03_
Date

DEPOSITION
EXHIBIT
Payne 11

Exhibit

"J"

# Warning Notice

PLEASE PRINT

## EMPLOYEE DATA:

Employee: Palmer    Islyn
LAST          FIRST          MIDDLE

Shift: Breakfast

Employee No.:

## FIRST WARNING NOTICE:

| Date of warning: | Date of violation: | Time of violation: |
|---|---|---|
| 8 / 20 / 03 | 8 / 16 / 03 | : ☒ AM ☐ PM |

Action to be taken:
Verbal warning was given due to Ms. Palmer work ethics. After meeting Ms. Palmer was let go as to work performance and scheduling conflicts.

Additional remarks:

Employee's comments:

This is your **First Warning** for a company rules violation or unsatisfactory performance. Future violations may lead to immediate dismissal without further notice.

Employee Signature

Supervisor Signature

Personnel Manager Signature

### VIOLATION:

☐ Intoxication or drugs
☐ Clocking out ahead of time
☐ Clocking wrong time card
☒ Substandard work
☐ Wrongful conduct
☒ Carelessness
☐ Disobedience
☐ Tardiness
☐ Absenteeism
☐ Other:

## SECOND WARNING NOTICE:

| Date of warning: | Date of violation: | Time of violation: |
|---|---|---|
| / / | / / | : ☐ AM ☐ PM |

Action to be taken:

Additional remarks:

DEPOSITION
EXHIBIT
Payne 2
PENGAD 800-631-6989

Employee's comments:

This is your **Second Warning** for a company rules violation or unsatisfactory performance. Future violations may lead to immediate dismissal without further notice.

Supervisor Signature

### VIOLATION:

☐ Intoxication or drugs
☐ Clocking out ahead of time
☐ Clocking wrong time card
☐ Substandard work
☐ Wrongful conduct
☐ Carelessness
☐ Disobedience
☐ Tardiness
☐ Absenteeism
☐ Other:

Exhibit

"K"

NEWARK SLEEP INN



April 14, 2004

Mr. Alfred L. Harris
Enforcement Manager
U.S. Equal Employment
 Opportunity Commission
21 South 5th Street
Philadelphia, PA 19106

RE: EEOC Charge No. 17C-2004-00029

Dear Mr. Harris:

This letter is response to above mention case. New owners bought the Sleep Inn Hotel on
August 4, 2003. On July 30, 2003 there was employee orientation to introduce the new
owners and Ms. Palmer did not attend. The weekend following the takeover, Ms. Palmer
showed up to work to do our breakfast when the owners had already hire a full time
person for the breakfast. The owners were not aware of her employment by the previous
owners.

After speaking with her about her schedule she said she previously was working
Saturdays and Sundays and a Sunday the following week. This of course did not benefit
the schedule that the owners' needed for the breakfast. Due to her scheduling conflict she
was let go by the General Manager.

Should you have any questions or if I can be of more assistance please do not hesitate to
call me at (302) 453-1700.

Sincerely,

Joan Payne
General Manager

DEPOSITION
EXHIBIT
Payne 9
PENGAD 800-631-6989

630 S. COLLEGE AVENUE
NEWARK, DE 19713
PHONE 302-453-1700  FAX 302-453-1710
For reservations worldwide: 1-800-4CHOICE  choicehotels.com

0000000194

EEP INN                          FAX NO. :3024531710                    . 13 2004 12:12AM P2

SLEEP INN NEWARK



Dec. 10, 2004

BY CHOICE HOTELS

**_Via Facsimile and U.S. Mail_**
Ms. Evangeline Draper Hawthorne
US Equal Employment
21 South 5th Street, Suite 400
Philadelphia, PA 19106-2515

Dear Ms. Hawthorne:

RE: Charge Number 170-2004-00029
Palmer v. Sleep Inn/Choice Hotels International

This letter is in respondent to the charges listed in your letter dated December 1, 2004.
When management took over on Aug. 4, 2003, they did not have any idea which
employees would be staying or leaving or know who the employees were as they not
formally introduce.

Ms. Palmer showed up for breakfast duties on the weekend of Aug. 16th & 17th 2003. We
had already established a breakfast person since we were unaware of her employment.
When Ms. Palmer came in on her first weekend she was screaming because she had seen
someone already working the breakfast area. We let her work the weekend and on the
following week when she came in for her paycheck, I had a meeting with her to discuss
breakfast attendant duties.

We offer for her to continue working breakfast on weekends but she said that she could
only work Saturday & Sunday one weekend and just Saturday the following weekend.
Also our breakfast starts at 6 am, which she said she could not be in at 6am. With the
requests of Ms. Palmers' weekend schedule, we did not have a back up person for her in
case she called out. Ms. Palmer was also informed that part of the breakfast duties was
also cleaning the lobby area, public bathroom, vacuum, dust and cleaning windows and
doors. Ms. Palmer said was not able to do all that or to assist housekeeping in any
cleaning.

Ms. Palmer had several guest complaints after her first weekend of rudeness and not
keeping the breakfast area clean. Age was never an issue, as we did not know her age.
We embrace mature adults because of their work ethics.

630 S. COLLEGE AVENUE
NEWARK, DELAWARE 19713
PHONE 302.453.1700
FAX 302.453.1710
For reservations worldwide: 800.4CHOICE℠ choicehotels.com



DEPOSITION
EXHIBIT

Payne LD

0000000188

FROM :SLEEP INN                    FAX NO. :3024531710                    . 13 2004 12:13AM  P3

After that meeting she was let go due to insubordination. I have enclosed a copy of Receipt and Acknowledgement of Employee Handbook, which was signed by Ms. Palmer that mentions that Sleep Inn has the right to terminate employment at any time, with or without reason.

Should you have any questions or concerns please feel free to contact me at (302) 453-1700.

Sincerely,

Joan Payne
General Manager

Enc.